**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PROFESSIONAL SOLUTIONS INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. |
| LUTHERAN CHILD AND FAMILY SERVICES OF ILLINOIS, CAMP WARTBURG LUTHERAN RETREAT CENTER INCORPORATED, and JANE DOE, | ) ) ) ) ) | |
| Defendants. | ) ) | |

_____

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff, Professional Solutions Insurance Company ("PSIC"), by and through its counsel, submits this Complaint for Declaratory Judgment under U.S.C. §§ 2201 and 2202 against defendants Lutheran Child and Family Services of Illinois and Camp Wartburg Lutheran Retreat Center Incorporated.

### NATURE OF ACTION

1.      This is an action for declaratory judgment, brought pursuant to U.S.C. §§ 2201 and 2202, seeking a declaration that no coverage exists under an insurance policy issued by PSIC.

2.      Plaintiff seeks a declaration that it owes no obligation to defend or indemnify Lutheran Child and Family Services of Illinois ("Lutheran Services") or Camp Wartburg Lutheran Retreat Center Incorporated ("Camp Wartburg," and with Lutheran Services, "Defendants"), in connection with a lawsuit styled *Jane Doe v. Camp Wartburg and Lutheran*

*Child and Family Services of Illinois*, 22-LA-0687, pending in the Illinois Circuit Court, St. Clair County ("the Doe Lawsuit").

3. Defendants seek coverage from Plaintiff for the Doe Lawsuit. Plaintiff has denied coverage to Defendants for the Doe Lawsuit. Accordingly, an actual, justiciable controversy exists between the parties which is ripe for adjudication.

## PARTIES

4. Plaintiff Professional Solutions Insurance Company is an Iowa Insurance Company with its principal place of business in Clive, Iowa.

5. Defendant Lutheran Child and Family Services of Illinois is an Illinois not-for-profit corporation with its principal place of business in Oakbrook Terrace, Illinois.

6. Defendant Camp Wartburg Lutheran Retreat Center Incorporated is an Illinois not-for-profit corporation with its principal place of business in Waterloo, Illinois.

7. Nominal defendant Jane Doe is a citizen and resident of the State of Illinois.

8. Ms. Doe is a nominal defendant named as an interested and necessary party to this declaratory judgment action by virtue of her status as plaintiff in the underlying Doe Lawsuit. *See Williams v. Madison County Mut. Auto. Ins. Co.*, 40 Ill.2d 404 (Ill. 1968); *Hapag-Lloyd (America), Inc. v. Home Ins. Co.*, 312 Ill. App.3d 1087 (Ill. App. Ct. 1st Dist. 2000); *Society of Mount Carmel v. National Ben Franklin Ins. Co. of Illinois*, 268 Ill. App.3d 655 (Ill. App. Ct. 1st Dist. 1994*); Flashner Medical Partnership v. Marketing Management, Inc.*, 189 Ill. App.3d 45 (Ill. App. Ct. 1st Dist. 1989).

## JURISDICTION AND VENUE

9.     This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(a)(1) and 1332(c)(1), because there is complete diversity between the plaintiff and defendants, and the amount in controversy, exclusive of interest, exceeds $75,000.

10.     Venue is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because the defendant reside in this District and the policy at issue was delivered in this District.

## FACTUAL BACKGROUND

A.     *The Doe Lawsuit*

11.     Jane Doe then filed the underlying Doe Lawsuit on August 11, 2021 in the Illinois Circuit Court for St. Clair County (the "Complaint").  A true and correct copy of the Complaint in the Doe Lawsuit is attached hereto as Exhibit A.

12.     The Complaint alleges that Camp Wartburg is owned and operated by Lutheran Services.  Ex. A, ¶ 2.

13.     Jane Doe is alleged to have been a seasonal staff member at Camp Wartburg during the summer of 2020.  *Id.* at ¶ 3.

14.     At the time of her employment, Doe was a 17-year-old minor.  *Id.*

15.     Matthew T. Hubbard ("Hubbard") was also employed by Camp Wartburg, and served as a camp Director.  *Id.* at ¶ 6.

16.     Hubbard was 39 years old during the time periods relevant to the Complaint. *Id.* at ¶ 7.

17.     Hubbard is alleged to have been in a hierarchical position of trust, authority, and supervision over Doe.  *Id.* at ¶ 10.

18.　　The Complaint alleges that, during the summer of 2020, Hubbard inappropriately sexually groomed Doe.  *Id.* at ¶ 14.

19.　　The Complaint alleges that, from July 2020 through at least December 2020, Hubbard sexually abused, sexual assaulted, and harassed Doe.  *Id.* at ¶ 16.

20.　　The Complaint alleges that Hubbard admitted to an inappropriate relationship with Jane Doe to Robert Polansky, Camp Wartburg's executive director, and John Hemmingway, Camp Wartburg's manager.  *Id.* at ¶ 23.

21.　　The Complaint alleges that Polansky and Hemmingway had at least four separate reports of inappropriate sexual conduct committed by Hubbard against Doe.  *See id.* at ¶ 18-22.

22.　　The Complaint alleges that Lutheran Services and Camp Wartburg were on notice of the sexual abuse perpetrated by Hubbard and failed to take action against Hubbard. *See id.* at ¶ 23-24.

23.　　The Complaint further alleges that while on Camp Wartburg property, Hubbard "did groom, isolate, coerce, harass, and sexually abuse and assault Jane Doe, thereby causing Jane Doe physical injury, mental anguish, and emotional distress."  *Id.* at ¶ 34-35.

24.　　The Complaint states ten causes of action, as follows:

> Count 1 – Negligent Hiring against Camp Wartburg
> Count 2 – Negligent Retention against Camp Wartburg
> Count 3 – Negligent Supervision against Camp Wartburg
> Count 4 – Negligent Hiring against Lutheran Services
> Count 5 – Negligent Retention against Lutheran Services
> Count 6 – Negligent Retention against Lutheran Services
> Count 7 – Willful and Wanton Supervision against Camp Wartburg
> Count 8 – Willful and Wanton Retention against Camp Wartburg
> Count 9 – Willful and Wanton Supervision against Lutheran Services
> Count 10 – Willful and Wanton Retention against Lutheran Services

*See* Ex. A.

4

25.     On or around December 17, 2021, Hubbard's arrest was publicly announced, commenting that he was indicted in Monroe County, Illinois on charges of felony criminal sexual abuse arising out of alleged sexual abuse at Camp Wartburg from August 2020 through December 2020.  A copy of the article from the Republic Times as Exhibit B.

**B.      *The Policies***

26.     PSIC a Not-For-Profit Management Liability Policy, No. FQ350DMLA210 to Lutheran Child & Family Services of Illinois for the Policy Period from July 1, 2021 to July 1, 2022 (the "Policy").   A true and correct copy of the Policy is attached hereto as Exhibit C.

27.     PSIC later issued an employment practices liability endorsement to the Policy, effective January 1, 2022 to July 1, 2022 (the "EPL Coverage Part").  A true and correct copy of the EPL Coverage Part is attached hereto as Exhibit D.

28.     Lutheran Services and Camp Wartburg are seeking coverage under two coverage parts of the Policy: 1) the directors and officers liability coverage part (the "D&O Coverage Part), and the EPL Coverage Part.  *See* Exs. C-D.

29.     The Policy contains general terms and conditions that are applicable to all coverage sections.  Ex. C., Form MPF-10GTC-07-09, p. 1 of 15.

30.     Included in the general terms and conditions is a section defining single claims, which states:

> **VI. SINGLE CLAIMS**[1]
>
> All **Claims** under the **Liability Coverage Sections** which arise out of the same **Wrongful Act** or **Interrelated Wrongful Act** shall be deemed one **Claim,** and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made against any **Insured,** regardless of

---

[1] Bold and capitalized terms are defined in the Policy.

whether such date is before or during the **Policy Period.** In no event shall a single lawsuit or proceeding constitute more than one **Claim.**

If a single **Claim** is covered in whole or in Part under more than one **Liability Coverage Section,** the applicable Retention under each such **Liability Coverage Section** shall be applied with respect to coverage for such **Claim** under such **Liability Coverage Section,** provided the sum of all applicable Retentions under all such **Liability Coverage Sections** shall not exceed the largest of such applicable Retentions.

Ex. C., Form MPF-10GTC-07-09, p. 8 of 15.

31. The general terms and conditions define **Interrelated Wrongful Act** as "all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause, or series of related facts, circumstances, situations, events, transactions or causes." Ex. C., Form MPF-10GTC-07-09, p. 3 of 15

32. The EPL Coverage Part contains the following relevant insuring agreement:

**I.      INSURING AGREEMENTS**

**A.      EMPLOYMENT PRACTICES LIABILITY COVERAGE**

The Underwriter shall pay on behalf of the **Insureds** all **Loss** for which the **Insureds** become legally obligated to pay on account of any **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or during the **Extended Reporting Period,** if exercised, for **Employment Practices Wrongful Act.**

Ex. D, Form MPF-10EPL-07-19, p. 1 of 10.

33. The EPL Coverage Part contains the following relevant definitions:

**III.      DEFINITIONS**

**D.      Employment Practices Claim** means:

1. a written demand against any **Insured** for monetary damages or non-monetary (including injunctive) relief, including a written demand for reinstatement, reemployment or reengagement of an **Employee,** a written demand that the **Insured** toll or waive a statute of

6

limitations, or a written demand or request for arbitration, mediation or other alternative dispute resolution, which shall be deemed first made upon the **Insured's** receipt of the demand;

2.    a civil proceeding against any **Insured** commenced by and which shall be deemed first made upon service upon the **Insured** of a complaint or similar pleading;

3.    a criminal proceeding against any **Insured** commenced by and which shall be deemed first made upon the **Insured's** arrest, the return of an indictment or information, or receipt of a notice of charges or similar document;

**E.**    **Employment Practices Wrongful Act** means any actual or alleged:

…

11.    employment-related negligent hiring, retention, training or supervision leading to the infliction of emotional distress or mental anguish;

…

**J.**    **Insured Persons** means:

1.    any one or more natural persons who were, now are or shall become a duly elected or appointed director (including a de facto director and shadow director), trustee (other than a bankruptcy or litigation trustee), governor, **Manager,** officer, **Employee** (including employed lawyers solely in their capacity as an **Employee),** general counsel, risk manager, controller, advisory director, or member of a duly constituted committee or board of the **Organization** or their functional equivalent;…

**K.**    **Insured** means the **Insured Persons** and the **Organization.**

…

**X.**    **Wrongful Act** means:

**1.**    an **Employment Practices Wrongful Act** by any of the **Insured Persons** in their capacity as such, or by the **Organization;….**

7

Ex. D, Form MPF-10EPL-07-19, pp. 3-4 of 10.

34.     The EPL Coverage Part contains an endorsement excluding coverage as follows:

### IV.     EXCLUSIONS

The Underwriter shall not be liable under this Coverage Section to pay any **Loss** from any **Claim** made against any **Insured**:

### B.     PENDING OR PRIOR LITIGATION

based upon, arising out of, or attributable to any **Claim** against any **Insured** which was pending on or existed prior to the respective Pending or Prior Date for this Coverage Section set forth in the Coverage Schedule in ITEM 8 of the Declarations [01/01/2022], or the same or substantially the same fact, circumstance or **Wrongful Act** alleged in or underlying such prior **Claim.**

Ex. D, Form MPF-10EPL-07-19, p. 8 of 10 (the "P&P Litigation Exclusion").

35.     The Policy also contains the following relevant exclusion as to the EPL coverage

part:

In consideration of the premium charged, no coverage will be available under the Coverage Section identified above for **Loss** arising from any **Claim** based upon, arising out of, directly or indirectly resulting from, or in any way involving any actual or alleged sexual abuse, sexual assault, or molestation, including any mental anguish or emotional distress resulting therefrom and the failure to supervise or report any person alleged to have engaged in such misconduct.

All other terms, conditions and limitations of this Policy shall remain unchanged.

Ex. D, Endorsement No. MPE-03006-07-19.

36.     The Policy's D&O Coverage Part contains a separate insuring agreement, which

states as follows:

### I.     INSURING AGREEMENTS

### C.     ORGANIZATION LIABILITY COVERAGE

The Underwriter shall pay on behalf of the **Organization** all **Loss** for which the **Organization** becomes legally obligated to pay on account of a **Claim** first made against the **Organization** during the

> **Policy Period** or the **Extended Reporting Period,** if exercised, for a **Wrongful Act.**

Ex. C, Form MPF-10D&O-07-19, p. 1 of 14.

37.     The D&O Coverage Part contains the following relevant definitions:

**III.     DEFINITIONS**

G.     **Claim** means:

1.     a written demand for monetary damages, non-monetary or injunctive relief, including a demand that the **Insured** toll or waive a statute of limitations or a demand or request for arbitration, mediation or other alternative dispute resolution, which shall be deemed first made upon the **Insured's** receipt of the demand or request;

2.     a civil proceeding for monetary, non-monetary or injunctive relief commenced by the service upon the **Insured** of a complaint or similar proceeding;

**…**

Q.     **Insured** means the **Organization** and any **Insured Persons.**

R.     **Insured Persons** means:
1.     an **Executive;** and
2.     an **Employee;**

Ex. C, Form MPF-10D&O-07-19, p. 6 of 14.

38.     The Policy includes an endorsement stating that Camp Wartburg is an **Organization**.  Ex C., Endorsement No. MPE-00014-07-19.

39.     A **Wrongful Act** under the D&O Coverage Part is defined, in relevant part, as "any actual or alleged act, error, misstatement, misleading statement, neglect, breach of duty, omission or act by the **Organization."** Ex. C, Form MPF-10D&O-07-19, pp. 8-9 of 14.

40.     The D&O Coverage Part contains an exclusion for Claims brought by an Insured against another Insured, which states, in relevant part:

**IV.     EXCLUSIONS**

9

The Underwriter shall not be liable under this Coverage Section to pay any **Loss** from any **Claim** made against any **Insured:**

**EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS**

G.     **INSURED VS. INSURED**

brought or maintained by or on behalf of an **Insured Person** in any capacity or the **Organization** or an **Outside Entity;** provided this Exclusion shall not apply to:

**…**

> 2.     a **Claim** by an **Insured Person** who has not served as an **Insured Person** for at least two (2) years prior to the date such **Claim** is first made and who maintains such **Claim** without the active assistance or active participation of the **Organization** or **Outside Entity,** or any other **Insured Person** who is serving or has served as an **Insured Person** within such two (2) year period;

**…**

> 5.     a **Claim** against **Insured Persons** for an employment-related **Wrongful Act;**

Ex. C, Form MPF-10D&O-07-19, pp. 10-11 of 14 (the "IvI Exclusion").

41.     The Policy also states that the insurer "shall not be liable under this Coverage Section to pay any **Loss** from any **Claim** made against any **Insured** for any employment related **Wrongful Acts."** Ex. C, Form MPF-10D&O-07-19, p. 12 of 14 (the "Employment Exclusion").

42.     On August 26, 2022, PSIC requested that Defendants withdraw the claim for coverage.

43.     Lutheran Services and Camp Wartburg have not withdrawn the claim for coverage, necessitating this declaratory judgment action.

<u>**COUNT I – DECLARATORY JUDGMENT**</u>
**Prior & Pending Litigation Exclusion**

10

44.     Plaintiff incorporates and restate the allegations set forth in paragraphs 1 through 43 as if fully set forth herein.

45.     An actual case or controversy exists between the parties concerning coverage under the PSIC Policy for the Doe Lawsuit.

46.     The Doe Demand and Doe Lawsuit constitute a single Claim, first made on June 3, 2022, within the Policy Period, pursuant to the Policy's Single Claim condition.

47.     The Doe Lawsuit alleges an Employment Practices Claim against Lutheran Services and Camp Wartburg for "employment-related negligent hiring, retention, training or supervision leading to the infliction of emotional distress or mental anguish."

48.     Matthew Hubbard was indicted on October 12, 2021 in the Hubbard Case, and arrested on December 17, 2021 for the alleged sexual abuse perpetrated against Jane Doe.

49.     Hubbard is an Insured Person, as defined under the Policy, because he was an employee of the Organization.

50.     The Hubbard Case constitutes an Employment Practice Claim under the Policy no later than December 17, 2021 when Hubbard was arrested because the Hubbard Case constitutes "a criminal proceeding against any Insured commenced by … the Insured's arrest, the return of an indictment or information, or receipt of a notice of charges or similar document."

51.     The Policy's EPL Coverage Part contains the P&P Litigation Exclusion, which states that PSIC shall not be liable to pay any Loss from any Claim made against any Insured "based upon, arising out of or attributable to any Claim against any Insured which was pending on or existed prior to" January 1, 2022.

52.     The Doe Lawsuit is based upon, arises out of, and/or is attributable to the Hubbard Case, which was pending prior to January 1, 2022.

53.     The Doe Lawsuit is therefore wholly excluded from coverage under the Policy.

54.     Plaintiff seeks a judicial declaration pursuant to U.S.C. §§ 2201 and 2202 that they have no duty to defend or indemnify Lutheran Services and Camp Wartburg in connection with the Doe Lawsuit.

## COUNT II – DECLARATORY JUDGMENT
### Sexual Abuse Exclusion

55.     Plaintiff incorporates and restate the allegations set forth in paragraphs 1 through 54 as if fully set forth herein.

56.     An actual case or controversy exists between the parties concerning coverage under the PSIC Policy for the Doe Lawsuit.

57.     The Doe Lawsuit alleges that Hubbard groomed, isolated, coerced, harassed, and sexually abused and assaulted Doe, causing Doe physical injury, mental anguish, and emotional distress.

58.     The Doe Lawsuit states ten causes of action against Lutheran Services and Camp Wartburg for negligent hiring, retention, and supervision, as well as willful and wanton supervision and retention.

59.     The EPL Coverage Part's broad Sexual Abuse Exclusion excludes coverage "for Loss arising from any Claim based upon, arising out of, directly or indirectly resulting from, *or in any way involving any actual or alleged* sexual abuse, sexual assault, or molestation, including any mental anguish or emotional distress resulting therefrom and the failure to supervise or report any person alleged to have engaged in such misconduct." (Emphasis added.)

60.     The Doe Lawsuit is based upon, arises out of, directly or indirectly results from, or in any way involves actual or alleged sexual abuse, including the failure to supervise Hubbard.

61.     The Doe Lawsuit is therefore wholly excluded from coverage under the Policy, and Plaintiff can have no duty to indemnify Defendants for the Doe Lawsuit.

62.     Plaintiff seeks a judicial declaration pursuant to U.S.C. §§ 2201 and 2202 that they have no duty to defend or indemnify Lutheran Services and Camp Wartburg in connection with the Doe Lawsuit.

## COUNT III – DECLARATORY JUDGMENT
### Employment Exclusion

63.     Plaintiff incorporates and restate the allegations set forth in paragraphs 1 through 62 as if fully set forth herein.

64.     An actual case or controversy exists between the parties concerning coverage under the PSIC Policy for the Doe Lawsuit.

65.     Lutheran Services and Camp Wartburg's letter to PSIC states that Doe and Hubbard were both employees at Camp Wartburg.

66.     The Policy states that the insurer shall not be liable under the D&O Coverage Part to pay any Loss from any Claim made against any Insured "for any employment related Wrongful Acts."

67.     The Doe Lawsuit is a Claim against Lutheran Services and Camp Wartburg for employment related Wrongful Acts, for their negligent hiring, retention, and supervision of Hubbard, as well as the alleged willful and wanton supervision and retention of Hubbard.

68.     The Doe Lawsuit is therefore wholly excluded from coverage under the Policy by reason of the Employment Exclusion.

69.     Plaintiff seeks a judicial declaration pursuant to U.S.C. §§ 2201 and 2202 that they have no duty to defend or indemnify Lutheran Services and Camp Wartburg in connection with the Doe Lawsuit.

**COUNT IV – DECLARATORY JUDGMENT**
**Insured Versus Insured Exclusion**

70.     Plaintiff incorporates and restate the allegations set forth in paragraphs 1 through 69 as if fully set forth herein.

71.     An actual case or controversy exists between the parties concerning coverage under the PSIC Policy for the Doe Lawsuit.

72.     Lutheran Services and Camp Wartburg are both defined Organizations under the D&O Coverage Part.

73.     Doe was an employee of Camp Wartburg, which is conceded in the July 29, 2022 letter, which makes her an Insured Person as defined in the D&O Coverage Part.

74.     The D&O Coverage Part of the Policy states that the insurer shall not be liable under this Coverage Section to pay any Loss from any Claim made against any Insured "brought or maintained by or on behalf of an Insured Person in any capacity."

75.     The IvI Exclusion contains an exception for a Claim by an "Insured Person who has not served as an Insured Person for at least two (2) years prior to the date such Claim was first made…"

76.     The Doe Demand was first made on or around June 3, 2020.

14

77. The Doe Lawsuit alleges Hubbard began grooming and sexual abusing Doe "beginning in approximately July of 2020 and continuing through approximately December 2020."

78. Doe was an employee of Camp Wartburg within two years of making her Claim, therefore, the exception to the IvI Exclusion does not apply.

79. The other relevant exception to the IvI Exclusion is for a Claim "against Insured Persons for an employment-related Wrongful Act."

80. No Insured Persons are named in the Doe Lawsuit.

81. Therefore, the exception to the IvI Exclusion does not apply.

82. The Doe Lawsuit is brought or maintained by or on behalf of an Insured Person against the Organization, and no exceptions to the IvI Exclusion apply.

83. The Doe Lawsuit is therefore wholly excluded from coverage under the Policy.

84. Plaintiff seeks a judicial declaration pursuant to U.S.C. §§ 2201 and 2202 that they have no duty to defend or indemnify Lutheran Services and Camp Wartburg in connection with the Doe Lawsuit.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Professional Solutions Insurance Company, respectfully requests that this Court find in its favor and enter judgment as follows:

(a) Judicial declaration that Plaintiff has no duty to defend Lutheran Child and Family Services of Illinois and Camp Wartburg Lutheran Retreat Center Incorporated under Policy No. FQ350DMLA210 in connection with the Doe Lawsuit;

(b) Judicial declaration Plaintiff has no duty to indemnify Lutheran Child and Family Services of Illinois and Camp Wartburg Lutheran Retreat Center Incorporated under Policy No. FQ350DMLA210 in connection with the Doe Lawsuit; and

(c)     Any further relief that this Court deems just and equitable under the circumstances.


Dated: August 26, 2022                          *Respectfully Submitted,*

                                                 /s/Cassandra L. Jones
                                                Cassandra L. Jones (Bar No. 6309352)
                                                WALKER WILCOX MATOUSEK LLP
                                                One North Franklin Street, Suite 3200
                                                Chicago, Illinois 60606
                                                Telephone: (312) 244-6700
                                                Fax: (312) 244-6800
                                                Email: cjones@walkerwilcox.com

                                                ***Attorneys for Plaintiff Professional Solutions Insurance Company***

# EXHIBIT A

Electronically Filed
Marie Zaiz
Circuit Clerk
Nora Sternau
22LA0687
St. Clair County
8/11/2022 2:10 PM
19051948

IN THE CIRCUIT COURT
TWENTIETH JUDICIAL CIRCUIT
ST. CLAIR COUNTY, ILLINOIS

JANE DOE,                         )
                                  )
        Plaintiff,                )
                                  )
    v.                            )        Case No. **22LA0687**
                                  )
CAMP WARTBURG (LUTHERAN           )
RETREAT CENTER), a not-for-       )
profit corporation; and          )
LUTHERAN CHILD AND FAMILY         )
SERVICES OF ILLINOIS, a not-      )
for-profit corporation,          )
                                  )
        Defendants.               )

## COMPLAINT

### COUNT I

**(Negligent Hiring v. Camp Wartburg)**

COMES NOW Plaintiff, by and through her attorneys, **KEEFE,
KEEFE & UNSELL, P.C.**, and for Count I of her Complaint, against
defendant Camp Wartburg (Lutheran Retreat Center), states:

1.    At all times herein mentioned, defendant Camp Wartburg
(Lutheran Retreat Center) was a not-for-profit corporation,
incorporated and doing business in Illinois, operating a summer
camp for Southern Illinois youth, and did hire, employ, and
supervise Matthew T. Hubbard from May 2019 through December
2020, including during the summer of 2020.

2.      At all times herein mentioned, defendant Lutheran Child and Family Services of Illinois was a not-for-profit corporation, incorporated and doing business in Illinois, including St. Clair County, Illinois, wherein it operates a Program Office, and was the owner and operator of Camp Wartburg.

3.      That Jane Doe attended Camp Wartburg in the summer of 2020 in the capacity as a seasonal staff member, at which time she was a 17-year-old minor.

4.      That Jane Doe was one of, if not the only, seasonal staff member who was a 17-year-old-minor.

5.      That at all times herein mentioned, Defendant knew Jane Doe was a 17-year-old minor.

6.      That Defendant hired Matthew T. Hubbard as a full-time employee and placed him in the position of after-camp and day camp Director.

7.      That during the summer of 2020, Matthew T. Hubbard was 39 years old.

8.      That Matthew T. Hubbard would have been aware of Defendant's stated goal of hiring college-age or younger students for seasonal staff employment or volunteer work.

9.      That because Defendant employed Matthew T. Hubbard as a Camp Director, and in other similar positions, Defendant knew

that Matthew T. Hubbard worked in a supervisory role over young
seasonal staff, including Jane Doe.

10. That Defendant placed its employee Matthew T. Hubbard
in a hierarchical position of trust, authority, and supervision
over Jane Doe.

11. That at all times herein mentioned, Defendant's
employee Matthew T. Hubbard knew Jane Doe was a 17-year-old
minor.

12. That at all times herein mentioned, Matthew T. Hubbard
resided on Defendant's property at Camp Wartburg, in a private
staff cabin.

13. That at all times herein Defendant's employees Robert
A. Polansky and John "Sparky" Hemmingway were executive director
and manager of Camp Wartburg and were directly responsible for
supervising both Matthew T. Hubbard and Jane Doe.

14. That during the summer of 2020, at Camp Wartburg,
Defendant's employee Matthew T. Hubbard engaged in sexually
inappropriate grooming behavior toward Jane Doe.

15. That during the summer of 2020, at Camp Wartburg and
in his role as a camp Director, Defendant's employee Matthew T.
Hubbard frequently isolated Jane Doe in one-on-one activities
and situations.

16.   That beginning in approximately July of 2020 and continuing through approximately December 2020, on Defendant's property at Camp Wartburg and at other locations, Defendant's employee Matthew T. Hubbard coerced Jane Doe to engage in sexual acts and did sexually abuse, sexually assault, and harass Jane Doe.

17.   That the sexual abuse, sexual assault, and sexual harassment of Jane Doe included multiple incidents of penetrative vaginal and oral sex in the cabin Defendant provided to Matthew T. Hubbard for his Camp Wartburg residence.

18.   That during the summer of 2020, Defendant, through its employees, agents, and apparent agents, and specifically through Robert A. Polansky and John "Sparky" Hemmingway, knew or in the exercise of reasonable care should have known that Matthew T. Hubbard was grooming Jane Doe for sexual interaction; was exhibiting inappropriate sexualized behavior with Jane Doe; was isolating Jane Doe in one-on-one activities; and had engaged Jane Doe in an inappropriate relationship.

19.   That in fact, more than one of Defendant's employees told Robert A. Polansky and John "Sparky" Hemmingway that Matthew T. Hubbard was "flirting" with 17-year-old minor Jane Doe; Matthew T. Hubbard had taken Jane Doe under an outdoor pavilion late at night alone; Matthew T. Hubbard took Jane Doe

from Camp Wartburg in his truck for long "driving lessons";
Matthew T. Hubbard was attending parties, bringing Jane Doe as
his date; and that on one occasion Hubbard became intoxicated at
a party and Jane Doe drove him back to his cabin.

20.   Robert A. Polansky told the Monroe County Sheriff's
Department that to his knowledge during the summer of 2020, 17-
year-old Jane Doe was a 'willing participant' in the
'relationship' between Doe and 39-year-old camp director
Hubbard.

21.   That on more than one occasion during the summer and
fall of 2020, Matthew T. Hubbard actually admitted to Robert A.
Polansky and John "Sparky" Hemmingway that he had engaged Jane
Doe in an inappropriate relationship and was continuing to
engage with 17-year-old Doe in said 'relationship.'

22.   That throughout the summer and fall of 2020,
Defendant's executive camp director and manager Robert A.
Polansky and John "Sparky" Hemmingway gave Matthew T. Hubbard
verbal and written warnings regarding Hubbard's inappropriate
interactions with Jane Doe.

23.   That at no time did Defendant, through Polansky,
Hemmingway or any other employee or agent, inform Jane Doe's
parents/guardians that Defendant's 39-year-old camp director
Matthew T. Hubbard was in a reported, known, and self-proclaimed

'relationship' with Jane Doe; nor did Defendant inform Jane

Doe's parents/guardians that Camp Hubbard's executive director

and manager had met with Hubbard at least four times from June

2020 to October 2020 regarding the 'relationship' with their

daughter and issued more than one disciplinary warning to

Hubbard regarding his, admitted, continued sexual coercion of

their 17-year-old daughter.

24.   That despite Defendant's multiple meetings with

Hubbard to address his 'relationship' with and sexual coercion

of a 17-year-old subordinate employee, Defendant let Hubbard

continue the 'relationship'; where said "relationship" was the

Defendant's staff director's coercion, mental abuse, sexual

abuse, sexual assault, and sexual harassment of Defendant's 17-

year-old subordinate employee.

25.   That had Defendant conducted a reasonable background

check or screening of Matthew T. Hubbard, Defendant would or

should have known that Matthew T. Hubbard had a sexual interest

in teenagers or otherwise had a proclivity to abuse a position

of authority in order to victimize a subordinate for his sexual

gratification.

26.   That had Defendant reasonably supervised Matthew T.

Hubbard, Defendant would have known or been on notice of Matthew

T. Hubbard's inappropriate conduct toward Jane Doe, including
his sexual and mental abuse of Doe.

27.  That had Defendant reasonably trained its staff and
counselors to recognize and report sexual abuse, Defendant would
have known or been on notice of Matthew T. Hubbard's
inappropriate conduct toward, sexual grooming and coercion of,
mental abuse of, and repeated sexual assault and abuse of Jane
Doe.

28.  That had Defendant reasonably trained its staff and
counselors to recognize and report sexual abuse, Matthew T.
Hubbard's sexual abuse of Jane Doe would have been timely
reported to the authorities and/or other timely reasonable
measures would have been taken to protect Jane Doe and end
Hubbard's abuse of her.

29.  That had Defendant reasonably implemented clear
expectations for staff performance and conduct, including sexual
harassment policies and policies regarding interaction and
conduct of adult staff with teenage camp participants, then
Matthew T. Hubbard's sexual abuse of Jane Doe would not have
progressed, unabated, at Camp Wartburg.

30.  That as his employer and direct supervisor, Defendant
knew or had reason to know that it had the ability to control,
monitor, and limit Matthew T. Hubbard's access to unsupervised

time with teenage camp participants, including Jane Doe, at Camp Wartburg and/or during Camp Wartburg facilitated activities.

31.  That Defendant knew or should have known of the necessity and opportunity for it to control, monitor, and limit Matthew T. Hubbard's access to unsupervised time with Jane Doe at Camp Wartburg and/or during Camp Wartburg facilitated activities.

32.  That at the time she was groomed for and sexually abused by Defendant's employee Matthew T. Hubbard, Jane Doe was a 17-year-old, on Defendant's property for the purpose of participating in Camp Wartburg's business operation, under the direction of Camp Wartburg staff, and was removed from the normal opportunities for protection afforded by her parents and family.

33.  That Defendant, individually, and by and through its employees, agents, and apparent agents was guilty of carelessly and negligently hiring Matthew T. Hubbard in failing to perform a reasonably adequate background check or staff screening on Matthew T. Hubbard and/or failing to adequately respond to the results of such background check or screening, and thereby failed to ascertain Matthew T. Hubbard's particular unfitness for a job in which he would have access to and be in a position of trust over teenage girls.

34.  That as a proximate cause of Defendant's negligence as aforesaid, Matthew T. Hubbard was hired as a staff member of Defendant's youth summer camp, was placed in a position of authority over Jane Doe, and on the property of Defendant's camp did groom, isolate, coerce, harass, and sexually abuse and assault Jane Doe, thereby causing Jane Doe physical injury, mental anguish, and emotional distress.

WHEREFORE, Plaintiff demands judgment against the defendant in an amount greater than SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

## COUNT II

### (Negligent Retention v. Camp Wartburg)

COMES NOW Plaintiff, by and through her attorneys, **KEEFE, KEEFE & UNSELL, P.C.**, and for Count II of her Complaint, against defendant Camp Wartburg (Lutheran Retreat Center), states:

1. - 32.  Plaintiff hereby adopts and incorporates the allegations of paragraphs 1 through and including 32 of Count I of as and for paragraphs 1 through and including 32 of Count II of her Complaint.

33.  That Defendant, individually, and by and through its employees, agents, and apparent agents was guilty of carelessly and negligently employing and retaining for employment Matthew T. Hubbard despite Defendant's knowledge of, or the reasonable

opportunity during his employment for Defendant to ascertain, Matthew T. Hubbard's particular unfitness for a job in which he had access to and was in a position of trust over teenage girls, including Jane Doe.

34. That Defendant, individually, and by and through its employees, agents, and apparent agents was guilty of carelessly and negligently employing and retaining for employment Matthew T. Hubbard despite Defendant's knowledge that Matthew T. Hubbard had engaged in ongoing inappropriate conduct with 17-year-old subordinate employee Jane Doe.

35. That as a proximate cause of Defendant's negligence as aforesaid, Matthew T. Hubbard was retained as a staff member of Defendant's youth summer camp and on the property of Defendant's camp did groom, isolate, coerce, harass, and sexually abuse and assault Jane Doe, thereby causing Jane Doe physical injury, mental anguish, and emotional distress.

WHEREFORE, Plaintiff demands judgment against the defendant in an amount greater than SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

## COUNT III

### (Negligent Supervision v. Camp Wartburg)

COMES NOW Plaintiff, by and through her attorneys, **KEEFE, KEEFE & UNSELL, P.C.**, and for Count III of her Complaint,

against defendant Camp Wartburg (Lutheran Retreat Center), states:

1. – 32.  Plaintiff hereby adopts and incorporates the allegations of paragraphs 1 through and including 32 of Count I of as and for paragraphs 1 through and including 32 of Count III of her Complaint.

33.  That Defendant, individually, and by and through its employees, agents, and apparent agents was guilty of carelessly and negligently supervising its employee Matthew T. Hubbard to the extent reasonably necessitated by Matthew T. Hubbard's role at a residential summer camp, in a position of trust and authority over teenage camp participants, with the opportunity to be in one-on-one or otherwise private situations with teenage girls, including Jane Doe.

34.  That Defendant, individually, and by and through its employees, agents, and apparent agents was guilty of carelessly and negligently supervising its employee Matthew T. Hubbard despite Defendant's knowledge that Matthew T. Hubbard had engaged in ongoing inappropriate conduct with 17-year-old subordinate employee Jane Doe.

35.  That as a proximate cause of Defendant's negligence as aforesaid, Defendant failed to recognize, appreciate, or adequately act upon Matthew T. Hubbard's inappropriate conduct

with Jane Doe and Matthew T. Hubbard did proceed to groom,
isolate, coerce, harass, and sexually abuse and assault Jane Doe
at Defendant's camp, thereby causing Jane Doe physical injury,
mental anguish, and emotional distress.

WHEREFORE, Plaintiff demands judgment against the defendant
in an amount greater than SEVENTY-FIVE THOUSAND DOLLARS
($75,000.00).

<u>COUNT IV</u>

**(Negligent Hiring v. Lutheran Child and Family Services of
Illinois)**

COMES NOW Plaintiff, by and through her attorneys, **KEEFE,
KEEFE & UNSELL, P.C.**, and for Count IV of her Complaint, against
defendant Lutheran Child and Family Services of Illinois,
states:

1. – 34. Plaintiff hereby adopts and incorporates the
allegations of paragraphs 1 through and including 34 of Count I
of as and for paragraphs 1 through and including 34 of Count IV
of her Complaint.

WHEREFORE, Plaintiff demands judgment against the defendant
in an amount greater than SEVENTY-FIVE THOUSAND DOLLARS
($75,000.00).

<u>COUNT V</u>

**(Negligent Retention v. Lutheran Child and Family Services of
Illinois)**

Case No.
Page **12** of **18**

COMES NOW Plaintiff, by and through her attorneys, **KEEFE**, **KEEFE & UNSELL**, **P.C.**, and for Count V of her Complaint, against defendant Lutheran Child and Family Services of Illinois, states:

1. – 35.  Plaintiff hereby adopts and incorporates the allegations of paragraphs 1 through and including 35 of Count II of as and for paragraphs 1 through and including 35 of Count V of her Complaint.

WHEREFORE, Plaintiff demands judgment against the defendant in an amount greater than SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

### COUNT VI

**(Negligent Supervision v. Lutheran Child and Family Services of Illinois)**

COMES NOW Plaintiff, by and through her attorneys, **KEEFE**, **KEEFE & UNSELL**, **P.C.**, and for Count VI of her Complaint, against defendant Lutheran Child and Family Services of Illinois, states:

1. – 35.  Plaintiff hereby adopts and incorporates the allegations of paragraphs 1 through and including 35 of Count III of as and for paragraphs 1 through and including 35 of Count VI of her Complaint.

WHEREFORE, Plaintiff demands judgment against the defendant

in an amount greater than SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

## COUNT VII

### (Willful and Wanton Supervision v. Camp Wartburg)

COMES NOW Plaintiff, by and through her attorneys, **KEEFE, KEEFE & UNSELL, P.C.,** and for Count VII of her Complaint, against defendant Camp Wartburg (Lutheran Retreat Center), states:

1. – 32.   Plaintiff hereby adopts and incorporates the allegations of paragraphs 1 through and including 32 of Count I of as and for paragraphs 1 through and including 32 of Count VII of her Complaint.

33.   That Defendant, individually, and by and through its employees, agents, and apparent agents knew its employee Matthew T. Hubbard was engaged in a continued sexually inappropriate relationship with subordinate employee, and minor, Jane Doe, and took no reasonable action to stop or timely report that continued sexually inappropriate relationship.

34.   That as a proximate cause of Defendant's willful and wanton supervision as aforesaid, its employee Matthew T. Hubbard did proceed and continue to groom, isolate, coerce, harass, and sexually abuse and assault Jane Doe at Defendant's camp, thereby

causing Jane Doe physical injury, mental anguish, and emotional distress.

WHEREFORE, Plaintiff demands judgment against the defendant in an amount greater than SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

**COUNT VIII**

**(Willful and Wanton Retention v. Camp Wartburg)**

COMES NOW Plaintiff, by and through her attorneys, **KEEFE, KEEFE & UNSELL, P.C.,** and for Count VIII of her Complaint, against defendant Camp Wartburg (Lutheran Retreat Center), states:

1. – 32. Plaintiff hereby adopts and incorporates the allegations of paragraphs 1 through and including 32 of Count I of as and for paragraphs 1 through and including 32 of Count VIII of her Complaint.

33. That Defendant, individually, and by and through its employees, agents, and apparent agents knew its employee Matthew T. Hubbard was engaged in a continued sexually inappropriate relationship with subordinate employee, and minor, Jane Doe, and yet continued to employ Hubbard and continued to employ Hubbard in a position that Defendant knew provided Hubbard access and means to continue his abuse of Doe.

34.  That as a proximate cause of Defendant's willful and wanton employment and retention as aforesaid, its employee Matthew T. Hubbard did proceed and continue to groom, isolate, coerce, harass, and sexually abuse and assault Jane Doe at Defendant's camp, thereby causing Jane Doe physical injury, mental anguish, and emotional distress.

WHEREFORE, Plaintiff demands judgment against the defendant in an amount greater than SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

## COUNT IX

### (Willful and Wanton Supervision v. Lutheran Child and Family Services of Illinois)

COMES NOW Plaintiff, by and through her attorneys, **KEEFE, KEEFE & UNSELL, P.C.**, and for Count IX of her Complaint, against defendant Lutheran Child and Family Services of Illinois, states:

1. – 34.  Plaintiff hereby adopts and incorporates the allegations of paragraphs 1 through and including 34 of Count VII of as and for paragraphs 1 through and including 34 of Count IX of her Complaint.

WHEREFORE, Plaintiff demands judgment against the defendant in an amount greater than SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).

Case No.
Page **16** of **18**

## COUNT X

### (Willful and Wanton Retention v. Lutheran Child and Family Services of Illinois)

COMES NOW Plaintiff, by and through her attorneys, **KEEFE, KEEFE & UNSELL, P.C.,** and for Count X of her Complaint, against defendant Lutheran Child and Family Services of Illinois, states:

1. - 34.   Plaintiff hereby adopts and incorporates the allegations of paragraphs 1 through and including 34 of Count VIII of as and for paragraphs 1 through and including 34 of Count X of her Complaint.

WHEREFORE, Plaintiff demands judgment against the defendant in an amount greater than SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00).


/s/ Thomas Q. Keefe, III
THOMAS Q. KEEFE, III
Ill. Reg. No. 6294376
Attorney for Plaintiff


**KEEFE, KEEFE & UNSELL, P.C.**
**ATTORNEY AT LAW**
**#6 EXECUTIVE WOODS COURT**
**BELLEVILLE, ILLINOIS 62226**
**618/236-2221**
**618/236-2194 (Facsimile)**
**Primary Email:** tiffany@tqkeefe.com
**Secondary Email:** keefetq@gmail.com


Case No.
Page **17** of **18**

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that he has filed
the foregoing document(s) using the Odyssey e-File system on the
11th day of August, 2022.

/s/Thomas Q. Keefe, III

# EXHIBIT B

# Former camp worker charged with sex abuse

republictimes.net/former-camp-worker-charged-with-sex-abuse/

December 17, 2021



A St. Louis man was charged this week in connection with an alleged sex crime last year while he was a staff member of Camp Wartburg in Waterloo.

Matthew T. Hubbard, 40, of St. Louis, faces a felony charge of aggravated criminal sexual abuse.

The Monroe County Sheriff's Department said that on Dec. 23, 2020, an investigation began after allegations were made regarding a sex assault. As the investigation was conducted, investigators learned a



Matthew Hubbard

female juvenile had been sexually abused by an adult male staff member of Camp Wartburg.

Investigators learned the staff member, identified as Hubbard, met the juvenile at the camp. A sexual relationship was formed by Hubbard and this juvenile that lasted between August and December 2020, police said.

"During the course of the investigation, it was obvious the suspect 'groomed' the juvenile victim by convincing her to isolate herself away from her friends and only hang out with him," MCSD Sgt. Justin Biggs said. "This allowed the possibility of more time to sexually abuse the victim. During the investigation, investigators also learned the suspect took the female victim to other states, where the victim was sexually abused."

MCSD investigators contacted the Martin City Police Department in Tennessee, where some of the alleged abuse occurred and where the suspect had fled after becoming aware of the investigation.

On Oct. 19, investigators were contacted by St. Louis Metropolitan Police and informed that Hubbard was being transported to a St. Louis hospital for a self-inflicted gunshot wound. On Tuesday, the MCSD finally took Hubbard into custody after he was released from the hospital.

He remains at the Monroe County Jail on bond set at $100,000.

Police said it was learned during this investigation that Hubbard has had other previous local employment around juveniles.

Hubbard was employed at Camp Wartburg from May 2019 to Dec. 23, 2020. Prior to that, he worked at Caywoods Youth Center in Waterloo from May 2018 to July 2019 as a full-time employee and from September to October 2019 on a part-time basis, police said.

"Investigators have been in contact with management of both places," Biggs said. "It should be noted that investigators have no evidence or belief that there are any other victims at this time. However, we have a duty to inform the citizens of what information we can within legal guidelines to make sure and confirm there are no additional victims."

Anyone wishing to contact police in reference to this case may do so at 618-939-8651.

Camp Wartburg Executive Director Robert Polansky issued a statement regarding this case. The camp is located at 5705 LRC Road.

"First, our sympathies go out to the victim and her family for this deeply concerning situation. Our primary concern at Camp Wartburg is always for the safety and well-being of all our campers and staff. Up until now, our leadership could not comment on what was an active investigation," Polansky said. "To clarify, the accused individual and victim were both employed at Camp Wartburg during the summer of 2020. To the best of our knowledge, none of the incidents in question occurred on camp property. On Dec. 23, 2020, Camp Wartburg

leadership were made aware of the situation. The employee in question was immediately terminated and Camp Wartburg's executive director reported the accusations to the local authorities for investigation."

# EXHIBIT C

nexus

Underwritten by: Professional Solutions Insurance Company, 14001 University Avenue, Clive, IA 50325

# NOT-FOR-PROFIT MANAGEMENT LIABILITY POLICY DECLARATIONS

**THIS POLICY'S LIABILITY COVERAGE SECTIONS, IF PURCHASED, ARE ON A CLAIMS MADE AND REPORTED BASIS AND COVER ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD OR, IF EXERCISED, THE EXTENDED REPORTING PERIOD. CLAIM EXPENSES SHALL REDUCE THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGMENTS OR SETTLEMENTS AND SHALL ALSO BE APPLIED AGAINST THE APPLICABLE RETENTION.**

**PLEASE READ THE ENTIRE POLICY CAREFULLY AND DISCUSS THE COVERAGE HEREUNDER WITH YOUR INSURANCE AGENT OR BROKER.**

**ITEM 1**

| NAMED INSURED AND ADDRESS | UNDERWRITER |
|---|---|
| Lutheran Child & Family Services of IL<br>One Oakbrook Terrace, Suite 501<br>Oakbrook Terrace, IL 60181 | Professional Solutions Insurance Company,<br>14001 University Avenue, Clive, IA 50325 |
| **POLICY NUMBER** | **PRODUCER** |
| FQ350DMLA210 | AmWINS Brokerage of Illinois, LLC |

**ITEM 2**   **POLICY AGGREGATE LIMIT OF LIABILITY** for all **Liability Coverage Sections:** $5,000,000
All **Loss** under all **Liability Coverage Sections**, combined

**ITEM 3**   **POLICY PERIOD:**         FROM  07/01/2021         TO  07/01/2022
12:01 A.M. LOCAL TIME AT THE ADDRESS OF THE NAMED INSURED SHOWN ABOVE

**ITEM 4**   **EXTENDED REPORTING PERIOD:**

A. Additional Premium:        100    % of Annualized Premium in ITEM 7 Below
B. Additional Period:        1      Year(s)

**ITEM 5**   **RUN-OFF COVERAGE PERIOD:**

1. One (1) year        125    % of the Annualized Premium in ITEM 7 Below

**ITEM 6**   **NOTICE TO UNDERWRITER:**

Notice of Claim or Circumstances:                   All Other Notices:

Nexus Specialty, Inc.                               Nexus Specialty, Inc.
Attn: Claims                                        Attn: Underwriting
25 Broadway, 9th Floor                              25 Broadway, 9th Floor
New York, NY 10004                                  New York, NY 10004
notifications@nexusclaims.com                       NSIsubs@nexusunderwriting.com

**ITEM 7    POLICY PREMIUM:** $23,033.00

**ITEM 8    COVERAGE SCHEDULE:**

If any of the coverages described below are left blank or "N/A" is indicated, such coverage including any Coverage Section, Limit of Liability, Sublimit of Liability or Additional Limit, and any other reference thereto is deleted from the policy. No Retention shall apply to non-indemnifiable Loss.

| COVERAGE SECTION | AGGREGATE LIMIT OF LIABILITY | SUBLIMIT | RETENTION | PENDING OR PRIOR DATE | SHARED LIMIT |
|---|---|---|---|---|---|
| **DIRECTORS AND OFFICERS LIABILITY** | $4,000,000 | | $25,000 | 07/01/2009 | Separate |
| Stakeholder Investigative Costs | | $250,000 | $25,000 | | |
| Asset Protection Costs | | $100,000 | $25,000 | | |
| Public Relations Costs | | $100,000 | $25,000 | | |
| D&O Crisis Management Expenses | | $25,000 | $25,000 | | |
| Internal Revenue Code Violations | | $100,000 | $25,000 | | |
| Excess Benefit Transaction Excise Taxes | | $100,000 | $25,000 | | |
| | | | | | |
| **EMPLOYMENT PRACTICES LIABILITY** | Not Purchased | | Not Purchased | N/A | N/A |
| Workplace Violence Expenses | | | $ | | |
| EPL Crisis Management Expenses | | | $ | | |
| Illegal Hiring or Harboring | | | $ | | |
| | | | | | |
| **FIDUCIARY LIABILITY** | $1,000,000 | | $0 | 07/01/2009 | Separate |
| Voluntary Settlement Program Costs | | $100,000 | $0 | | |

| | | | | |
|---|---|---|---|---|
| HIPAA Penalties | | $150,000 | $0 | |
| Section 502(c) Penalties | | $250,000 | $0 | |
| Pension Protection Act of 2006 Penalties | | $250,000 | $0 | |
| Affordable Care Act Penalties | | $250,000 | $0 | |
| Section 4975 Tax Penalties | | $250,000 | $0 | |
| Pension Crisis Management Expenses | | $25,000 | $0 | |
| | | | | |
| **CRIME** | See Attached Crime Declarations Page | | | |
| | | | | |
| **CYBER** | See Attached Cyber Declarations Page | | | |
| | | | | |
| **EMPLOYED LAWYERS LIABILITY** | Not Purchased | | Not Purchased | N/A | N/A |
| Intra-Organization Claims Defense Expenses | | | | |
| General Counsel Replacement Expenses | | | | |
| | | | | |
| **MISCELLANEOUS PROFESSIONAL LIABILITY** | Not Purchased | | Not Purchased | N/A | N/A |
| Disciplinary Proceeding Expenses | | | | |

The following Additional Limits shall be in addition to and not part of the respective Aggregate Limits of Liability for each applicable Coverage Section, and in addition to and not part of the **POLICY AGGREGATE LIMIT OF LIABILITY** in **ITEM 2**:

**Additional Side A Limit of Liability for Executives:** $500,000

**Additional Defense Expenses Limit for Employment Practices Liability:** Not Purchased

**Additional Defense Expenses Limit for Fiduciary Liability:** Not Purchased

**Policy Aggregate Limit for E-Discovery Consultant Services:**          Not Purchased

**ITEM 9          MISCELLANEOUS PROFESSIONAL LIABILITY (if purchased)**

            **PROFESSIONAL SERVICES:**

            **RETROACTIVE DATE:**

**ITEM 10    FORMS AND ENDORSEMENTS APPLICABLE TO THIS POLICY ON THE DATE THIS POLICY IS ISSUED**

            See attached Schedule of Forms and Endorsements

# PRIVATE COMPANY MANAGEMENT LIABILITY POLICY
# CRIME DECLARATIONS

### ITEM 1   COVERAGE SCHEDULE

If any of the Insuring Agreements described below are left blank or "N/A" is indicated, such Insuring Agreement, Limit of Liability, and other reference thereto is deleted from the policy.

| Insuring Agreement | Limit of Liability Per Occurrence | Deductible Per Occurrence |
|---|---|---|
| **A.  Fidelity Coverage** | | |
| A1.  Employee Theft Coverage | $2,000,000 | $20,000 |
| A2.  Client Property Coverage | $2,000,000 | $20,000 |
| A3.  ERISA Coverage | $2,000,000 | N/A |
| **B.  Premises Coverage** | $2,000,000 | $20,000 |
| **C.  In Transit Coverage** | $2,000,000 | $20,000 |
| **D.  Forgery Coverage** | $100,000 | $1,000 |
| **E.  Computer Crime Coverage** | $2,000,000 | $20,000 |
| E1.Computer Fraud Coverage | $2,000,000 | $20,000 |
| E2.Computer Data Restoration Expenses Coverage | $50,000 | $20,000 |
| **F.  Funds Transfer Fraud Coverage** | $2,000,000 | $20,000 |
| **G.  Money Orders and Counterfeit Currency Fraud Coverage** | $2,000,000 | $20,000 |
| **H.  Credit Card Fraud Coverage** | $100,000 | $1,000 |
| **I.  Social Engineering Fraud Coverage** | $100,000 | $10,000 |
| **J.  Personal Account Protection** | $100,000 | $1,000 |
| Personal Accounts Forgery or Alteration | $100,000 | $1,000 |
| Identity Fraud Reimbursement | $25,000 | $1,000 |
| **K.  Expense Coverage** | $25,000 | $20,000 |

**Policy Attachments:**

| Coverage: General Terms and Conditions |
| --- |
| MPE-00014-07-19 \| Amend Definition of Organization |
| MPE-000IL-07-19 \| Illinois Amendatory Endorsement |

| Coverage: Common |
| --- |
| MPE-01015-07-19 \| Disclosure Pursuant To Terrorism Risk Insurance Act |
| MPE-01017-07-19 \| Cap On Losses From Certified Acts Of Terrorism Endorsement |

| Coverage: D&O |
| --- |
| MPE-02009-07-19 \| Sexual Abuse Exclusion |
| MPE-02013-07-19 \| Network Security and Privacy  Exclusion |
| MPE-12003-07-19 \| Absolute BI PD Exclusion |
| MPE-12015-05-20 \| Professional E&O Exclusion |

| Coverage: FID |
| --- |
| None |

| Coverage: Crime |
| --- |
| None |

nexus

## NOT-FOR-PROFIT MANAGEMENT LIABILITY POLICY
## GENERAL TERMS AND CONDITIONS SECTION

In consideration of payment of the premium, and in reliance on all statements made and information furnished to the Underwriter, and subject to the Declarations and all of the terms, conditions and limitations of this Policy, the Underwriter and the Insureds agree as follows:

**I.      TERMS AND CONDITIONS**

Except for these General Terms and Conditions or unless stated to the contrary in any Coverage Section or endorsement of this Policy, the terms and conditions of each Coverage Section of this Policy apply only to that Coverage Section and shall not apply to any other Coverage Section of this Policy. If any provision in these General Terms and Conditions is inconsistent or in conflict with the terms, conditions and limitations of any Coverage Section, the terms, conditions and limitations of such Coverage Section shall control for purposes of that Coverage Section. Any defined term referenced in these General Terms and Conditions but defined in a Coverage Section shall, for purposes of coverage under that Coverage Section, have the meaning set forth in that Coverage Section.

**II.     DEFINITIONS**

A.    **Application** means all written materials and information, including all signed applications and any materials attached thereto or incorporated therein, submitted by or on behalf of the **Insureds** to the Underwriter in connection with the underwriting of this Policy; provided, that any such statements or filings submitted in connection with the application(s) were made within twelve (12) months of the Inception Date of this Policy. The **Application** is deemed attached to and incorporated into this Policy.

B.    **Change in Control** means the occurrence of either of the following during the **Policy Period**:

1.   the **Named Insured**: (i) sells all or substantially all of its assets to any other person or entity or affiliated group of persons or entities, or (ii) merges or consolidates with another entity such that the **Named Insured** is not the surviving entity; or

2.   any person, entity or affiliated group of persons or entities acquires:

a.   an ownership interest of the **Named Insured** representing more than fifty percent (50%) of the power to manage or control the **Named Insured**, including the power to elect, appoint or designate a majority of the board of directors or equivalent executives of such entity; or

b.   the right pursuant to written contract or the by-laws, charter, operating agreement or similar documents of the **Named Insured** (including a limited liability company or joint venture) to elect, appoint or designate a majority of the board of directors or equivalent executives of the **Named Insured**.

C.    **Claim** means, with respect to any **Liability Coverage Section**, those matters defined as a **Claim** in such Coverage Section.

D.    **Clean-Up Costs** means any amount incurred to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**.

E. **Coverage Event** means, with respect to a **Non-Liability Coverage Section**, the event or loss which must occur or be discovered in order to invoke coverage under such Coverage Section.

F. **Defense Expenses** means that Section of **Loss** consisting of reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses incurred in defending any **Claim**, including the cost of **E-Discovery Consultant Services**, and the premium for appeal, attachment or similar bonds.  **Defense Expenses** does not include any remuneration, salaries, wages, fees, overhead or benefit expenses of any **Insured**.

G. **Domestic Partner** means any natural person qualifying as a domestic Partner under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by the **Organization.**

H. **E-Discovery Consultant Firm** means any e-discovery consulting firm selected by the Underwriter to perform **E-Discovery Consultant Services** in connection with a **Claim**.

I. **E-Discovery Consultant Services** means the following services performed by an **E-Discovery Consultant Firm:**

1. assisting the **Insured** with managing and minimizing the internal and external costs associated with the development, collection, storage, organization, cataloging, preservation and/or production of electronically stored information ("E-Discovery");

2. assisting the **Insured** in developing or formulating an E-Discovery strategy which shall include interviewing qualified and cost effective E-Discovery vendors; serving as project manager, advisor and/or consultant to the **Insured**, defense counsel and the Underwriter in executing and monitoring the E-Discovery strategy; and

J. **Employee** means the following:

1. any natural persons who were, now are or shall be in the regular service of the **Organization** in the ordinary course of the **Organization's** business, regardless of whether such natural person is in a supervisory, co-worker or subordinate position or otherwise, and including any such natural persons who are leased, temporary, part-time or seasonal employees of the **Organization**;

2. any independent contractor working for the **Organization**, and

3. any volunteers or interns working for the **Organization**

in their capacity as such;

provided (i) any independent contractor or person who is leased to the **Organization** shall qualify as an **Employee** only if the **Organization** provides indemnification to such leased individual in the same manner as is provided to the **Organization's** employees.

K. **Enforcement Unit** means any federal, state, local or foreign law Enforcement Unit or other investigative, administrative, regulatory or governmental authority (including but not limited to, the U.S. Department of Justice, the U.S. Securities and Exchange Commission or any attorney general), or the enforcement unit of any securities or commodities exchange or similar self-regulatory organization (including, but not limited to, the New York Stock Exchange, NASDAQ and the American Stock Exchange).

L.  **ERISA** means the Employee Retirement Income Security Act of 1974, and as amended, and any similar foreign, state or local law, statute, rule or regulation.

M.  **Executive** means with respect to any **Organization** the natural persons who were, now are or shall become a duly elected or appointed director (including a de facto director or shadow director), officer, trustee, trustee emeritus, regent, governor, executive director, advisory director department head, faculty member, member of the Board of Managers, duly constituted committee member, member of an advisory board, in-house general counsel or risk manager or the functional equivalent of any of the foregoing positions.

N.  **Extended Reporting Period** means the period set forth in ITEM 4.B of the Declarations for the extended coverage under the **Liability Coverage Sections**, as described in Section XIV of these General Terms and Conditions.

O.  **Extradition** means any formal process by which an **Insured Person** located in any foreign or domestic jurisdiction is or is sought to be surrendered to any other foreign or domestic jurisdiction for trial, or otherwise to answer any criminal accusation, for a **Wrongful Act**.

P.  **Financial Impairment** means the status of the **Organization** resulting from:

    1.  the appointment of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate the **Organization**, or

    2.  the **Organization** becoming a debtor in possession, as defined under U.S. Bankruptcy law or equivalent foreign law.

Q.  **Foreign Jurisdiction** means any jurisdiction, other than the United States or any of its territories or possessions.

R.  **Foreign Policy** means the standard insurance policy (including all mandatory endorsements, if any) approved by the Underwriter for use within a **Foreign Jurisdiction** that provides coverage substantially similar to the coverage afforded by the applicable Coverage Section under this Policy, but shall not include any commercial general liability, property or similar insurance policy.

S.  **Insured Persons** means with respect to each Coverage Section the natural persons defined as **Insured Persons** in such **Coverage Section**.

T.  **Insureds** means with respect to each Coverage Section the entities, plans and natural persons defined as **Insureds** in such Coverage Section.

U.  **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause, or series of related facts, circumstances, situations, events, transactions or causes.

V.  **Liability Coverage Section** means any of the following: Directors and Officers Liability Coverage Section, Employment Practices Liability Coverage Section, Fiduciary Liability Coverage Section, Cyber Coverage Section, Employed Lawyers Liability Coverage Section, or Miscellaneous Professional Liability Coverage Section, if purchased as set forth in the Coverage Schedule in ITEM 8 of the Declarations.

W.  **Loss** means:

    1.  with respect to any **Liability Coverage Section**, the amounts defined as **Loss** in such Coverage Section; and

    2.  with respect to the Crime Coverage Section, the amounts covered under such Crime Coverage Section.

X.  **Manager** means any natural person who is a former, present or future manager, managing member, general partner, member of the board of managers or equivalent executive of an **Organization** that is a limited liability company or a limited partnership.

Y.  **Non-Indemnifiable Loss** means **Loss** incurred by an **Insured Person** for which the **Organization** is not permitted by common or statutory law to indemnify or is not financially able to indemnify by reason of **Financial Impairment**.

Z.  **Named Insured** means the organization designated in ITEM 1 of the Declarations.

AA.  **Organization** means, collectively, the **Named Insured** and its **Subsidiaries**, including any such organization as a debtor in possession under United States bankruptcy law or an equivalent status under the law of any other country.

BB.  **Personal Injury** means libel, slander, disparagement, defamation, invasion of privacy, invasion of right of publicity, wrongful entry, wrongful detention, wrongful eviction, false imprisonment, false arrest, malicious prosecution, malicious use or abuse of process, assault, battery, loss of consortium, or any violation of a federal, state or local statutory or common law, rule or regulation involving the unsolicited electronic dissemination of faxes, emails, texts, or other communications by or on behalf of an **Organization** to any actual or prospective customers of an **Organization** or any other third party, including but not limited to the Telephone Consumer Protection Act, the United States of America CAN-SPAM Act of 2003, the Junk Fax Prevention Act of 2005, and any amendments thereto, or any similar federal, state or local statutory or common law, rule or regulation.

CC.  **Plans** mean the plans and programs defined as **Plans** in the Fiduciary Liability Coverage Section, if purchased.

DD.  **Policy Period** means the period set forth in ITEM 3 of the Declarations, subject to prior termination in accordance with Section XIX (Cancellation and Nonrenewal) of these General Terms and Conditions.

EE.  **Pollutants** means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by or identified on a list of hazardous substances issued by, the United States Environmental Protection Agency or a state, county, municipality or locality counterpart thereof. **Pollutants** also means any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, silica, noise, fungus (including mold, mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but not any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field. Such matters shall include, without limitation, solids, liquids, gaseous, thermal, biological, nuclear or radiological irritants, contaminants or smoke, soot, fumes, acids, alkalis, chemicals or waste materials.

FF. **Subsidiary** means:

  1. any organization in which more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for the election of directors or equivalent position is owned, in any combination, by one or more **Organizations**;

  2. any organization in which one or more **Organizations**, in any combination, have the right, pursuant to a written contract with or the by-laws, charter, operating agreement or similar document of such organization, to elect or appoint a majority of the directors or equivalent position of such organization;

  3. any organization in which exactly fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for the election of directors or equivalent positions is owned, in any combination, by one or more **Organizations**, if one or more **Organizations** solely controls the management and operation of such organization pursuant to a written contract with the owners of the remaining fifty percent (50%) of such securities or voting rights;

  4. any not-for-profit organization controlled or exclusively sponsored by one or more **Organizations**.

GG. **Wage and Hour Law** means any state, local or foreign statutory or common law (including, but not limited to the Fair Labor Standards Act or Wage Payment and Collection Act), or any amendments thereto, or rule or regulations promulgated thereunder governing wage, hour and payroll policies and practices (except the Equal Pay Act) including, but not limited to:

  1. the refusal, inability or failure of an **Organization** or **Insured Person** to pay wages or overtime pay, off-the-clock work, on-call time compensation, compensation for waiting time and dressing time, minimum wage compensation, reimbursement of expenses or any amounts representing such wages or pay or expenses, for services rendered or time spent in connection with work related activities;

  2. improper pay deductions taken by an **Organization** or **Insured Person** from any employee or purported employee, including but not limited to garnishments and withholdings;

  3. improper classification of any employee or purported employee or improper or failure to maintain accurate records;

  4. child labor;

  5. pay equity or comparable worth;

  6. failure to provide or enforce any legally required rest or meal breaks; or

  7. any similar practices, policies, or procedures.

HH. **Wrongful Acts** means, with respect to any **Liability Coverage Section**, the acts, errors, omissions and other matters defined as **Wrongful Acts** in such Coverage Section.

III.   **NOTICE**

A.   Any notice to the Underwriter with respect to any Coverage Section shall designate the Coverage Section under which notice is being given and shall be treated as notice only under the Coverage Section so designated.

B.   Except as otherwise provided in this Policy, all notices under any provision of this Policy shall be in writing and given by prepaid express courier, certified mail, email or fax properly addressed to the appropriate party. Notice to the **Insureds** may be given to the **Named Insured** at the address as shown in ITEM 1 of the Declarations. Notice to the Underwriter shall be given to the respective address shown in ITEM 6 of the Declarations. Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee or in the case of courier, email or fax, one day following the date such notice is sent, whichever earlier, subject to proof of transmittal.

IV.   **LIMITS OF LIABILITY**

A.   **POLICY AGGREGATE LIMIT OF LIABILITY**

The amount set forth in ITEM 2 of the Declarations shall be the Underwriter's maximum limit for all **Loss** covered under all **Liability Coverage Sections**, combined.

The Underwriter's maximum liability under the Crime Coverage Section shall be the respective Limits of Liability as set forth in the Crime Declarations, if any. Such Limits of Liability will be applied as described in the respective Crime Coverage Section.

B.   **EACH LIABILITY COVERAGE SECTION LIMIT OF LIABILITY**

The respective Aggregate Limit of Liability for each **Liability Coverage Section**, as set forth in the Coverage Schedule in ITEM 8 of the Declarations, shall be the Underwriter's maximum aggregate liability for all **Loss** on account of all **Claims** under each such **Liability Coverage Section**.

The Limit of Liability for each **Liability Coverage Section** shall be part of and not in addition to, the Policy Aggregate Limit of Liability as set forth in ITEM 2 of the Declarations.

C.   **SHARED LIABILITY COVERAGE SECTION LIMIT OF LIABILITY**

If the Aggregate Limit(s) of Liability for more than one Coverage Section is selected to be a Shared Limit in ITEM 8 of the Declarations, then: (i) the Aggregate Limit of Liability for each shared Coverage Section shall be the maximum liability of the Underwriter for all **Loss** arising from all **Claims** under such shared Coverage Sections, (ii) any **Loss** paid under one shared Coverage Section shall reduce the Aggregate Limit of Liability for all other shared Coverage Sections, and (iii) in no event shall the maximum liability of the Underwriter for all **Loss** arising from all **Claims** under all Shared Coverage Sections, collectively, exceed the highest Aggregate Limit of Liability applicable to such Coverage Sections that have a Shared Limit. Such Shared Limit of Liability shall be part of and not in addition to the Policy Aggregate Limit of Liability as set forth in ITEM 2 of the Declarations. This paragraph further limits the Underwriter's maximum liability under each such **Liability Coverage Section** and does not increase the respective separate Aggregate Limit of Liability for each **Liability Coverage Section**.

D. **LIABILITY UNDER MULTIPLE COVERAGE SECTIONS**

In the event that a single **Claim** is covered in whole or in part under more than one **Liability Coverage Section**, then the Underwriter's maximum aggregate limit of liability for all **Loss** resulting from such **Claim** shall not exceed the largest single applicable Limit of Liability available under any such **Liability Coverage Section**.

E. **POLICY AGGREGATE SUBLIMIT FOR E-DISCOVERY CONSULTANT SERVICES**

The Policy Aggregate Sublimit for E-Discovery Consultant Services stated in Item 8 of the Declarations shall mean the maximum limit of the Underwriter's liability for all **E-Discovery Consultant Services** resulting from all Claims or Related Claims under all Liability Coverage Sections combined. Such Policy Aggregate Sublimit for E-Discovery Consultant Services shall be part of, and not in addition to, the Policy Aggregate Limit of Liability and the any applicable Aggregate Limit of Liability for any **Liability Coverage Section**.

F. **COORDINATION OF COVERAGE**

Any **Loss** covered under more than one **Liability Coverage Section** including the Cyber Coverage Section, shall first be covered under the Cyber Coverage Section, subject to its terms, conditions and limitations. Any remaining portion of such **Loss** which is not paid under the Cyber Coverage Section shall then be covered under the Employment Practices Liability Coverage Section, if applicable, subject to its terms, conditions and limitations. Any remaining portion of such **Loss** otherwise covered under any other applicable **Liability Coverage Section** which is not paid under the Cyber Coverage Section or Employment Practices Liability Coverage Section shall be covered under such other **Liability Coverage Section**, subject to the terms, conditions and limitations of such **Liability Coverage Section**.

G. **SUBLIMITS OF LIABILITY**

Except as otherwise indicated, any Sublimit of Liability set forth in any Coverage Section shall be part of and not in addition to, the respective Aggregate Limit of Liability for that Coverage Section. No retention shall apply to any **Loss** which is subject to a Sublimit of Liability unless otherwise specifically indicated in the Declarations, the Policy and/or any endorsements thereto.

H. **DEFENSE EXPENSES WITHIN LIMIT OF LIABILITY**

Except as otherwise provided, **Defense Expenses** are part of and not in addition to the Limits of Liability applicable to the **Liability Coverage Sections**, and the payment by the Underwriter of **Defense Expenses** reduces such Limits of Liability.

I. **LIMIT OF LIABILITY EXHAUSTION AND PAYMENT**

If the applicable Limit of Liability under this Policy is exhausted by payment of **Loss**, the Underwriter's obligations, including without limitation any duty to defend, shall be completely fulfilled and extinguished. Except with respect to Section XVIII of these General Terms and Conditions (Payment of Loss), the Underwriter is entitled to pay **Loss** as it becomes due and payable by the **Insureds**, without consideration of other future payment obligations.

**V.    RETENTION**

    A.  **RETENTIONS FOR LIABILITY COVERAGE SECTIONS**

        1.  The Underwriter's liability under the **Liability Coverage Sections** with respect to **Loss** on account of each **Claim** shall apply only to that Section of **Loss** which is excess of the applicable Retention set forth in the Coverage Schedule in ITEM 8 of the Declarations. If more than one Retention applies to a single **Claim**, the largest applicable Retention shall apply to such **Claim**. The retention shall be uninsured under this Policy. The Underwriter shall recognize payment of any applicable retention by the **Insured**, any Side A Excess DIC Underwriter and/or by any other source.

        2.  If an **Organization** refuses or fails within sixty (60) days after an **Insured Person's** request to indemnify or advance covered **Loss** or if the **Organization** is unable to indemnify or advance covered **Loss** due to its **Financial Impairment**, the Underwriter shall pay such covered **Loss** without applying the applicable Retention. If the Underwriter pays under this Policy any **Loss** incurred by an **Insured Person** for which the **Organization** is legally permitted or required and is financially able to advance or indemnify, then the **Organization** shall reimburse the Underwriter for such amounts up to the applicable Retention, and such amounts shall become due and payable as a direct obligation of the **Organization** to the Underwriter.

        3.  No Retention shall apply to the first $10,000 of **E-Discovery Consultant Services** incurred by the **Insured** in connection with a **Claim**.

    B.  **DEDUCTIBLES FOR CRIME COVERAGE SECTION**

    The Underwriter's maximum liability and the applicable Deductible under the Crime Coverage Section shall be the respective Limits of Liability and Deductible amounts as set forth in the respective Crime Declarations, if any. Such Limits of Liability and Deductible amounts will be applied as described in the respective Crime Coverage Section.

**VI.    SINGLE CLAIMS**

All **Claims** under the **Liability Coverage Sections** which arise out of the same **Wrongful Act** or **Interrelated Wrongful Act** shall be deemed one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made against any **Insured**, regardless of whether such date is before or during the **Policy Period**. In no event shall a single lawsuit or proceeding constitute more than one **Claim.**

If a single **Claim** is covered in whole or in Part under more than one **Liability Coverage Section**, the applicable Retention under each such **Liability Coverage Section** shall be applied with respect to coverage for such **Claim** under such **Liability Coverage Section**, provided the sum of all applicable Retentions under all such **Liability Coverage Sections** shall not exceed the largest of such applicable Retentions.

**VII.    ALLOCATION**

Subject to this Section VIII, if in any **Claim** under a **Liability Coverage Section** the **Insureds** incur both **Loss** covered by this Policy and loss not covered by this Policy either because the **Claim** against the **Insureds** includes both covered and uncovered matters or because the **Claim** is made

against both **Insureds** who are afforded coverage for such **Claim** and others, including **Insureds**, who are not afforded coverage for such **Claim**, then:

A.   one hundred percent (100%) of any **Defense Expenses** shall be allocated to covered **Loss** under such **Liability Coverage Section**; and

B.   loss, other than **Defense Expenses**, incurred by the **Insureds** in connection with such **Claim** shall be allocated between covered **Loss** and uncovered loss based upon the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and/ or settlement of the **Claim** by the **Insured Persons**, the **Organization** and others.  In making such a determination, the **Organization**, the **Insured Persons** and the Underwriter agree to use their best efforts to determine a fair and proper allocation of all such amounts. In the event that the Underwriter and the **Insureds** do not reach an agreement with respect to an allocation, then the Underwriter shall be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of this **Policy** and applicable law.

## VIII.   COOPERATION

With respect to all Coverage Sections, the **Insureds** agree to provide the Underwriter with all information, assistance and cooperation which the Underwriter reasonably requests and agree that in the event of a **Claim** or **Coverage Event**, the **Insureds** will do nothing that shall prejudice the Underwriter's position or its potential or actual rights of recovery. The failure of any **Insured** to comply with this Section IX shall not be imputed to or create a coverage defense under this Policy with respect to any other **Insured Person**.

## IX.   CHANGES IN EXPOSURE

### A.   NEW ORGANIZATIONS OR PLANS

If before or during the **Policy Period** the **Organization** acquires or creates a new **Subsidiary** or a new **Plan** or acquires an entity by merger or consolidation, coverage under this Policy shall automatically apply to the new organization or **Plan** and its **Insureds**, provided such coverage shall apply only:

1.   with respect to any **Liability Coverage Section**, solely for **Claims** for **Wrongful Acts** taking place after such acquisition or creation;

2.   with respect to the Crime Coverage Section, solely after the effective date of such acquisition subject to Section X - Liability For Prior Losses of the Crime Coverage Section;

This Section IX.A does not apply to, and no coverage is afforded under, this Policy for any **Subsidiary** acquired during the **Policy Period** and its **Insureds** if such **Subsidiary** is a registered issuer of securities pursuant to the Securities Exchange Act of 1934, as amended, unless the Underwriter agrees by endorsement to this Policy to afford coverage for such **Subsidiary** and its **Insureds**.

### B.   ACQUISITION OF NAMED INSURED

In the event of a **Change in Control** coverage under this Policy shall continue until the termination of this Policy, provided such coverage shall apply only with respect to **Claims** for **Wrongful Acts** (under a **Liability Coverage Section**) or a **Coverage Event** (under the Crime

Coverage Section) taking place prior to such **Change in Control**. The entire premium for this Policy shall be deemed fully earned as of the effective date of such **Change in Control**.

C. **RUN-OFF PURCHASE OPTION**

1. In the event of a **Change in Control** during the **Policy Period**, the **Named Insured** shall have the right, upon payment of the additional premium set forth in ITEM 5 of the Declarations, to an extension of coverage granted by the **Liability Coverage Sections** for the Run-Off Coverage Period set forth in ITEM 5 of the Declarations (Run Off Coverage Periods), which shall commenced as of the effective date of the **Change in Control** ("Run-Off Period**"**).

2. This extension of coverage shall apply: (i) to any **Claim** deemed first made during the Run-Off Period but only for **Wrongful Acts** taking place prior to the effective date of the Run-Off Period, and (ii) only to coverage provided under the **Liability Coverage Sections** selected in ITEM 8 of the Declarations. The **Named Insured** shall have the right to elect only one of the Run-Off Coverage Periods referenced in ITEM 5 of the Declarations.

3. If the **Named Insured** elects to purchase a Run-off Period, they shall submit to the Underwriter: (i) a written request to purchase the Run-Off Period, and (ii) payment of the additional premium for such Run-Off Period, no later than sixty (60) days following the effective date of such **Change in Control**. The premium paid for the Run-Off Period shall be deemed fully earned at the inception of the Run-Off Period.

4. This extension of coverage shall in no way increase the Policy Aggregate Limit of Liability under the **Liability Coverage Section(s)** selected or the Policy Aggregate Limit of Liability under the Policy. If a Run-Off Period is purchased, Sections XII (Extended Reporting Period) and XIX (Cancellation and Nonrenewal) shall be deleted.

D. **CESSATION OF SUBSIDIARIES**

If before or during the **Policy Period** an organization ceases to be a **Subsidiary**, coverage with respect to such **Subsidiary** and its **Insureds** shall continue until termination of this Policy, provided such coverage shall apply (i) with respect to any **Liability Coverage Sections**, only with respect to **Claims** for **Wrongful Acts** taking place prior to the date such organization ceased to be a **Subsidiary**, and (ii) with respect to Crime Coverage Section, only with respect to **Coverage Events** taking place prior to the date such organization ceased to be a **Subsidiary**.

E. **CESSATION OF PLANS**

If before or during the **Policy Period** a **Plan** is terminated, coverage for such **Plan** and its **Insureds** under the Fiduciary Liability Coverage Section, if purchased, shall continue until termination of such Coverage Section with respect to **Wrongful Acts** taking place prior to the termination of such **Plan.**

X. **REPRESENTATIONS, SEVERABILITY AND NON-RESCINDABLE COVERAGES**

A. **REPRESENTATIONS**

The **Insureds** represent and acknowledge that the particulars and statements contained in the **Application** are true and accurate and are the basis of this Policy and are to be considered

incorporated into and constituting a Part of this Policy. This Policy is issued in reliance upon the truth and accuracy of such representations.

B. **SEVERABILITY**

The **Application** shall be construed as a separate application for coverage by each of the **Insureds**. If with respect to any Coverage Section the **Application** contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by the Underwriter under such Coverage Section, then the Underwriter shall not be liable under such Coverage Section to pay any **Loss** on account of, and shall not be obligated to defend, any **Claim** based upon, arising out of or attributable to the facts that were not truthfully and accurately disclosed in the **Application** to the extent such **Loss** is incurred by:

1. any **Insured Person** who knew the facts that were not truthfully disclosed in the **Application**;

2. any **Organization** that grants indemnification to an **Insured Person** who knew the facts that were not truthfully disclosed in the **Application**; and

3. any **Organization** or **Plans** if the chief executive officer or chief financial officer **Executive** of such **Organization** knew the facts that were not truthfully disclosed in the **Application**;

whether or not such **Executive** or **Insured Person** knew the **Application** contained such misrepresentation or omission. No knowledge of one **Insured Person** shall be imputed to any other **Insured Persons** and the knowledge of any past or present chief executive officer or chief financial officer (or equivalent position thereof) of the **Organization** shall be imputed to such **Organization.**

C. **NON-RESCINDABLE POLICY**

The Underwriter shall not have the right to rescind or void this Policy or any Coverage Section, in whole or in Part, for any reason.

**XI. OTHER INSURANCE**

Solely with respect to any **Liability Coverage Section**, if any **Loss** resulting from any **Claim** is insured by any other valid and collectible insurance issued to any **Insured**, then this Policy shall apply only excess of the amount of any deductibles, retentions and limits of liability under such other policy whether such other policy is stated to be primary, contributory, excess, contingent or otherwise, unless such other policy is written specifically excess of this Policy. However, this Policy shall apply on a primary basis with respect to (i) any personal umbrella or other personal liability policy available to an **Insured Person**, or (ii) any private equity or venture capital liability, general partnership liability or other similar management or professional liability insurance policy available to an **Insured Person**.

**XII. EXTENDED REPORTING PERIOD**

If the Underwriter or the **Named Insured** terminates or refuses to renew this Policy other than for nonpayment of premium, the **Insureds** shall have the right, upon payment of the additional premium set forth in ITEM 4.A of the Declarations, to an extension of the coverage granted by the **Liability Coverage Sections** for the **Extended Reporting Period** set forth in ITEM 4.B of

the Declarations following the effective date of termination or nonrenewal, but only with respect to any **Wrongful Act** taking place prior to the effective date of such termination or nonrenewal. This right of extension shall lapse unless written notice of such election, together with payment of the additional premium due, is given by the **Insureds** to the Underwriter within sixty (60) days following the effective date of termination or nonrenewal.

The offer of renewal terms and conditions or premiums different from those in effect prior to renewal shall not constitute refusal to renew.

The entire additional premium for the **Extended Reporting Period** shall be deemed fully earned at the inception of the **Extended Reporting Period**.

The Limit of Liability for the **Extended Reporting Period** shall be part of and not in addition to the applicable Limits of Liability for the **Policy Period**.

## XIII. ESTATES, LEGAL REPRESENTATIVES, SPOUSES AND DOMESTIC PARTNERS

The estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** of **Insured Persons** shall be considered an **Insured Person** under the **Liability Coverage Sections** but only for a **Claim** arising solely out of their status as such and, in the case of a spouse or **Domestic Partners**, where such **Claim** seeks damages from marital community property, jointly held property or property transferred from the **Insured Person** to the spouse or **Domestic Partner**. No coverage is provided for any wrongful act or omission of an estate, heir, legal representative, assign, spouse or **Domestic Partner**. All provisions in these General Terms and Conditions and the respective **Liability Coverage Section** applicable to **Loss** incurred by the **Insured Person** shall also apply to covered loss incurred by such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners**.

## XIV. TERRITORY AND VALUATION

Coverage under any **Liability Coverage Section** shall extend to **Claims** made and **Wrongful Acts** anywhere in the world.

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in *The Wall Street Journal* on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

Any **Loss** incurred by an **Organization** in a **Foreign Jurisdiction** shall be deemed, at the written direction of the **Named Insured**, a **Loss** of the **Named Insured** payable to the **Named Insured** at the address shown on the Declarations. Any such payment by the Underwriter to the **Named Insured** pursuant to this paragraph shall fully discharge the Underwriter's liability under this Policy for such **Loss**. Any **Loss** incurred by an **Insured Person** in a **Foreign Jurisdiction** and which is not indemnified or paid by an **Organization** shall, to the extent permissible under applicable law, be paid to such **Insured Person** in a jurisdiction mutually acceptable to such **Insured Person** and the Underwriter.

**XV.    SUBROGATION**

Solely with respect to any **Liability Coverage Section**, the Underwriter shall be subrogated to the extent of any payment to all of the rights of recovery of the **Insureds**. The **Insureds** shall do everything reasonably necessary to secure and preserve such rights, including, without limitation, the execution of any documents necessary to enable the Underwriter to effectively bring suit in the name of the **Insureds**. The **Insureds** shall do nothing to prejudice the Underwriter's position or any rights of recovery.  In no event, however, shall the Underwriter seek subrogation against any Insured under this Policy unless:

A.    such **Insured** has been convicted of a criminal act;

B.    it has been determined by a final and non-appealable adjudication in any judicial or administrative proceeding, other than an action or processing commenced by the Underwriter to determine coverage under this Policy, that such **Insured** committed a deliberately fraudulent or dishonest act or omission, or wilfully violated any statute, rule or law; or

C.    it has been it has been determined by a final and non-appealable adjudication in any judicial or administrative proceeding, other than an action or processing commenced by the Underwriter to determine coverage under this Policy, that such **Insured** gained any personal profit, remuneration or financial advantage to which such Insured was not legally entitled.

**XVI.    ALTERATION, ASSIGNMENT AND HEADINGS**

By acceptance of this Policy, all **Insureds** and the Underwriter agree that this Policy (including the Declarations, **Application**, all purchased Coverage Sections and any written endorsements attached to this Policy) constitute the entire agreement between the parties. The terms, conditions and limitations of this Policy can be waived or changed only by written endorsement hereto. This Policy and any and all rights hereunder are not assignable without the prior written consent of the Underwriter, which consent shall be in the sole and absolute discretion of the Underwriter.

The titles and headings to the various sections, subsections and endorsements of this Policy and schedule of endorsements attached to this Policy, are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions or existence of such sections, subsections or endorsements.

**XVII.    RISK MANAGEMENT**

The Underwriter directly or indirectly may make available risk management services in connection with this Policy for the purpose of managing and reducing the risks covered under this Policy.  Such risk management services may cease or change in the Underwriter's sole discretion at any time.

**XVIII.    PAYMENT OF LOSS**

In the event payment of **Loss** is due and owing by the Underwriter under a **Liability Coverage Section** exceeds the then-remaining Limit of Liability applicable to such **Loss**, the Underwriter shall pay such **Loss**, subject to the applicable Limits of Liability, in the following priority:

A.    First, the Underwriter shall pay such **Loss** which is non indemnifiable incurred by **Insured Persons**;

B.   Second, the Underwriter shall pay all other **Loss** covered under the **Liability Coverage Section**.

C.   Except as otherwise provided in this Section XVII, the Underwriter may pay covered Loss as it becomes due under the Liability Coverage Section without regard to the potential for other future payment obligations under the Liability Coverage Section.

## XIX.  CANCELLATION AND NONRENEWAL

The **Named Insured** may cancel this Policy or any Coverage Section by mailing or delivering to the Underwriter advance written notice of cancellation. The Underwriter may not cancel this Policy or any Coverage Section, except for the **Named Insured's** failure to pay a premium when due.  In such event, the Underwriter shall mail or deliver to the **Named Insured** written notice of cancellation at least twenty (20) days before the effective date of such cancellation, but such cancellation shall not become effective if the **Insureds** pay such premium in full during such twenty (20) day period. Any notice of cancellation will state the effective date of cancellation. The **Policy Period** will end on that date. If this Policy is cancelled, the Underwriter will send to the **Named Insured** the premium refund, computed pro rata. The cancellation will be effective even if the Underwriter has not made or offered a premium refund.

The Underwriter will not be required to renew this Policy upon expiration.  The Underwriter will provide the **Named Insured** with sixty (60) days' notice of any non-renewal.

## XX.  AUTHORIZATION CLAUSE

By acceptance of this Policy, the **Named Insured** agrees to act on behalf of the **Insureds** with respect to giving and receiving notices, paying premiums and receiving any return premiums that may become due under this Policy, and agreeing to endorsements, and the **Insureds** agree that the **Named Insured** may act on their behalf with respect to such matters.

## XXI.  BANKRUPTCY

Bankruptcy or insolvency of any **Insured** or of the estate of any **Insured** shall not relieve the Underwriter of its obligations nor deprive the **Insured** of its rights or defenses under this Policy.

In the event a liquidation or reorganization proceeding is commenced by or against an **Organization** pursuant to the United States Bankruptcy Code, as amended, or any similar foreign, state or local law, the **Insureds** hereby (i) waive and release any automatic stay or injunction which may apply in such proceeding to this Policy or its proceeds under such bankruptcy law, and (ii) agree not to oppose or object to any efforts by the Underwriter, the **Organization** or any **Insured** to obtain relief from any such stay or injunction.

## XXII.  ACTION AGAINST UNDERWRITER

No action may be taken against the Underwriter unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this Policy. No person or entity shall have the right under this Policy to join the Underwriter as a party to any action against any **Insured** to determine such **Insured's** liability nor shall the Underwriter be impleaded by such **Insured** or legal representative of such **Insured**.

**XXIII. COMPLIANCE WITH APPLICABLE TRADE AND ECONOMIC SANCTION LAWS**

This Policy does not provide coverage that would be in violation of any applicable laws or regulations concerning trade or economic sanctions, including, but not limited to, those administered and enforced by the U.S. Treasury's Office of Foreign Asset Control (OFAC). Payment of **Loss** under this Policy shall be made only if such payment is in full and complete compliance with all economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by OFAC.

**XXIV. STATE AMENDATORY ENDORSEMENTS**

In the event there is an inconsistency between a state amendatory endorsement attached to this Policy and any term or condition of this Policy, then, where permitted by law, the Underwriter shall apply those terms and conditions of either the state amendatory endorsement or this Policy which are more favorable to the **Insured**.

nexus

**NOT-FOR-PROFIT MANAGEMENT LIABILITY POLICY**
**DIRECTORS AND OFFICERS LIABILITY COVERAGE SECTION**

In consideration of payment of the premium and subject to the Declarations, the General Terms and Conditions, and the terms, conditions and limitations of this Coverage Section, the Underwriter and the **Insureds** agree as follows:

I.  **INSURING AGREEMENTS**

    A.  **INSURED PERSONS NON-INDEMNIFED LOSS COVERAGE**

        The Underwriter shall pay on behalf of the **Insured Persons** all **Loss** for which the **Insured Persons** are not indemnified by the **Organization** and which the **Insured Persons** become legally obligated to pay on account of any **Claim** first made against them during the **Policy Period** or the **Extended Reporting Period**, if exercised, for a **Wrongful Act**

    B.  **INSURED PERSONS INDEMNIFIED LIABILITY COVERAGE**

        The Underwriter shall pay on behalf of the **Organization** all **Loss** for which the **Organization** grants indemnification to the **Insured Persons** and which the **Insured Persons** have become legally obligated to pay on account of any **Claim** first made against them during the **Policy Period** or the **Extended Reporting Period**, if exercised, for a **Wrongful Act**.

    C.  **ORGANIZATION LIABILITY COVERAGE**

        The Underwriter shall pay on behalf of the **Organization** all **Loss** for which the **Organization** becomes legally obligated to pay on account of a **Claim** first made against the **Organization** during the **Policy Period** or the **Extended Reporting Period**, if exercised, for a **Wrongful Act**.

    D.  **STAKEHOLDER DERIVATIVE DEMAND INVESTIGATION COSTS AND BOOKS AND RECORDS COSTS**

        The Underwriter shall pay on behalf of the **Organization** all **Investigative Costs** on account of all **Stakeholder Derivative Demands** and **Books and Records Requests** first received by the **Organization** during the **Policy Period** or the **Extended Reporting Period**, if exercised, provided the Underwriter's maximum liability for all **Investigative Costs** covered under this Insuring Agreement D shall be the respective Sublimit of Liability set forth in ITEM 8 of the Declarations, which shall be part of and not in addition to the Aggregate Limit of Liability for this Coverage Section.

II.  **COVERAGE ENHANCEMENTS**

    A.  **PRE-CLAIM EXPENSES**

        If the **Insured** gives notice to the Underwriter in accordance with Section IV.C of this Coverage Section ("Noticed Matter"), and if a **Claim** is subsequently made against an **Insured** arising out of such Noticed Matter, then any **Pre-Claim Expenses** incurred by an **Insured**, in an amount no greater than the lesser of $25,000, or fifty percent (50%) of the applicable retention, shall qualify as **Loss** solely for purposes of exhaustion of the applicable retention subject to the following:

1.  Coverage will apply only to such **Pre-Claim Expenses** incurred on or after the date the **Insured** provides written notice to the Underwriter of the Noticed Matter and prior to the time such Noticed Matter becomes a **Claim**. Once the retention has been exhausted, **Pre-Claim Expenses** shall no longer qualify as **Loss** covered under the policy;

2.  This coverage shall not be deemed to waive any of the Underwriter's rights hereunder or limit or affect the **Insureds'** rights to receive coverage for **Loss** incurred following the reporting of **Claim**; and

3.  Coverage as provided herein shall not include **Investigation Costs** or **Defense Expenses** incurred in connection with an **Inquiry** or any investigation of an **Insured**.

B.  **EXECUTIVE PROTECTION COVERAGE**

**Loss** shall include the following provided they arise out of a **Claim** against an **Insured Person**:

1.  **Asset Protection Costs**; and

2.  **Public Relations Costs**;

Such **Costs** shall be provided subject to the respective Sublimits of Liability set forth in ITEM 8 of the Declarations, which shall be part of and not in addition to the Aggregate Limit of Liability for this Coverage Section.

C.  **OUTSIDE CAPACITY COVERAGE**

Subject to the other terms and conditions applicable to this Coverage Section, Insuring Agreement A and Insuring Agreement B include coverage for **Executives** while serving in an **Outside Position**. Such coverage shall be specifically excess of any indemnification and insurance available from or provided by the **Outside Entity** in which the **Executives** serves in an **Outside Capacity**.

D.  **ADDITIONAL SIDE A LIMIT OF LIABILITY FOR EXECUTIVES LIABILITY**

If an Additional Side A Limit of Liability is selected in the Declarations, and if the Limit of Liability applicable to **Loss** covered under this Coverage Section is exhausted by payments by the Underwriter, then the Underwriter's liability for any **Loss** covered under Insuring Agreement A which is incurred by any **Executive** shall be the amount set forth in the Declarations, which shall be in addition to and not part of the Aggregate Limit of Liability for this Coverage Section, and in addition to and not part of the Combined Aggregate Limit of Liability set forth in ITEM 2 of the Declarations, provided that this Additional Side A Limit of Liability shall be excess of any other valid and collectible insurance that is specifically excess of this Coverage Section and such insurance must be completely exhausted by payment of loss, damages or defense expenses thereunder before the Underwriter shall have any obligation to make any payment on account of the Additional Limit of Liability for Executives.

E.  **D&O CRISIS MANAGEMENT REIMBURSEMENT COVERAGE**

Upon satisfactory proof of payment by the **Organization**, the Underwriter will reimburse the **Organization**, up to the D&O Crisis Management Expenses Sublimit stated in ITEM 8 of the Declarations, for **Crisis Management Expenses** actually paid by the **Organization** in connection with a **Crisis Management Event** that first occurs during the **Policy Period** subject

to the Sublimit of Liability as set forth in ITEM 8 of the Declarations, for all **Crisis Management Expenses**, which shall be part of and not in addition to the Aggregate Limit of Liability for this Coverage Section.

## III.  DEFINITIONS

When used in the Directors and Officers Liability Coverage Section, the following terms, whether in the singular or plural, are defined as follows:

A.  **Antitrust Claim** means any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any **Antitrust Violation.**

B.  **Antitrust Violation** means any: price fixing (including horizontal or other price fixing of wages, hours, salaries, compensation, benefits or any other terms and conditions of employment); restraint of trade; monopolization; or violation of the Interstate Commerce Act of 1887, the Sherman Antitrust Act of 1890, the Clayton Act of 1914, the Robinson Patman Act of 1936, the Cellar-Kefauver Act of 1950, the Federal Trade Commission Act of 1914, or any other federal statute involving antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, or of any regulations promulgated under or in connection with any of the foregoing statutes, or of any similar provision of any federal, state or local statute, ordinance, regulation or common law.

C.  **Asset Protection Costs** means reasonable fees, costs and expenses consented to by the Underwriter, such consent not to be unreasonably withheld or delayed, and incurred by an **Executive** to oppose an **Asset Protection Order** and to obtain the discharge or revocation of any such **Asset Protection Order** imposed upon such **Executive** during the **Policy Period**.

D.  **Asset Protection Order** means any order issued by an **Enforcement Unit** to seize or enjoin the sale or transfer of an **Executive's** personal assets or real property first received by such **Executive** during the **Policy Period**.

E.  **Books and Records Costs** means any reasonable fees and expenses incurred by the **Organization** in response to a **Books and Records Request**, other than wages, salaries, fees, benefits or overhead associated with any **Insured**.

F.  **Books and Records Request** means any written request by or on behalf of a shareholder of the **Organization** upon the Board of Directors of the **Organization** to inspect the books and records of such **Organization** pursuant to Section 220 of the Delaware General Corporation Law or other similar statute.

G.  **Claim** means:

1.  a written demand for monetary damages, non-monetary or injunctive relief, including a demand that the **Insured** toll or waive a statute of limitations or a demand or request for arbitration, mediation or other alternative dispute resolution, which shall be deemed first made upon the **Insured's** receipt of the demand or request;

2.  a civil proceeding for monetary, non-monetary or injunctive relief commenced by the service upon the **Insured** of a complaint or similar pleading;

3.    a criminal proceeding commenced by and which shall be deemed first made upon the **Insured's** arrest, the return of an indictment or information, or receipt of a notice of charges or similar document;

4.    a formal administrative or regulatory proceeding commenced by and which shall be deemed first made upon the **Insured's** receipt of a notice of charges or similar document;

against an **Insured** for a **Wrongful Act**; provided that a **Claim** under paragraphs 1-4 above, shall not provide coverage for any investigation of an **Insured**;

5.    solely with respect to Insuring Agreements A and B, **Claim** means any **Inquiry**, provided that the **Inquiry** shall be deemed a **Claim** only if the **Insured** elects to provide written notice of such **Inquiry** to the Underwriter pursuant to Section VI.C of this Coverage Section of the Policy and shall be deemed first made when it is noticed to the Underwriter;

6.    solely with respect to Insuring Agreement D, **Claim** means a **Stakeholder Derivative Demand** or **Books and Records Request**, which shall be deemed first made upon the **Insured's** receipt of such **Stakeholder Derivative Demand** or **Books and Records Request**;

7.    the arrest or confinement of any **Insured Person** to: (i) a specified residence; or (ii) a secure custodial premises operated by or on behalf of any **Enforcement Unit,** if such arrest or confinement is in connection with the business of any **Organization,** which shall be deemed first made upon the **Insured Person's** receipt of the warrant for arrest or notice of confinement; or

8.    an official request for the **Extradition** of any **Insured Person** for a **Wrongful Act** or the execution of a warrant for the arrest of any **Insured Person** for a **Wrongful Act** where such execution is an element of **Extradition**, which shall be deemed first made upon the **Insured Person's** receipt of the official request or warrant.

H.    **Crisis Management Event** means any of the following events which, in the good faith opinion of the **Organization**, did cause or is reasonably likely to cause material public harm to the **Organization**:

1.    the public announcement that the **Organization** intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of the **Organization** or the imminence of bankruptcy proceedings, whether voluntary or involuntary;

2.    the public announcement of layoffs of Employees;

3.    the public announcement that the **Organization** has defaulted or intends to default on its debt;

4.    the public announcement or accusation that the **Organization** has caused bodily injury, sickness, disease, or death to a group of persons, or damage to or destruction of any tangible group of properties, including the loss of use thereof;

5.    the public announcement of the commencement or threat of commencement of governmental or regulatory proceedings against the **Organization**;

6. the public announcement of the termination, suspension or limitation of an **Organization's** right to participate in any program of a federal, state or local governmental, regulatory or administrative agency; or

7. the public announcement of the loss of a major funding source of the **Organization**.

I. **Crisis Management Expenses** means reasonable fees, costs, and other expenses of a public relations or crisis management firm engaged by the **Organization** and approved by the Underwriter, such approval not to be unreasonably withheld, to mitigate reputational harm to such **Organization** as a result of a **Crisis Management Event.**

J. **Derivative Suit** means any lawsuit by a **Stakeholder** of an **Organization** brought derivatively on behalf of such **Organization** against an **Insured Person** or the **Organization,** including against the **Organization** as a nominal defendant.

K. **Disqualified Person** means a "disqualified person" as that term is defined in Section 4958 of the Internal Revenue Code of 1986, as amended.

L. **Excess Benefit Transaction** means an "excess benefit transaction" as that term is defined in Section 4958(c) of the Internal Revenue Code of 1986, as amended.

M. **Excess Benefit Transaction Excise Tax** means any excise tax imposed by the Internal Revenue Service on an **Insured Person** who is an **Organization Manager** as a result of such Insured Person's participation in an **Excess Benefit Transaction**.

N. **Freedom Costs** means reasonable fees, costs, and expenses consented to by the Underwriter, such consent not to be unreasonably withheld or delayed, and incurred by an **Executive** to seek their lawful release in connection with a **Freedom Event**. **Freedom Costs** shall include the premium for a bond or similar instrument (provided the Underwriter shall have no obligation to apply for or furnish such bond) to guarantee any contingent obligation ordered by a court that are incurred or required outside the United States of America during the **Policy Period**, if such premiums arise out of an actual or alleged **Wrongful Act** of the **Executive.**

O. **Freedom Event** means the arrest or confinement of an **Executive** in their capacity, by or on behalf of a governmental law Enforcement Unit to a specific residence or secure custodial premises.

P. **Inquiry** means:

1. a civil, criminal, administrative, or regulatory investigation or inquiry of an **Insured Person** by an **Enforcement Unit**, commenced by the **Insured Person's** receipt of a subpoena, Wells Notice, target letter (within the meaning of Title 9, §11.151 of the U.S. Attorney's Manual), formal order of investigation, civil investigative demand, notice of charges, order to show cause, search warrant, S.E.C. Form 1661 or 1662, or other similar document, or the functional or foreign equivalent thereof;

2. a written request or demand of an **Insured Person** by an **Enforcement Unit** for an interview, meeting, sworn testimony or documents in connection with the business of the **Organization**, or in connection with such **Insured Person** in his or her capacity as such;

3. a written request or demand of an **Insured Person** by an **Organization** (including its board of directors or any committee of its board of directors) for an interview, meeting,

sworn testimony or documents in connection with: (i) a **Stakeholder Derivative Demand**, or (ii) an investigation of an **Organization** by an **Enforcement Unit**;

**Inquiry** shall not include any routine or regularly scheduled regulatory or internal supervision, inspection, compliance, review, examination, production or audit, industry sweep, including any request for mandatory information from an **Enforcement Unit**, conducted in an **Organization's** and/or **Enforcement Unit's** normal review or compliance process or any subpoena received by an **Insured** as a non-party witness.

Q.   **Insured** means the **Organization** and any **Insured Persons**.

R.   **Insured Persons** means:

1.   an **Executive**; and

2.   an **Employee**;

S.   **Internal Revenue Code Violation** means any actual or alleged violation by an Insured of any of the following sections of the Internal Revenue Code of 1986, as amended, involving any Organization that is exempt from taxation under the Internal Revenue Code of 1986, as amended:

Section 4911 (Taxes on Excess Expenditures to Influence Legislation);
Section 4941 (a) and (b) (Taxes on Self-Dealing);
Section 4942 (Taxes on Failure to Distribute Income);
Section 4943 (Taxes on Excess Business Holdings);
Section 4944 (Taxes on Investments which Jeopardize Charitable Purpose);
Section 4945 (Taxes on Taxable Expenditures);
Section 6652 (c) (1) (A)(B) (Penalties for Failure to File Certain Information Returns or Registration Statements);
Section 6655 (a)(1) (Penalties for Failure to Pay Estimated Income Taxes); or
Section 6656(a) and (b) (Penalties for Failure to Make Deposit of Taxes).

T.   **Investigative Costs** means **Stakeholder Derivative Demand Fees** and all **Books and Records Costs**.

U.   **Loss** means the total amount the **Insured** becomes legally obligated to pay on account of a **Claim** made against them, including, but not limited to, monetary damages (including punitive, exemplary or multiple damages, to the extent such damages are insurable under the law of any jurisdiction which has a substantial relationship to the **Insureds**, this Policy or the **Claim** giving rise to such damages and which is most favorable to the insurability of such damages), judgments, any award of pre-judgment and post-judgment interest with respect to covered damages, settlements, and **Defense Expenses**.

**Loss** shall also include:

1.   **UK Corporate Manslaughter Act Costs** and **Freedom Costs;**

2.   solely with respect to Section II.B, **Asset Protection Costs** and **Public Relations Costs**;

3.   taxes imposed on an **Organization** for which an **Insured Person** is legally obligated to pay solely by reason of the **Organization's Financial Impairment**;

4.    Solely with respect to Insuring Agreement D, **Investigative Costs**;

5.    **Excess Benefit Transaction Excise Taxes** that an Insured Person is obligated to pay as a result of a **Claim**; provided that **Loss** shall not include the twenty-five percent (25%) excise tax assessed against any **Disqualified Person** or the 200% tax assessed for failure to correct an **Excess Benefit Transaction**, provided that the Underwriter's maximum aggregate liability for all such civil fines and penalties for all **Excise Benefit Transaction Excise Taxes** under this Coverage Section shall be the Sublimit of Liability as set forth in ITEM 8 of the Declarations, which shall be part of and not in addition to the Aggregate Limit of Liability for this Coverage Section.

6.    civil fines and penalties levied against an **Insured** for an **Internal Revenue Code Violation**, provided that the Underwriter's maximum aggregate liability for all such civil fines and penalties for an **Internal Revenue Code Violation** under this Coverage Section shall be the Sublimit of Liability as set forth in ITEM 8 of the Declarations, which shall be part of and not in addition to the Aggregate Limit of Liability for this Coverage Section; and

7.    civil penalties levied against an **Insured Person** pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act;

**Loss** except with respect to **Defense Expenses**, does not include:

8.    any amount not indemnified by the **Organization** for which the **Insureds** are absolved from payment by reason of any covenant, agreement or court order;

9.    taxes, fines or penalties imposed by law, other than the taxes or civil fines or civil penalties expressly referenced above;

10.  solely with respect to Insuring Agreements B and C, any amount that represents or is substantially equivalent to an increase in the consideration paid or proposed to be paid by an **Organization** in connection with its purchase of any securities or assets;

11.  any amount incurred by the **Insureds** to comply with any injunctive or other non-monetary relief or any agreement to provide such relief;

12.  any amount not uninsurable under the law pursuant to which this Policy is construed; or

13.  **Clean-Up Costs**.

V.  **Outside Capacity** means services by an **Executive** in the position of a director, officer, trustee, trustee emeritus or governor of an **Outside Entity**, but only during the time that such service is at the request or direction of the **Organization**.

W.  **Outside Entity** means any of the following Organizations, provided such Organization is not included in the definition of **Organization**:

1.    any Organization chartered and operated as a not-for-profit Organization;

2.    any other for-profit Organization specifically included as an **Outside Entity** by endorsement to this Policy.

X.  **Personal Injury Wrongful Act** means false arrest, wrongful detention or imprisonment, malicious prosecution, libel, slander, defamation of character, publication of material in violation of a person's right of privacy, wrongful entry or eviction or other invasion of the right of occupancy.

Y.  **Pre-Claim Expenses** means any reasonable fees (including attorneys' fees, experts' fees, document production costs and e-discovery costs) and expenses (other than wages, salaries, fees or benefits of any **Insured Person**) incurred by an **Insured** in the investigation, defense, or appeal of a Noticed Matter.

Z.  **Public Relations Costs** means the reasonable fees, costs, and other expenses of a public relations consultant engaged by the **Organization** and approved by the Underwriter, such approval not to be unreasonably withheld, to mitigate reputational harm to such **Organization** as a result of a **Publication Event.**

AA.  **Publication Event** means any negative statement about an **Executive** made during the **Policy Period** in any publication by an individual authorized to speak on behalf of any **Enforcement Unit**.

BB.  **Publisher Liability Wrongful Act** means any infringement of copyright or trademark, unauthorized use of title, plagiarism or misappropriation of ideas.

CC.  **Stakeholder** means any natural person member of a not-for-profit **Organization** who has an active interest that such **Organization** fulfill its mission.

DD.  **Stakeholder Derivative Demand** means:

1.  any written demand by a **Stakeholder** of the **Organization** upon the Board of Directors of such **Organization** to bring a civil proceeding in a court of law against an **Executive** for a **Wrongful Act** by such **Executive**; or

2.  any lawsuit brought by a **Stakeholder** of the **Organization** derivatively on behalf of such **Organization** against an **Executive** for a **Wrongful Act** without first making a demand as described in subparagraph 1 above.

EE.  **Stakeholder Derivative Demand Fees** means all reasonable fees (including attorney's fees and expert's fees) and expenses (other than wages, salaries, fees or benefits of the directors, officers or employees of the **Organization**) incurred by the **Organization** (including its Board of Directors or any committee of its Board of Directors) to (i) investigate or evaluate on behalf of the **Organization** whether it is in the best interest of the **Organization** to prosecute the claims alleged in a **Stakeholder Derivative Demand**, or (ii) seek the dismissal of a derivative lawsuit on behalf of the **Organization** against **Executives**.

FF.  **UK Corporate Manslaughter Act Costs** means reasonable fees, costs and expenses consented to by the Underwriter, such consent not to be unreasonably withheld or delayed, and incurred by an **Executive** in an investigation, defense and/or appeal of a **Claim** first made against an **Organization** for violation of the United Kingdom Corporate Manslaughter and Corporate Homicide Act of 2007, or any similar criminal statute.

GG.  **Wrongful Act** means:

1.  with respect to the **Insured Persons**:

a.  any actual or alleged error, misstatement, misleading statement, neglect, breach of duty, omission or act by the **Insured Persons**:

  i.  in their capacity as such; or

  ii.  in an **Outside Capacity**;

b.  any matter claimed against them by reason of their serving in such capacity;

provided, however, that an **Inquiry** of an **Insured Person** shall be treated as a **Claim** for a **Wrongful Act** whether or not a **Wrongful Act** is alleged;

2.  solely with respect to Insuring Agreement C, any actual or alleged act, error, misstatement, misleading statement, neglect, breach of duty, omission or act by the **Organization**.

3.  with respect to both **Insured Persons** and the **Organization**, and subject to paragraphs (1), (2) and (3) above, any actual or alleged:

  a.  **Antitrust Violation**;

  b.  **Personal Injury Wrongful Act**; and

  c.  **Publisher Liability Wrongful Act**.

## IV.  EXCLUSIONS

The Underwriter shall not be liable under this Coverage Section to pay any **Loss** from any **Claim** made against any **Insured**:

### EXCLUSIONS APPLICABLE TO ALL INSURING AGREEMENTS

### A.  PRIOR NOTICE

based upon, arising out of, or attributable to any fact, circumstance, situation, transaction, event or **Wrongful Act** which have been the subject of any written notice given prior to inception of this Policy and accepted under any prior directors and officers liability or comparable insurance policy or coverage section.

### B.  PENDING OR PRIOR LITIGATION

based upon, arising out of, or attributable to any **Claim** against any **Insured** which was pending on or existed prior to the respective Pending or Prior Date for this Coverage Section, set forth in the Coverage Schedule in ITEM 8 of the Declarations, or the same or substantially the same fact, circumstance or **Wrongful Acts** alleged in or underlying such prior **Claim**.

### C.  CONDUCT

based upon, arising out of or attributable to:

1.  any deliberately fraudulent act or omission, or any willful violation of any law, statute or regulation, committed by such **Insured**; or

2. such **Insured** gaining any personal financial profit, remuneration or financial advantage to which such **Insured** was not legally entitled,

if evidenced by a final, non-appealable adjudication adverse to such **Insured** in the underlying proceeding provided that:

3. with respect to section IV.C.2 above, any acts or omissions which are treated as criminal violations in a foreign jurisdiction that are not treated as criminal violations in the United States of America, the imposition of a criminal fine or other criminal sanction in such foreign jurisdiction will not, by itself, be conclusive proof that deliberately criminal or fraudulent acts occurred;

For purposes of determining the applicability of this exclusion, the **Wrongful Act**, knowledge of, or facts pertaining to any **Insured Person** shall not be imputed to any other **Insured Person** and only the **Wrongful Acts**, knowledge of or facts pertaining to the chief executive officer or chief financial officer of the **Named Insured** shall be imputed to the **Organization**.

D. **BODILY INJURY/PROPERTY DAMAGE**

for any actual or alleged bodily injury (other than mental anguish or emotional distress), sickness, disease or death, or damage to or destruction of any tangible property including loss of use of such damaged or destroyed property; provided this exclusion shall not apply to: (i) **Defense Expenses** incurred by an **Executive** in connection with a **Claim** against such **Protected Executive** for a violation of the United Kingdom Corporate Manslaughter and Corporate Homicide Act of 2007 or any similar statute in any other jurisdiction or (ii) a **Claim** covered under Insuring Agreement A.

E. **POLLUTION**

for:

1. the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **Pollutants** at any time; or

2. any request, demand, or order, or statutory or regulatory requirement, that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, **Pollutants**;

provided this exclusion shall not apply to Insuring Agreement A.

F. **NUCLEAR**

based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged nuclear reaction, nuclear radiation, radioactive contamination or radioactive substance.

G. **INSURED VS. INSURED**

brought or maintained by or on behalf of an **Insured Person** in any capacity or the **Organization** or an **Outside Entity**; provided this Exclusion shall not apply to:

1.  any **Stakeholder Derivative Demand;**

2.  a **Claim** by an **Insured Person** who has not served as an **Insured Person** for at least two (2) years prior to the date such **Claim** is first made and who maintains such **Claim** without the active assistance or active participation of the **Organization** or **Outside Entity**, or any other **Insured Person** who is serving or has served as an **Insured Person** within such two (2) year period;

3.  a **Claim** by or on behalf of a bankruptcy or insolvency trustee, examiner, receiver, conservator, liquidator, similar official or creditors committee for such **Organization** or **Outside Entity**, or any assignee of such trustee, examiner, receiver, conservator, liquidator, similar official or creditors committee;

4.  a **Claim** maintained in any non-common law jurisdiction outside the United States;

5.  a **Claim** against **Insured Persons** for an employment-related **Wrongful Act**;

6.  a **Claim** by any **Insured Person** for contribution or indemnity, if the **Claim** directly results from another **Claim** covered under this Coverage Section; or

7.  a **Claim** brought against an **Insured Person** by a whistleblower pursuant to any federal, state, foreign or local whistleblower law.

H.  **ERISA**

for an actual or alleged violation of the responsibilities, obligations or duties imposed by **ERISA** or similar provisions of any federal, state or local statutory law or common law with respect to any pension, profit sharing, health and welfare or other employee benefit plan or trust established or maintained for the purpose of providing benefits to employees of the **Organization** or an **Outside Entity**.

I.  **SECURITIES**

based upon, arising out of or attributable to (i) the actual purchase or sale, or offer or solicitation of an offer to purchase or sell, any public equity securities by the **Organization** or an **Outside Entity**, or (ii) the actual or alleged violation of any federal, state, local or foreign law relating to public equity securities; provided this exclusion shall not apply to any:

1.  **Claim** based upon, arising out of or attributable to the purchase or sale, or offer or solicitation of an offer to purchase or sell, any securities not required to be registered under the Securities Act of 1933, as amended; or

2.  matters involving tax exempt bonds and tax exempt bond holders.

J.  **WAGE AND HOUR**

based upon, arising out of, attributable to, in whole or in part, or directly or indirectly resulting from or in consequence of, any actual or alleged violation of any of the responsibilities, obligations or duties imposed by any **Wage and Hour Law**; provided that notwithstanding anything in this Policy to the contrary it shall be the duty of the **Insureds** and not the duty of the Underwriter to defend any **Claim** which is in part excluded from coverage pursuant to this Exclusion J.

K. **EMPLOYMENT**

for any employment related **Wrongful Acts**.

L. **THIRD PARTY VIOLATIONS**

based upon, arising out of or attributable to any actual or alleged discrimination against, or harassment (whether sexual or non-sexual in nature) of, any person or entity that is not an **Insured.**

M. **OTHER VIOLATIONS OF LAW**

for any actual or alleged violation of the any of the responsibilities, obligations or duties imposed by:

1. the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, the Occupational Safety and Health Act of 1970, and as amended, and the National Labor Relations Act, as amended, or any similar provisions of any federal, state, local or foreign statutory or common law;

2. any law governing workers' compensation, unemployment insurance, unemployment compensation, social security, retirement benefits, disability benefits, or any similar provisions of any federal, state, local or foreign statutory or common law.

**ORGANIZATION EXCLUSIONS**

Solely with respect to Insuring Agreement C only:

N. **INTELLECTUAL PROPERTY**

based upon, arising out of or attributable to any actual or alleged infringement of copyright, patent, trademark, trade name, trade dress or service mark, or the actual or alleged misappropriation of ideas or trade secrets or the unauthorized disclosure of or access to confidential information; provided this exclusion shall not apply to any **Claim** for a **Publisher Liability Wrongful Act**.

O. **CONTRACT**

for any actual or alleged liability of the **Organization** under any express contract or agreement; provided, that this exclusion shall not apply to liability which would have attached in the absence of such express contract or agreement; or

V. **SEVERABILITY OF EXCLUSIONS**

For the purpose of determining the applicability of any Exclusion set forth in Section IV, the **Wrongful Act** or knowledge of any **Insured Person** shall not be imputed to any other **Insured Person**, and under Insuring Agreement C only the **Wrongful Act** or knowledge of the chief executive officer or chief financial officer of the **Organization** shall be imputed to such **Organization**.

## VI.   NOTICE OF CLAIM AND CIRCUMSTANCES

A.   *Notice of Claim***:** The **Insureds** shall give to the Underwriter written notice of any **Claim** made against an **Insured** as soon as practicable after a risk manager or general counsel of an **Organization** (or the functional equivalent), first learns of such **Claim**, but in no event later than ninety (90) days after the expiration of the **Policy Period** or the end of the **Extended Reporting Period**, if exercised.  The failure of the **Insureds** to provide notice of a **Claim** as soon as practicable as required by this Section VI.A shall not constitute a coverage defense with respect to such **Claim** unless the Underwriter establishes it was materially prejudiced by such failure.

B.   *Notice of a Crisis Management Event:*  If an **Insured** elects to seek coverage for a **Crisis Management Event**, the **Insured** shall give notice of such of any **Crisis Management Event** to the Underwriter no later than thirty (30) days after the **Organization's** risk manager or general counsel (or functional equivalent) first learns of such **Crisis Management Event**.  Within sixty (60) days of making any payment of **Crisis Management Event Expenses**, the **Insureds** must provide the Underwriter with a detailed breakdown of all **Crisis Management Event Expenses** for which the **Organization** seeks reimbursement, together with satisfactory proof of payment and any additional information as the Underwriter may reasonably request.

C.   *Notice of Circumstances*: If during the **Policy Period** or the **Extended Reporting Period**, if exercised, the **Insured** first becomes aware of circumstances that could give rise to a **Claim** against the **Insureds** and give written notice of such circumstances to the Underwriter during the **Policy Period** or the **Extended Reporting Period**, if exercised, then any **Claims** subsequently arising from such circumstances shall be considered to have been made during the **Policy Period**. Except as otherwise provided this Coverage Section, no coverage is afforded under this Coverage Section for fees, expenses or other loss incurred in connection with such circumstances prior to the time a **Claim** is actually made and reported to the Underwriter.

The **Insureds** shall include with any such notice of circumstance a description of the circumstances, the nature of any potential **Wrongful Act(s)**, the nature of the alleged or potential damage, the names of actual or potential claimants, and the manner in which the **Insureds** first became aware of the **Wrongful Act(s)**.

## VII.   CLAIM SETTLEMENT

The **Insureds** agree not to admit any liability for any **Claim**, offer to settle or settle any **Claim**, incur any **Defense Expenses** or otherwise assume any contractual obligation, without the Underwriter's prior written consent, such consent shall not be unreasonably withheld. The Underwriter shall not be liable for or as a result of any offer to settle, settlement, **Defense Expenses**, assumed obligation, admission or stipulated judgment to which it has not given its prior consent; provided, however, if the **Insured** is able to fully and finally settle all **Claims** in their entirety, which are subject to a single retention, for an aggregate amount including **Defense Expenses** not exceeding fifty percent (50%) of such retention, the Underwriter's consent will not be required for the settlement of such **Claims**.

The Underwriter shall have the right to make investigations and conduct negotiations and, with the consent of the **Insureds**, enter into such settlement of any **Claim** as the Underwriter deems appropriate.

**VIII.   CLAIM DEFENSE**

The Underwriter shall have the right and duty to defend any **Claim** covered by this Coverage Section, even if any of the allegations are groundless, false or fraudulent. The Underwriter's duty to defend any **Claim** shall cease upon exhaustion of the applicable Limit of Liability applicable to such **Claim**.

The Underwriter shall have the right to select and appoint counsel to defend against any **Claim**. The Underwriter may appoint different defense counsel to represent different **Insureds**, but only if required due to an actual conflict of interest.

nexus

## NOT-FOR-PROFIT MANAGEMENT LIABILITY POLICY
## FIDUCIARY LIABILITY COVERAGE SECTION

In consideration of payment of the premium and subject to the Declarations, the General Terms and Conditions, and the terms, conditions and limitations of this Coverage Section, the Underwriter and the **Insureds** agree as follows:

**I.    INSURING AGREEMENTS**

**FIDUCIARY LIABILITY COVERAGE**

The Underwriter shall pay on behalf of the **Insureds** all **Loss** for which the **Insureds** become legally obligated to pay on account of a **Claim** first made against the **Insureds** during the **Policy Period** or the **Extended Reporting Period**, if exercised, for a **Wrongful Act**.

**II.    COVERAGE ENHANCEMENTS**

A.    **VOLUNTARY SETTLEMENT PROGRAM COVERAGE**

The Underwriter shall pay on behalf of the **Insureds** any **Voluntary Settlement** and **Defense Expenses** which the **Insureds** become legally obligated to pay resulting from a **Voluntary Settlement Program Notice** first given to the Underwriter during the **Policy Period**, provided such **Voluntary Settlement** and **Defense Expenses** are incurred after such **Voluntary Settlement Program Notice** is first given to the Underwriter. The Underwriter's maximum liability under this Section II.A for all covered **Voluntary Settlements** and **Defense Expenses**, combined, shall be the Voluntary Settlement Program Costs Sublimit of Liability set forth in ITEM 8 of the Declarations.

B.    **ADDITIONAL DEFENSE EXPENSES LIMIT FOR FIDUCIARY LIABILITY**

If Additional **Defense Expenses** Limit for Fiduciary Liability is selected on ITEM 8 of the Declarations, then the Underwriter shall provide an additional Limit of Liability for **Defense Expenses** under this Coverage Section, in the amount set forth in the Declarations, which shall be in addition to and not part of the Aggregate Limit of Liability for this Coverage Section and in addition to and not part of the Combined Aggregate Limit of Liability set forth in ITEM 8 of the Declarations. Such Additional Limit shall attach only after the exhaustion of such Aggregate Limit of Liability and any amounts payable under any other insurance policies that are specifically written excess of this Coverage Section.

C.    **PENSION CRISIS MANAGEMENT REIMBURSEMENT COVERAGE**

Upon satisfactory proof of payment by the **Organization**, the Underwriter will reimburse the **Organization**, up to the Pension Crisis Management Expense Sublimit stated in ITEM 8 of the Declarations, for all **Pension Crisis Management Expenses** actually paid by the **Organization** in connection with a **Pension Crisis Management Event** that first occurs during the **Policy Period**, subject to the Sublimit of Liability as set forth in ITEM 8 of the Declarations, for all **Pension Crisis Management Expenses**, which shall be part of and not in addition to the Aggregate Limit of Liability for this Coverage Section.

III. **DEFINITIONS**

When used in the Fiduciary Liability Coverage Section, the following terms, whether in the singular or plural, are defined as follows:

A. **Administration** means (i) advising, counseling or providing notice to employees, beneficiaries or **Plan** participants with respect to any **Plan**, (ii) providing interpretations with respect to any **Plan**, (iii) handling records or effecting enrollment, terminating or canceling employees, beneficiaries or participants under any **Plan**, (iv) complying with the provisions of the Health Insurance Portability and Accountability Act (HIPAA) or Health Information Technology for Economic and Clinical Health Act (HITECH).

B. **Affordable Care Act** means the Patient Protection and Affordable Care Act and the Health Care and Education Reconciliation Act of 2011, as amended.

C. **Claim** means:

1. a written demand against any **Insured** for monetary damages or non-monetary (including injunctive) relief, including a written demand that the **Insured** toll or waive a statute of limitations or a written demand or request for arbitration, mediation or other alternative dispute resolution, which shall be deemed first made upon the **Insured's** receipt of the demand or request;

2. a civil proceeding against any **Insured** commenced by and which shall be deemed first made upon the service upon the **Insured** of a complaint or similar pleading, or an appeal of any such proceeding;

3. a criminal proceeding against any **Insured** commenced by and which shall be deemed first made upon, the **Insured's** arrest, the return of an indictment or information, or receipt of a notice of charges or similar document, or an appeal of any such proceeding;

4. a formal administrative or regulatory proceeding against any **Insured** commenced by and which shall be deemed first made upon, the service on or other receipt by the **Insured** of a notice of charges or similar document, or an appeal of any such proceeding;

5. any **Fiduciary Inquiry**, provided that the **Fiduciary Inquiry** shall be deemed a **Claim** only if the **Insured** elects to provide written notice of such **Fiduciary Inquiry** to the Underwriter pursuant to Section IV.B of this Coverage Section and shall be deemed first made when it is noticed to the Underwriter;

6. a civil, criminal, administrative or regulatory investigation (including a fact-finding investigation by the Department of Labor, Pension Benefit Guaranty Corporation or similar authority) of any **Insured** commenced by and which shall be deemed first made upon the service on or other receipt by the **Insured** of a target letter or formal investigative order;

7. solely with respect to Section II.A, **Claim** means a **Voluntary Settlement Program Notice** only if the **Insured** elects to provide written notice of such **Voluntary Settlement Program Notice** to the Underwriter pursuant to Section IV.B of this Coverage Section and shall be deemed first made when it is noticed to the Underwriter.

D. **Fiduciary Inquiry** means:

1. a civil, criminal, administrative, or regulatory investigation or inquiry of an **Insured Person** by an **Enforcement Unit**, commenced by the **Insured Person's** receipt of a subpoena, Wells Notice, target letter (within the meaning of Title 9, §11.151 of the U.S. Attorney's Manual), formal order of investigation, civil investigative demand, notice of charges, order to show cause, search warrant, S.E.C. Form 1661 or 1662, or other similar document, or the functional or foreign equivalent thereof;

2. a written request or demand of an **Insured Person** by an **Enforcement Unit** for an interview, meeting, sworn testimony or documents in connection with the business of the **Organization**, or in connection with such **Insured Person** in his or her capacity as such;

3. a written request or demand of an **Insured Person** by an **Organization** (including its board of directors or any committee of its board of directors) for an interview, meeting, sworn testimony or documents in connection with an investigation of an **Organization** by an **Enforcement Unit**;

in connection with a **Plan**, insurance actually or attempted to be purchased through a **Healthcare Exchange**, or the facilitation of the administration of a "multiemployer plan" by a third party.

**Fiduciary Inquiry** shall not include any routine or regularly scheduled regulatory or internal supervision, inspection, compliance review, examination, production or audit, industry sweep, including any request for mandatory information from an **Enforcement Unit**, conducted in an **Organization's** and/or **Enforcement Unit's** normal review or process or any subpoena received by an **Insured** as a non-party witness.

E. **Healthcare Exchange** means any public, private or government-sponsored or controlled entity established to facilitate the purchase of health insurance in accordance with the **Affordable Care Act**.

F. **Insured Persons** means any one or more natural persons who were, now are or shall become duly elected or appointed directors, trustees, governors, **Managers**, officers, **Employees** (including employed lawyers solely in their capacity as an **Employee**), advisory directors or members of a duly constituted committee or board of any **Organization** or **Plan** or their functional equivalent.

G. **Insureds** means:

1. the **Insured Persons**;

2. the **Organization**; and

3. the **Plans**.

H. **Loss** means the total amount the **Insureds** become legally obligated to pay on account of a **Claim** made against them, including, but not limited to, damages (including punitive, exemplary or multiple damages, to the extent such damages are insurable under the law of any jurisdiction which has a substantial relationship to either the **Insureds** or this Policy responding to the **Claim** giving rise to such damages, whichever is most favorable to the insurability of such

damages), judgments, any award of pre-judgment and post-judgment interest with respect to covered damages, settlements, **Defense Expenses**, and solely with respect to Section II.A, **Loss** means a **Voluntary Settlement** and **Defense Expenses** associated therewith.

**Loss** includes:

1. the five percent (5%) or less or the twenty percent (20%) or less civil penalties imposed under §502(i) or (l) of **ERISA**;

2. civil penalties imposed upon an **Insured** for violation of the privacy provisions of the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended, provided that the Underwriter's maximum aggregate liability for all such civil money penalties under this Coverage Section shall be the Sublimit of Liability set forth in ITEM 8 of the Declarations for Penalties for Violations of HIPAA Privacy Provisions;

3. the civil penalties imposed upon an **Insured** as a fiduciary under Section 502(c) of **ERISA**, other than penalties under the Pension Protection Act, provided that the Underwriter's maximum aggregate liability under this Coverage Section for all such civil penalties shall be the Sublimit of Liability set forth in ITEM 8 of the Declarations for Penalties under Section 502(c) of ERISA;

4. the civil penalties imposed upon an **Insured** under the Pension Protection Act of 2006, provided that the Underwriter's maximum aggregate liability under this Coverage Section for all such civil penalties shall be the Sublimit of Liability set forth in ITEM 8 of the Declarations for Penalties under the Pension Protection Act of 2006;

5. the civil penalties imposed upon an **Insured** under the **Affordable Care Act**, provided that the Underwriter's maximum aggregate liability under this Coverage Section for all such civil penalties shall be the Sublimit of Liability set forth in ITEM 8 of the Declarations for Penalties under the Affordable Care Act;

6. the fifteen percent (15%) or less tax penalty imposed upon an **Insured** under Section 4975 of the Internal Revenue Code of 1986, provided that the Underwriter's maximum aggregate liability under this Coverage Section for all such penalties shall be the Sublimit of Liability set forth in ITEM 8 of the Declarations for Penalty under IRC Section 4975;

7. civil penalties imposed upon an **Insured** by the United Kingdom Secretary of State for Social Services or by the United Kingdom Occupational Pensions Regulatory Authority, pursuant to the English Pension Scheme Act 1993, the English Pensions Act 1995, or rules or regulations thereunder, provided any coverage for such civil penalties applies only if the funds or assets of the subject **Plan** are not used to fund, pay or reimburse the premium for this Coverage Section;

**Loss**, except with respect to **Defense Expenses**, does not include:

i. any amount not indemnified by the **Organization** for which the **Insureds** are absolved from payment by reason of any covenant, agreement or court order;

ii. taxes, fines or penalties imposed by law, other than civil penalties expressly referenced in paragraphs 1 through 7 above;

iii. any costs incurred by the **Organization** or **Plan** to comply with any injunctive or other non-monetary relief or any agreement to provide such relief;

iv. matters uninsurable under the law pursuant to which this Policy is construed;

v. (i) benefits due or to become due under any **Plan**, or (ii) benefits which would be due under any **Plan** if such **Plan** complied with all applicable law, or (iii) that portion of any settlement or judgment which constitutes such benefits, except to the extent that recovery for such benefits is based upon a covered **Wrongful Act** by an **Insured Person** and such benefits are payable as a personal obligation of such **Insured Person**;

provided **Loss** shall include that portion of a settlement or judgment attributable to **Wrongful Acts** which actually or allegedly cause or contribute to a reduction or loss in the value of a **Plan's** assets or a participant's account in a **Plan**, due to investment losses, lost investment opportunities, excessive costs or failure to comply with such participant's investment directions.

I. **Pension Crisis Management Event** means any of the following events which, in the good faith opinion of the **Organization**, did cause or is reasonably likely to cause material public harm to the **Organization**:

1. a loss in the total assets of a Plan of twenty-five (25%) or more in a thirty (30) day period caused by investment loss, or a loss in a specific Plan investment of seventy-five percent (75%) or more in a thirty (30) day period; or

2. the public announcement of (a) a Plan's third party service provider's fraud, arrest, indictment or bankruptcy, or (b) a governmental or regulatory agency's investigation into, or litigation against, a Plan's third party service provider.

J. **Pension Crisis Management Expenses** means reasonable fees, costs, and other expenses of a public relations or crisis management firm engaged by the **Organization** and approved by the Underwriter, such approval not to be unreasonably withheld, to mitigate reputational harm to such **Organization** as a result of a **Pension Crisis Management Event**.

K. **Plan** means:

1. any Employee Benefit Plan, Pension Benefit Plan or Welfare Benefit Plan, as each is defined in **ERISA**, which was, is now, or hereafter becomes sponsored solely by the **Organization**, or sponsored jointly by the **Organization** and a labor organization, solely for the benefit of the employees of the **Organization**;

2. any other employee benefit plan or program not subject to **ERISA** sponsored solely by the **Organization** for the benefit of the employees of the **Organization**, including any fringe benefit, deferred compensation, supplemental executive retirement plan, top-hat plan or excess benefit plan;

3. any employee benefit plan or program otherwise described in paragraphs 1 or 2 above while such plan or program is being actively developed, formed or proposed by any **Organization** prior to the formal creation of such plan or program;

4. any government-mandated insurance program for workers' compensation, unemployment, social security or disability benefits for employees of the **Organization**; and

5. any Voluntary Employee's Beneficiary Association as defined in Section 501(c)(9) of the Internal Revenue Code of 1986, as amended, for which the purpose is to provide life, sickness, accident or other benefits for voluntary members who are **Employees** (including their dependents or designated beneficiaries).

**Plan** shall not include any "multiemployer plan" or "employee stock ownership plan" as defined by **ERISA**, unless such plan is specifically included as a **Plan** by endorsement to this Policy.

L. **Voluntary Settlement Program** means any voluntary compliance resolution program or similar voluntary settlement program administered by the United States Internal Revenue Service, United States Department of Labor or any other domestic or foreign governmental authority. Such programs include, without limitation, the Employee Plans Settlement Resolution System, Audit Closing Agreement Program, Voluntary Compliance Resolution Program, Walk-in Closing Agreement Program, Administrative Policy Regarding Self-Correction, Tax Sheltered Annuity Voluntary Correspondence Program, Delinquent Filer Voluntary Compliance Program, and Voluntary Fiduciary Correction Program.

M. **Voluntary Settlement Program Notice** means prior written notice to the Underwriter by any **Insured** of the **Insured's** intent to enter into a **Voluntary Settlement Program**.

N. **Voluntary Settlement** means any fees, fines or penalties paid by an **Insured** to a governmental authority pursuant to a **Voluntary Settlement Program** for the actual or alleged inadvertent non-**Settlement** by a **Plan** with any statute, rule or regulation; provided **Voluntary Settlement** shall not include (i) any costs to correct the non-compliance, or any other charges, expenses, taxes or damages; or (ii) any fees, fines or penalties relating to a **Plan** which, as of the earlier of the inception date of this Policy or the inception date of the first policy in an uninterrupted series of policies issued by the Underwriter of which this Policy is a direct or indirect renewal or replacement, any **Insured Person** knew to be actually or allegedly non-compliant.

O. **Wrongful Act** means:

1. any actual or alleged breach of the responsibilities, duties or obligations imposed by **ERISA** upon fiduciaries of any Plan committed or allegedly committed by an **Insured** in the **Insured's** capacity as such;

2. any actual or alleged act, error or omission committed or attempted by the **Insureds** in the **Administration** of a **Plan**;

3. any actual or alleged act, error or omission by an **Insured** in the **Insured's** settlor capacity with respect to any **Plan**;

4. any actual or alleged act, error or omission by an **Insured** in connection with insurance actually or attempted to be purchased through a **Healthcare Exchange**; and

5. any matter claimed against an **Insured** solely by reason of their status as a fiduciary of a **Plan**,

provided, however, that a **Fiduciary Inquiry** of an **Insured Person** shall be treated as a **Claim** for a **Wrongful Act** whether or not a **Wrongful Act** is alleged.

## IV.  EXCLUSIONS

The Underwriter shall not be liable under this Coverage Section to pay any **Loss** on account of that portion of any **Claim** made against any **Insured**:

A.  **PRIOR NOTICE**

based upon, arising out of, or attributable to any fact, circumstance or **Wrongful Acts** which have been the subject of any written notice given prior to inception of this Policy and accepted under any prior fiduciary liability or comparable insurance policy or coverage section.

B.  **PENDING OR PRIOR LITIGATION**

based upon, arising out of, or attributable to any **Claim** against any **Insured** which was pending on or existed prior to the respective Pending or Prior Date for this Coverage Section set forth in the Coverage Schedule in ITEM 8 of the Declarations, or the same or substantially the same fact, circumstance or **Wrongful Act** underlying or alleged therein.

C.  **CONDUCT**

based upon, arising out of or attributable to any deliberately fraudulent act or omission or any willful violation of any law, statute or regulation, committed by such **Insured**, if a final and non-appealable adjudication adverse to such **Insured** in the underlying proceeding establishes such **Insured** committed such a deliberately fraudulent act or omission or willful violation; provided that any acts or omissions which are treated as criminal violations in a foreign jurisdiction that are not treated as criminal violations in the United States of America, the imposition of a criminal fine or other criminal sanction in such foreign jurisdiction will not, by itself, be conclusive proof that deliberately criminal or fraudulent act occurred.

D.  **BODILY INJURY/ PROPERTY DAMAGE**

for bodily injury, sickness, emotional distress, mental anguish, humiliation, disease or death of any person or damage to or destruction of any tangible property including loss of use of such damaged or destroyed property; provided this exclusion shall not apply to **Defense Expenses** incurred in connection with an otherwise-covered **Claim** for breach of any fiduciary duties imposed by **ERISA** with respect to any **Plan**.

E.  **OTHER VIOLATIONS OF LAW**

for any actual or alleged violation of:

1.  any law governing workers' compensation, unemployment insurance, social security, disability benefits, or any similar federal, state or local statutory or regulatory law; provided this exclusion shall not apply to any actual or alleged obligation of any **Insured** pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 or Health Insurance Portability and Accountability Act of 1996, as amended;

2.  any **Wage and Hour Law**, provided that notwithstanding anything in this Policy to the contrary it shall be the duty of the **Insureds** and not the duty of the Underwriter to defend any **Claim** which is in part excluded from coverage pursuant to this Exclusion E.2.

F.   **CONTRACT**

based upon, arising out of, or attributable to any actual or alleged liability of an **Insured** under any written contract or agreement; provided this exclusion shall not apply to the extent (i) the **Insured** would have been liable in the absence of such contract or agreement; or (ii) the liability was assumed in accordance with or under the trust agreement or equivalent document pursuant to which the **Plan** was established.

G.   **DISCRIMINATION**

for any actual or alleged discrimination in violation of any law other than **ERISA**.

## V.   SEVERABILITY OF EXCLUSIONS

For the purpose of determining the applicability of any Exclusion set forth in Section IV, the **Wrongful Act** or knowledge of any **Insured Person** shall not be imputed to any other **Insured Person**, and only the **Wrongful Act** or knowledge of the chief executive officer or chief financial officer: (i) of the **Organization** shall be imputed to such **Organization**, and (ii) of a **Plan** shall be imputed to such **Plan**.

## VI.   NOTICE OF CLAIM AND CIRCUMSTANCES

A.   *Notice of Claim*: The **Insureds** shall give to the Underwriter written notice of any **Claim** made against an **Insured** as soon as practicable after an risk manager or general counsel of an **Organization** (or the functional equivalent), first learns of such **Claim**, but in no event later than ninety (90) days after the expiration of the **Policy Period** or the end of the **Extended Reporting Period**, if exercised.  The failure of the **Insureds** to provide notice of a **Claim** as soon as practicable as required by this Section VI.A shall not constitute a coverage defense with respect to such **Claim** unless the Underwriter establishes it was materially prejudiced by such failure.

B.   *Notice of Inquiry/Fiduciary Inquiry/Voluntary Settlement Program Notice*: If an **Insured** elects to seek coverage for a **Fiduciary Inquiry** or a **Voluntary Settlement Program Notice**, the **Insured** shall give notice of such **Fiduciary Inquiry** or **Voluntary Settlement Program Notice** to the Underwriter no later than ninety (90) days after the expiration of the **Policy Period** or **Extended Reporting Period**, if exercised.

C.   *Notice of a Pension Crisis Management Event:*  If an **Insured** elects to seek coverage for a **Pension Crisis Management Event**, the **Insured** shall give notice of any such **Pension Crisis Management Event** to the Underwriter no later than thirty (30) days after the **Organization's** risk manager or general counsel (or functional equivalent) first learns of such **Pension Crisis Management Event**.  Within sixty (60) days of making any payment of **Pension Crisis Management Event Expenses**, the **Insureds** must provide the Underwriter with a detailed breakdown of all **Pension Crisis Management Event Expenses** for which the **Organization** seeks reimbursement, together with satisfactory proof of payment and any additional information as the Underwriter may reasonably request.

D.   *Notice of Circumstances*: If during the **Policy Period** or the **Extended Reporting Period**, if exercised, the **Insured** first becomes aware of circumstances that could give rise to a **Claim** against the **Insureds** and give written notice of such circumstances to the Underwriter during the **Policy Period** or the **Extended Reporting Period**, if exercised, then any **Claims**

subsequently arising from such circumstances shall be considered to have been made during the **Policy Period**. No coverage is afforded under this Coverage Section for fees, expenses or other loss incurred in connection with such circumstances prior to the time a **Claim** is actually made and reported to the Underwriter.

The **Insureds** shall include with any such notice of circumstance a description of the circumstances, the nature of any potential **Wrongful Act(s)**, the nature of the alleged or potential damage, the names of actual or potential claimants, and the manner in which the **Insureds** first became aware of the **Wrongful Act(s)**.

## VII.  CLAIM SETTLEMENT

The **Insureds** agree not to admit any liability for any **Claim**, offer to settle or settle any **Claim**, incur any **Defense Expenses** or otherwise assume any contractual obligation, without the Underwriter's prior written consent, such consent shall not be unreasonably withheld. The Underwriter shall not be liable for or as a result of any offer to settle, settlement, **Defense Expenses**, assumed obligation, admission or stipulated judgment to which it has not given its prior consent; provided, however, if the **Insured** is able to fully and finally settle all **Claims** in their entirety, which are subject to a single retention, for an aggregate amount including **Defense Expenses** not exceeding fifty percent (50%) of such retention, the Underwriter's consent will not be required for the settlement of such **Claims**.

The Underwriter shall have the right to make investigations and conduct negotiations and, with the consent of the **Insureds**, enter into such settlement of any **Claim** as the Underwriter deems appropriate.

## VIII.  CLAIM DEFENSE

The Underwriter shall have the right and duty to defend any **Claim** covered this Coverage Section, even if any of the allegations are groundless, false or fraudulent. The Underwriter's duty to defend any **Claim** shall cease upon exhaustion of the applicable Limit of Liability applicable to such **Claim**.

The Underwriter shall have the right to select and appoint counsel to defend against any **Claim**. The Underwriter may appoint different defense counsel to represent different **Insureds**, but only if required due to an actual conflict of interest.

## IX.  CREATION OF AN ESOP

Notwithstanding anything in this Coverage Section to the contrary, if during the **Policy Period** the **Organization** creates or directly or indirectly acquires an employee stock ownership plan ("ESOP"), the **Organization** shall promptly give to the Underwriter written notice thereof together with such other information requested by the Underwriter. The Underwriter shall, at the request of the **Organization**, provide to the **Organization** a quotation for coverage for **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving such ESOP, subject to such terms, conditions and limitations of coverage and such additional premium as the Underwriter in its sole discretion may require. Unless the **Insureds** accept such quotation and pay such additional premium within thirty (30) days after receipt of the quotation, no coverage will be available under this Coverage Section for **Claims** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving such ESOP.

nexus

## NOT-FOR-PROFIT MANAGEMENT LIABILITY POLICY
## CRIME COVERAGE SECTION

In consideration of payment of the premium and subject to the Declarations, the General Terms and Conditions, and the terms, conditions and limitations of this Coverage Section, the Underwriter and the **Insureds** agree as follows:

**I.   INSURING AGREEMENTS**

    A.   **FIDELITY COVERAGE**

        1.   **Employee Theft Coverage**

        The Underwriter shall pay the **Insured** for direct loss of **Money**, **Securities** or **Property** sustained by an **Insured** resulting directly from **Theft** or **Forgery** committed by an **Employee** acting alone or in collusion with others.

        2.   **Employee Theft of Client Property Coverage**

        The Underwriter shall pay the **Insured** for direct loss of **Money**, **Securities** or **Property** sustained by a **Client** resulting directly from **Theft** or **Forgery** committed by an **Employee** acting alone or in collusion with others.

        3.   **ERISA Coverage**

        The Underwriter shall pay the **Insured** for direct loss of **Money**, **Securities** or **Property** sustained by an **ERISA Plan** resulting directly from a fraudulent or dishonest act committed by a **Fiduciary** acting alone or in collusion with others.

    B.   **PREMISES COVERAGE**

    The Underwriter shall pay the **Insured** for direct loss sustained by an **Insured** resulting from:

        1.   **Robbery, Safe Burglary** or the unlawful taking of **Money** or **Securities** committed by a **Third Party**,

        2.   actual destruction or disappearance of **Money** or **Securities,**

    present inside the **Premises** or **Banking Premises.**

    Coverage under this Insuring Agreement B shall also include:

        a.   direct loss of or damage to **Property** which results directly from **Robbery** or attempted **Robbery** within the **Premises**;

        b.   direct loss from damage to such **Property** contained within a locked safe or vault, directly caused by an actual or attempted **Safe Burglary** within the **Premises**;

        c.   direct loss from damage to a locked safe, cash drawer, cash box or cash register within the **Premises** by felonious entry or attempted felonious entry or loss by felonious abstraction of such container from within the **Premises**; and

   3.   direct loss from damage to the **Premises** or to its exterior resulting directly from **Safe Burglary** or **Robbery**, if the **Insured** is the owner of the **Premises** or is liable for damage committed to the **Premises** ,

committed by a **Third Party**.

C.  **IN TRANSIT COVERAGE**

   1.   The Underwriter shall pay the **Insured** for direct loss sustained by an **Insured** resulting from **Robbery** or unlawful taking of **Money** or **Securities** committed by a **Third Party**; or the actual destruction or disappearance of **Money** or **Securities** while **In Transit** or while temporarily within the home of an **Employee** or a partner of an **Insured**.

   2.   The Underwriter shall pay the **Insured** for direct loss from damage to **Property** directly resulting from **Robbery** while **In Transit** or while temporarily within the home of an **Employee** or a partner of an **Insured** committed by a **Third Party**;

D.  **FORGERY OR ALTERATION COVERAGE**

The Underwriter shall pay the **Insured** for direct loss sustained by an **Insured** resulting from **Forgery** or alteration of a **Financial Instrument** committed by a **Third Party**, including:

   1.   any check, draft, promissory note, convenience check, HELOC check or similar written promise, order or direction to pay a sum certain in **Money**, made, drawn by or drawn in the name of the **Insured**; and

   2.   any check, draft, promissory note, convenience check, HELOC check or similar written promise, order or direction to pay a sum certain in **Money** or drawn by one purported acting as the agent of the **Insured**.

E.  **COMPUTER CRIME COVERAGE**

   1.   **Computer Fraud Coverage**

      The Underwriter shall pay the **Insured** for direct loss of **Money**, **Securities** or **Property** sustained by an **Insured** resulting directly from **Computer Fraud** committed by a **Third Party**.

   2.   **Computer Data Restoration Expenses Coverage**

      The Underwriter shall pay the **Insured** for reasonable **Computer Data Restoration Expenses** incurred by the **Insured** and resulting directly from a loss covered under Insuring Agreement E.1 of the Coverage Section, but only if such covered loss is in excess of the Deductible applicable to such covered loss.

F.  **FUNDS TRANSFER FRAUD COVERAGE**

The Underwriter shall pay the **Insured** for direct loss of **Money** or **Securities** sustained by an **Insured** resulting from **Funds Transfer Fraud** committed by a **Third Party**.

G.  **MONEY ORDERS AND COUNTERFEIT CURRENCY FRAUD COVERAGE**

The Underwriter shall pay the **Insured** for direct loss sustained by an **Insured** resulting from **Money Orders and Counterfeit Currency Fraud** committed by a **Third Party**.

H.  **CREDIT CARD FRAUD COVERAGE**

The Underwriter shall pay the **Insured** for direct loss sustained by an **Insured** resulting from **Credit Card Fraud** committed by a **Third Party**.

I.  **SOCIAL ENGINEERING FRAUD COVERAGE**

The Underwriter shall pay the **Insured** for direct loss sustained by an **Insured** resulting from an **Insured** having transferred, paid or delivered any **Money** or **Securities** as the direct result of **Social Engineering Fraud** committed by a person purporting to be a **Vendor**, **Client** or **Employee** who was authorized by the **Insured** to instruct other **Employees** to transfer **Money** or **Securities**.

J.  **PERSONAL ACCOUNT PROTECTION**

1.  **Personal Accounts Forgery or Alteration**

    The Underwriter shall pay the **Insured**, on behalf of the **Executive**, for direct loss sustained by an **Executive** resulting directly from **Forgery** or alteration of any **Financial Instrument** to pay a sum certain in **Money** that is made or drawn upon the personal account for such **Executive**, or purportedly made or drawn upon the account of such **Executive**.

    For the purposes of this Insuring Agreement J.1, a substitute check as defined in the Check Clearing for the 21st Century Act shall be treated the same as the original check it replaced.

2.  **Identity Fraud Expense Reimbursement**

    The Underwriter shall pay the **Insured**, on behalf of an **Executive**, for **Identity Fraud Expense** incurred by an **Executive** resulting directly from **Identity Fraud**.

K.  **EXPENSE COVERAGE**

The Underwriter shall pay the **Insured** for reasonable **Investigative Expenses** incurred and paid by the **Insured,** with the Underwriter's prior written consent, to pay an independent accounting, auditing or other service that is not a **Client** to determine the existence or amount of loss covered under any Insuring Agreement of this Coverage Section; up to the Limit of Liability for the Expense Coverage Insuring Agreement set forth in ITEM 1 of the Crime Declarations and in excess of the deductible applicable to such covered loss.  Such Limit of Liability for Expense Coverage shall be part of and not in addition to the Limit of Liability applicable to such other Insuring Agreement.

II.     **DEFINTIONS**

When used in the Crime Coverage Section, the following terms, whether in the singular or plural, are defined as follows:

A.     **Banking Premises** means the interior portion of a building occupied by, or the depository or safe maintained by, any bank, trust company or similar financial institution, including a night depository chute, ATM machine owned by such financial institution (wherever located) or safe of such institution.

B.     **Client** means a customer of an **Insured** to whom an **Insured** provides goods or services under written contract or for a fee.

C.     **Computer Data Restoration Expenses** means reasonable expenses, other than the **Insured's** internal corporate costs (such as salary), incurred by the **Insured**, with the Underwriter's prior written consent, to reproduce or duplicate damaged or destroyed data that was stored in the **Insured's** computer system and was damaged or destroyed directly as a result of a loss covered under Insuring Agreement E.1 (Computer Fraud Coverage).  Such damaged or destroyed data shall be reproduced or duplicated from other data available to the **Insured**; however, if such damaged or destroyed data cannot be reproduced or duplicated from other data, then **Computer Data Restoration Expenses** means reasonable costs, other than the **Insured's** internal corporate costs (such as salary), incurred by the **Insured** for computer programmers or technology consultants to restore such damaged or destroyed data to substantially the same level existing immediately before the covered loss.  **Computer Data Restoration Expenses** shall not include any expenses incurred by a **Client**.

D.     **Computer Fraud** means the unlawful taking of **Money**, **Securities** or **Property** resulting from a **Computer Violation**.

E.     **Computer System** means a computer or network of computers, including its input, output, processing, storage and communication facilities, and shall include off-line media libraries.

F.     **Computer Violation** means an unauthorized:

1.     entry into or deletion of **Data** from a **Computer System**;

2.     change to **Data** elements or program logic of a **Computer System**, which is kept in a machine readable format; or

3.     introduction of instructions, programmatic or otherwise, which propagate themselves through a **Computer System**;

directed against an **Insured**.

G.     **Confidential Information** means confidential or personal information including, but not limited to, patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any similar type of nonpublic information.

H.     **Contractual Independent Contractor** means any natural person independent contractor while in the regular service of the **Insured** in the ordinary course of such **Insured's** business, pursuant to a written contract for services between such **Insured**, and either (i) such natural

person independent contractor, or (ii) any other entity acting on behalf of such natural person independent contractor.

I. **Credit Card Fraud** means the **Forgery** or alteration of, on or in, any written instrument required in connection with any credit card, debit card, or charge card issued to the **Insured** or at the request of the **Insured**, to any partner, officer or **Employee** of the **Insured**.

J. **Data** means information contained in records, manuscripts, accounts, microfilms, tapes or other records, which are processed and stored in a **Computer System**.

K. **Discover, Discovery** or **Discovered** means knowledge acquired by an **Executive** which would cause a reasonable person to believe a covered loss has occurred or an occurrence has arisen that may subsequently result in a covered loss, including loss:

   1. sustained prior to the inception date of any coverage under this Coverage Section;

   2. which does not exceed the applicable Deductible set forth in ITEM 1 of the Crime Declarations; or

   3. the exact amount or details of which are unknown;

   provided that **Discovery** or **Discovered** shall not include knowledge acquired by an **Executive** acting alone or in collusion with an **Employee**, or the knowledge possessed by any **Executive** who is a participant in the **Theft** or **Forgery**.

L. **Employee** means any:

   1. natural person:

      a. while in the regular service of the **Insured** or for 60 days after termination of service, unless such termination is due to **Theft** or **Forgery** or any other dishonest act committed by the **Employee**;

      b. whom such **Insured** governs and directs in the performance of such service for such **Insured** and

      c. whom the Insured compensates directly by salary, wages or commissions;.

   2. natural person who is furnished temporarily to the Insured:

      a. to substitute for a permanent **Employee**, as defined in Paragraph 1 above, who is on leave; or

      b. to meet seasons or short-term workload conditions;

      while that person is subject to the **Insured's** direction and control and performing services for the **Insured**; provided, any such natural person who has care and custody of property outside the **Premises** is specifically excluded from this definition;

   3. **Executive** while performing acts within the scope of the usual duties of an **Employee**;

   4. **Contractual Independent Contractor**;

5.    any natural person who is a guest student of the **Insured** or intern pursuing studies or duties with the **Insured**;

6.    natural person fiduciary, trustee, administrator or **Employee**, as defined in paragraphs 1 and 2 above, of an **ERISA Plan** and any other natural person, who handles **ERISA Plan** assets and is required to be bonded by the **Insured** in connection with such **ERISA Plan** by Title 1 of the Employee Retirement Income Security Act of 1974, as amended, or by the Pension Protection Act of 2006;

7.    former or retired **Employee**, as defined in paragraphs L. 1 and 2 above, of the **Insured**, retained as a consultant (as evidenced by a written contract for services) to the **Insured**;

8.    any non-compensated natural person other than one who is a fund solicitor, while performing services of the **Insured** that are within the scope of the usual duties of an **Employee**;

9.    natural person who is a non-compensated officer;

10.   any natural person who is a volunteer for the **Insured**; or

11.   any **Employee** of the **Insured**, while on military, family, medical or similar leave.

**Employee** does not mean any agent, broker, factor, commission merchant, consignee or representative or other person of the same general character not specified in Paragraphs 1. through 11. above.

M.   **ERISA Plan** means any Employee Benefit Plan, Pension Benefit Plan or Welfare Benefit Plan, defined and required to be bonded under Title 1 of the Employee Retirement Income Security Act of 1974, as amended, or by the Pension Protection Act of 2006, which is operated solely by the **Insured** or jointly by the **Insured** and a labor **Insured** for the benefit of **Employees** and which existed on or before the inception of this Policy or which is created or acquired after the inception of this Policy, provided that **ERISA Plan** shall not include any multi-employer plan.

N.   **Executive** means any natural person specified below:

1.    a duly elected or appointed director, officer, trustee, in-house general counsel or duly constituted committee member of any **Insured** incorporated in the United States of America;

2.    a duly elected or appointed: (i) manager or member of the Board of Managers or equivalent position; (ii) duly constituted committee member; (iii) in-house general counsel; or (iv) trustee, of any **Insured** formed as a limited liability company in the United States of America; or

3.    a holder of an equivalent position to those described in paragraphs 1 or 2 above in any **Insured** incorporated, formed or organized anywhere in the world.

O.   **Fiduciary** means any natural person who is a:

1.    trustee, officer, employee, administrator or manager of an **ERISA Plan**, except an administrator or manager of an **ERISA Plan** who is an independent contractor; and

    2.   **Executive** of the **Insured** while that person is handling **Money**, **Securities** or **Property** of any **ERISA Plan**.

P.   **Financial Instrument** means checks, drafts or similar written promises, orders or directions to pay a sum certain in money, that are made, drawn by or drawn upon the **Insured** or by anyone acting as the **Insured's** agent, or that are purported to have been so made or drawn.

Q.   **Forgery** means the signing of another natural person's name with the intent to deceive, but does not mean a signature that includes, in whole or in part, one's own name, with or without authority, in any capacity for any purpose. Mechanically or electronically produced or reproduced signatures shall be treated the same as hand-written signatures.

R.   **Funds Transfer Fraud** means fraudulent written, electronic, telegraphic, cable, teletype or telephone instructions (other than **Forgery**), purportedly issued by an **Insured**, and issued to a financial institution directing such institution to transfer, pay or deliver **Money** or **Securities** from any account maintained by such **Insured** at such institution, without such **Insured's** knowledge or consent.

S.   **Identity Fraud Expenses** means:

    1.   costs for notarizing fraud affidavits or similar documents for credit agencies, financial institutions, merchants or other credit grantors that have required such affidavits be notarized;

    2.   costs for certified mail to law enforcement agencies, credit agencies, financial institutions, merchants or other credit grantors;

    3.   costs for long distance telephone calls to law enforcement agencies, credit agencies, financial institutions, merchants or other credit grantors to discuss any actual **Identity Fraud**;

    4.   lost wages, up to a maximum of one thousand dollars ($1,000) per week for a maximum period of five (5) weeks, as a result of absence from employment:

        a.   to communicate with law enforcement agencies, legal counsel, credit agencies, financial institutions, merchants or other credit grantors;

        b.   to complete fraud affidavits or similar documents; or

        c.   due to wrongful incarceration arising solely from another person having committed a crime in an **Executive's** name; provided, that lost wages shall not apply in the case of wrongful incarceration absent all charges being dismissed or an acquittal;

    5.   loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information;

    6.   reasonable attorney fees incurred, with the Underwriter's prior written consent, for:

        a.   defense of lawsuits brought against an **Executive** by financial institutions, merchants, other credit grantors or their collection agencies;

      b.   the removal of any criminal or civil judgments wrongly entered against an **Executive**; or

      c.   challenging the accuracy or completeness of any information in a consumer credit report.

T.   **Insurance Representative** means an **Employee**, as defined in Sections II.L.1 and II.L.2 of the definition of **Employee**, including a risk manager, designated to represent an **Insured** for the purpose of effecting and maintaining insurance.

U.   **Insured** means:

      1.   for the purposes of Insuring Agreement A.3 (ERISA Plan Coverage), any **ERISA Plan**; or

      2.   for the purposes of all other Insuring Agreements any **Organization** or any **Sponsored Plan**.

V.   **In Transit** means being conveyed outside the **Premises**, from one person or place to another, by the **Insured** within the custody of:

      1.   an **Employee** or a partner of the **Insured**; or

      2.   a person duly authorized by such **Insured** to have custody of **Money**, **Securities** or **Property**;

provided that such conveyance begins immediately upon receipt of **Money**, **Securities** or **Property** by the person(s) described in Paragraphs 1 or 2 above, from such **Insured**, and ceases immediately upon delivery to the designated recipient or its agent.

W.   **Investigative Expenses** means reasonable expenses, other than the **Insured's** internal corporate costs (such as **Salary**), incurred by the **Insured** with the Underwriter's prior written consent to establish the existence and amount of a covered loss. **Investigative Expenses** shall not include expenses incurred by any **Client**.

X.   **Money** means currency, coin, bank notes, bullion, travelers checks, registered checks and money orders held for sale to the general public.

Y.   **Money Orders and Counterfeit Currency Fraud** means the good faith acceptance by the **Insured**:

      1.   in exchange for merchandise, **Money** or services, of any post office or express money order, issued or purporting to have been issued by any post office or express company, if such money order is not paid upon presentation; or

      2.   in the regular course of business, of counterfeit paper currency.

Z.   **Non-ERISA Plan** means any employee benefit plan not subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended, or by the Pension Protection Act of 2006, which is operated solely by the **Insured** or jointly by the **Insured** and a labor **Insured** for the benefit of **Employees** and which existed on or before the inception of this Policy or which is created or acquired after the inception of this Policy, provided that **Non-ERISA Plan** shall not include any multi-employer plan.

AA.   **Premises** means the interior portion of a building occupied by the **Insured** in conducting its business.

BB.   **Property** means tangible property other than **Money** or **Securities** that has an intrinsic value. **Property** shall not include any intangible property such as computer programs, electronic data or any other property excluded from coverage under this Coverage Section.

CC.   **Robbery** means the unlawful taking of **Money**, **Securities** or **Property** from the custody of an **Employee** or other person (except a person acting as a watchman, porter or janitor) duly authorized by the **Insured** to have custody of such **Money**, **Securities** or **Property**, by violence or threat of violence, committed in the presence and cognizance of such **Employee** or other person.

DD.   **Safe Burglary** means the unlawful taking of **Money**, **Securities** or **Property** by forcible or violent entry evidenced by visible marks, from a locked vault or safe located within the **Premises**.

EE.   **Salary** means compensation an **Insured** pays an **Employee**, including bonus, commission, incentive payments, and the cost of health, welfare and pension benefits.

FF.   **Securities** means any negotiable and non-negotiable contracts or instruments representing either **Money** or **Property**, including revenue and other stamps in current use, casino chips, tokens and tickets, provided that **Securities** shall not include **Money**.

GG.   **Social Engineering Fraud** means the intentional misleading of an **Employee**, through misrepresentation of a material fact which is relied upon by an **Employee**, believing it be genuine.

HH.   **Sponsored Plan** means any **ERISA Plan** and **Non-ERISA Plan**.

II.   **Theft** means the unlawful taking of **Money**, **Securities** or **Property** to the deprivation of:

    1.   an **Insured**, solely for the purposes of Insuring Agreement A.1 (Employee Theft Coverage) and A.2 (ERISA Plan Coverage); or

    2.   a **Client**, solely for the purposes of Insuring Agreement A.3 (Client Coverage).

JJ.   **Third Party** means a natural person other than:

    1.   an **Employee**; or

    2.   a natural person acting in collusion with an **Employee**.

KK.   **Vendor** means any entity or natural person that has provided goods or services to the **Insured** under a legitimate pre-existing arrangement or written agreement. However, **Vendor** does not include any financial institution, asset manager, broker-dealer, armored motor vehicle company, or any similar entity.

**III.   EXCLUSIONS**

A.   No coverage will be available for:

1. **TRADING**

   loss resulting directly or indirectly from any authorized or unauthorized trading of **Money**, **Securities** or **Property**, whether or not in the name of an **Insured** and whether or not in a genuine or fictitious account, provided that this exclusion shall not apply to direct losses caused by **Theft** or **Forgery** which result in improper financial gain to an **Employee** (direct losses as used herein shall mean only the amount of improper financial gain to such **Employee**, which shall not include **Salary**, commissions, fees or other compensation, including promotions and raises associated with employment, paid by the **Insured** to such **Employee**);

2. **CONFIDENTIAL INFORMATION**

   a. loss involving the disclosure or use of an **Insured's** or another entity or person's **Confidential Information** while in the care, custody or control of an **Insured**; or

   b. fees, costs, fines, penalties or any other expenses incurred by an **Insured** which result, directly or indirectly, from the access to or disclosure of **Confidential Information**;

3. **OWNER/PARTNER**

   loss due to **Theft** or **Forgery** committed by an owner or partner of the **Insured**, whether acting alone or in collusion with others, provided that if such **Theft** or **Forgery** would otherwise be covered under Insuring Agreement A (Fidelity Coverage), this exclusion shall not apply to the extent coverage under this Coverage Section is excess of the amount of such owner or partner's percentage ownership of such **Insured**, on the day immediately preceding the date of **Discovery**, multiplied by such **Insured's** total assets as reflected in such **Insured's** most recent annual financial statements;

4. **WAR**

   loss or damage due to declared or undeclared war, civil war, insurrection, rebellion, revolution, military, naval or usurped power, governmental intervention, expropriation or nationalization, or any act or condition incident to any of the foregoing;

5. **NUCLEAR**

   loss or damage due to nuclear reaction, nuclear radiation or radioactive contamination, or any act or condition incident to any of the foregoing;

6. **SOCIAL ENGINEERING FRAUD**

   loss or damage due to **Social Engineering Fraud**; provided that this exclusion shall not apply to otherwise covered loss under Insuring Agreement I (Social Engineering Coverage);

7. **POTENTIAL INCOME**

   loss of income not realized as the result of a covered loss;

8.  **INDIRECT/CONSEQUENTIAL**

    indirect or consequential loss of any kind, provided that this exclusion shall not apply to:

    a.  otherwise covered **Investigative Expenses** and **Computer Data Restoration Expenses** under Insuring Agreement E.2 (Computer Data Restoration Expense Coverage) and Insuring Agreement K (Expense Coverage);

    b.  the cost of reproducing information contained in any lost or damaged manuscripts, records, accounts, microfilms, tapes, or other records resulting directly from a covered loss, provided that the **Insured's** maximum liability for the cost of reproducing information contained in any lost or damaged manuscripts, records, accounts, microfilms, tapes, or other records resulting directly from a covered loss sustained shall be $25,000, which amount shall be part of, and not in addition to, the applicable Limit of Liability set forth in ITEM 1 of the Crime Declarations;

9.  **DATA, FEES, COSTS AND EXPENSES**

    fees, costs or expenses incurred or paid:

    a.  as a result of the reconstitution of **Data** if the **Insured** knowingly used illegal copies of programs;

    b.  to render the **Data** usable by replacement processing equipment;

    c.  to design, update or improve software or programs or to perfect their operation or performance; or

    d.  as a result of an alteration in **Data** held on magnetic media due to the effect of magnetic fields, their incorrect use or the obsolescence of the computer or its facilities;

10. **LEGAL FEES, COSTS AND EXPENSES**

    fees, costs or expenses incurred or paid in defending or prosecuting any legal proceedings or claim, provided that this exclusion shall not apply to the coverage provided under Section IV (Legal Expenses Extension);

11. **VOLUNTARY EXCHANGE OR PURCHASE**

    loss due to an **Insured** knowingly having given or surrendered **Money**, **Securities** or **Property** in any exchange or purchase with a **Third Party**, not in collusion with an **Employee**, provided that this exclusion shall not apply to otherwise covered loss under Insuring Agreement A (Fidelity Coverage), G (Money Orders and Counterfeit Currency Fraud Coverage), or I (Social Engineering Fraud), or otherwise covered loss of **Property** under Insuring Agreement E (Computer Crime Coverage);

12. **ADVANTAGE**

    loss sustained by one **Insured** to the advantage of any other **Insured**;

13. **CUSTODIAL**

loss of or damage to **Money**, **Securities** or **Property** while in the custody of any bank, trust company, similar recognized place of safe deposit, armored motor vehicle company or any person who is duly authorized by an **Insured** to have custody of such **Money**, **Securities** or **Property**, provided that this exclusion shall not apply to the extent that coverage under this Coverage Section is in excess of the amount recovered or received by such **Insured** under:

a.   such **Insured's** contract, if any, with, or insurance carried by, any of the foregoing; or

b.   any other insurance or indemnity in force which would cover the loss in whole or in part;

14. **GOVERNMENTAL AUTHORITY**

loss or damages resulting directly or indirectly from seizure or destruction of property by order of a governmental authority;

15. **AUTHORIZED REPRESENTATIVE**

loss or damage due to **Theft**, **Forgery**, **Computer Fraud**, **Funds Transfer Fraud**, **Money Orders And Counterfeit Currency Fraud**, **Credit Card Fraud** or other fraudulent, dishonest or criminal act (other than **Robbery** or **Safe Burglary**) committed by any authorized representative of an **Insured**, whether acting alone or in collusion with others, provided that this exclusion shall not apply to otherwise covered loss under Insuring Agreement A (Fidelity Coverage), resulting from **Theft** or **Forgery** committed by an **Employee** acting in collusion with such authorized representative.

B.   In addition to the Exclusions in Subsection A above, no coverage will be available under:

1.   Insuring Agreement A (Fidelity Coverage), for:

a.   **BROKER/INDEPENDENT CONTRACTOR**

loss caused by any broker, factor, commission merchant, consignee, contractor, independent contractor (other than a **Contractual Independent Contractor**), or other agent or representative of the same general character;

b.   **PRIOR DISHONESTY**

loss caused by an **Employee,** not in collusion with the **Insured** or an **Executive,** which is sustained by the **Insured** after an **Executive** or **Insurance Representative** becomes aware of any **Theft**, **Forgery**; or other fraudulent, dishonest or criminal act committed by such **Employee**, whether such act was committed before or after such **Employee** became employed by the **Insured**.  However, this provision shall not apply if the **Theft**, **Forgery** or any other dishonest act occurred prior to the **Employee** becoming an **Employee** of the **Insured** and the amount of loss resulting from such act did not exceed $10,000.

2.   Insuring Agreement B (Premises Coverage) or C (In Transit Coverage), for:

a. **OTHER INSURING AGREEMENTS**

loss or damage due to **Forgery**, **Computer Fraud**, **Funds Transfer Fraud**, **Money Orders and Counterfeit Currency Fraud** or **Credit Card Fraud**; or

b. **FIRE**

loss due to fire, provided that this exclusion shall not apply to:

    i. loss of **Money** or **Securities**; or

    ii. damage to any safe or vault caused by the application of fire thereto for the purposes of **Safe Burglary**.

c. **ACCOUNTING OR ARITHMETICAL ERRORS**

loss resulting from accounting or arithmetical errors or omissions.

d. **EXCHANGES OR PURCHASES**

loss or damages due to the giving or surrendering of **Mone**y, **Securities** or **Property** in any exchange or purchase.

e. **VOLUNTARY PARTING OF TITLE/POSSESSION**

loss resulting from the **Insured**, or anyone acting on its implied or express authority, being induced by any dishonest act to voluntarily part with title to or possession of any **Property**.

f. **VANDALISM**

loss or damage to the **Premises** or its exterior, or to any safe, vault, cash register, cash box, cash drawer or **Property** resulting from vandalism or malicious mischief.

3. Insuring Agreement B (Premises Coverage), C (In Transit Coverage), E (Computer Crime Coverage), F (Funds Transfer Fraud Coverage), or I (Social Engineering Fraud Coverage) for:

a. **KIDNAP, RANSOM OR EXTORTION**

loss or damage as a result of a kidnap, ransom or other extortion payment (as distinct from **Robbery**) surrendered to any person as a result of a threat to do bodily harm to any person or a threat to do damage to the **Premises** or other property;

b. **FORGERY OR ALTERATION**

loss due to **Forgery** or alteration of:

    i. any **Financial Instrument** committed by any **Third Party** in collusion with any **Employee**; or

     ii.    any registered or coupon obligations issued or purported to have been issued by the **Insured**, or any coupons whether attached or detached.

4.    Insuring Agreement D (Forgery or Alteration Coverage) for:

    a.    **FORGERY OR ALTERATION**

        loss due to **Forgery** or alteration of:

        i.    any **Financial Instrument** committed by any **Third Party** in collusion with any **Employee**; or

        ii.    any registered or coupon obligations issued or purported to have been issued by the **Insured**, or any coupons whether attached or detached.

5.    Insuring Agreement H (Credit Card Fraud Coverage) for:

    a.    **FORGERY OR ALTERATION (CREDIT CARD)**

        loss caused by any **Forgery** or alteration of, on or in any written instrument, provided that this Exclusion B.5 shall not apply if:

        i.    the provisions, conditions and other terms under which the involved credit card was issued were fully complied with; and

        ii.    the **Insured** is legally liable to the issuer of such credit card for such loss.

6.    Insuring Agreement I (Social Engineering Fraud Coverage) for:

    a.    **CAUSE(S) OF LOSS**

        loss or damage due to **Theft** by an **Employee**, **Forgery**, **Computer Fraud**, **Funds Transfer Fraud**, **Money Orders and Counterfeit Currency Fraud or Credit Card Fraud**;

    b.    **MAIL/CARRIER FOR HIRE**

        loss of or damage to **Money** or **Securities** while in the mail or in the custody of any carrier for hire, including but not limited to any armored motor vehicle company;

    c.    **INVESTMENTS**

        loss due to any investment in **Securities**, or ownership in any corporation, partnership, real property, or similar instrument, whether or not such investment is genuine;

    d.    **PRODUCTS OR SERVICES**

        loss due to the failure, malfunction, inadequacy or illegitimacy of any product or service;

     e.  **PERFORMANCE UNDER CONTRACT**

       loss due to the failure of any part to perform, in whole or in part, under any contract;

     f.  **LOANS AND CREDIT**

       loss due to the extension of any loan, credit or similar promise to pay;

     g.  **GAMBLING**

       loss due to any gambling, game of chance, lottery or similar game;

     h.  **PROPERTY**

       loss or damage to any **Property**

     i.  **CREDIT CARD LOSS**

       loss due to any party's use of or acceptance of any credit card, debit card or similar instrument, whether or not genuine.

C.  **Loss Discovered**

No coverage will be available for:

1. loss unless such loss is sustained by any **Insured**, and such loss is **Discovered** prior to the termination of this Coverage Section as to such **Insured**;

2. loss unless such loss is sustained by any **Insured** and **Discovered** prior to the termination of the applicable Insuring Agreement or the applicable coverage offered under any Insuring Agreement;

3. loss unless such loss is sustained by any **Insured** and **Discovered** prior to the termination of this Coverage Section in its entirety;

4. loss unless such loss is sustained prior to the termination of this Coverage Section and such loss is **Discovered** within one (1) year following such termination if the termination results from the voluntary liquidation or voluntary dissolution of the **Named Insured**; or

5. any loss that an **Insured** is aware of prior to the inception date of this Policy;

provided that in no event will coverage be available under this Coverage Section for such loss if such loss is covered under any renewal or replacement of this Coverage Section or any Insuring Agreement or any particular coverage offered under any Insuring Agreement.

## IV.  LEGAL EXPENSES EXTENSION

In addition to the Limits of Liability set forth in ITEM 1 of the Crime Declarations, the Underwriter shall pay the **Named Insured**:

A.   as a result of loss covered under Insuring Agreement D (Forgery or Alteration Coverage), reasonable court costs and attorneys' fees incurred and paid, with the Underwriter's prior written consent, in defending the **Insured** or the **Insured's** bank in any legal proceeding brought against it to enforce payment of a **Financial Instrument**; and

B.   as a result of loss covered under Insuring Agreement H (Credit Card Fraud Coverage), reasonable court costs and attorneys' fees incurred and paid with the Underwriter's prior written consent in defending the **Insured** in any legal proceeding brought against it to enforce payment of a written instrument, required in connection with any credit card, debit card, or charge card.

## V.   NOTICE AND PROOF OF LOSS

A.   It is a condition precedent to coverage under this Coverage Section that, upon **Discovery** by the **Insured** or an **Executive** of a loss of or damage to **Money**, **Securities** or **Property** that the **Insured** or an **Executive** reasonably believes will exceed fifty percent (50%) of the applicable Deductible stated in ITEM 1 of the Crime Declarations, the **Insured** will:

   1.   give written notice to the Underwriter at the earliest practicable moment, and in no event later than 90 days after such **Discovery**;

   2.   furnish affirmative proof of loss with full particulars to the Underwriter at the earliest practicable moment, and in no event later than 180 days after such **Discovery**;

   3.   submit to examination under oath at the Underwriter's request;

   4.   produce all pertinent records at such reasonable times and places as the Underwriter shall designate; and

   5.   provide full cooperation with the Underwriter in all matters pertaining to a loss or claim.

B.   Knowledge possessed by any **Insured**, or **Discovery**, shall be deemed knowledge possessed by, or **Discovery**, by all **Insureds**.

C.   The **Insured** may offer a comparison between the **Insured's** inventory records and actual physical count of its inventory to prove the amount of loss, only where an **Insured** establishes wholly apart from such comparison that it has sustained a covered loss, caused by an **Employee**.

## VI.   LIMITS OF LIABILITY

A.   The Underwriter's maximum liability for each loss shall not exceed the Limit of Liability applicable to such loss set forth in ITEM 1 of the Crime Declarations, regardless of the number of **Insureds** sustaining the loss.

B.   If a direct loss is covered under more than one Insuring Agreement, the maximum amount payable under this Coverage Section shall not exceed the largest applicable Limit of Liability of any such Insuring Agreement.

C.   All loss resulting from a single act or any number of acts of the same **Employee** or **Third Party**, whether such act or acts occurred before or during the **Policy Period**, will be treated as a single loss and the applicable Limit of Liability set forth in ITEM 1 of the Crime Declarations will apply to such single loss, subject to Section X (Liability for Prior Losses).

D.  Solely with respect to the coverage provided by Insuring Agreement A.3 (ERISA Coverage), the limit will apply separately to each **ERISA Plan**.  If the same occurrence triggers both Insuring Agreements A.1 (Employee Theft Coverage) and A.3 (ERISA Plan Coverage), the Underwriter will pay both limits.

E.  If the limit set forth in ITEM 1 of the Crime Declarations for Insuring Agreement A.3 (ERISA Plan Coverage) no longer complies with the minimum amount of coverage required for such **ERISA Plan(s)** under ERISA (other than noncompliance due to investment in non-assets), the Underwriter agrees to increase the limit applicable to each such **ERISA Plan** so as to equal the minimum amount of coverage required under ERISA, provided the original limit was in compliance at Policy inception.

## VII.   DEDUCTIBLE

A.  The Underwriter's liability under this Coverage Section shall apply only to that part of each loss which is in excess of the applicable Deductible set forth in ITEM 1 of the Crime Declarations.  If more than one Deductible applies to a single loss, then the largest applicable Deductible shall apply to such loss.

B.  If an **Insured** receives payment under another policy or bond, after applying a deductible or retention, for loss also covered hereunder, then the applicable Deductible set forth in ITEM 1 of the Crime Declarations shall be reduced by the deductible or retention previously applied to such loss.

## VIII.   OWNERSHIP; INTERESTS COVERED

A.  Except as provided in subparagraph B below, the Underwriter's liability under this Coverage Section shall only apply to **Money**, **Securities** or **Property** owned by the **Insured** or for which the **Insured** is legally liable, or held by the **Insured** in any capacity whether or not the **Insured** is liable, provided that:

   1.  the Underwriter's liability will not apply to damage to the **Premises** unless the **Insured** is the owner of such **Premises** or is legally liable for such damage; or

   2.  with respect to Insuring Agreement A.1 (Employee Theft Coverage), the Underwriter's liability will not apply to **Money**, **Securities** or **Property** of a **Client**.

B.  Solely for the purposes of Insuring Agreement A.2 (Client Property Coverage), the Underwriter's liability under this Coverage Section will only apply to **Money**, **Securities** or **Property**:

   1.  owned by a **Client**, which is held by the **Insured** in any capacity or for which the **Insured** is legally liable; or

   2.  held or owned by a **Client**, for which the **Client** is legally liable.

Notwithstanding the foregoing, the insurance provided by this Coverage Section is for the benefit of the **Insured** only and provides no rights or benefits to any other person or entity.  Any claim for loss covered under this Coverage Section must be submitted by the **Insured**.

IX.   **LIABILITY FOR PRIOR LOSSES**

Coverage will be available for loss sustained at any time and **Discovered** during the **Policy Period**, provided that coverage for loss sustained prior to the effective date of this Coverage Section, or the effective date of coverage for any additional **Insureds**, or the effective date of any coverage added by endorsement, is subject to the following:

A.   if the **Insured** or some predecessor in interest of such **Insured** carried a prior bond or policy which afforded coverage for a loss sustained during the period of such prior bond or policy and such prior bond or policy was not issued by the Underwriter or any subsidiary or affiliate of the Underwriter and such loss was first **Discovered** by an **Insured** prior to the expiration of the time allowed for discovery under the last such policy, then no coverage shall be available under this Coverage Section, unless the total amount of covered loss exceeds the limit of liability of the last such bond or policy carried by the **Insured** or predecessor in interest of such **Insured**, and the **Insured's** Limit of Liability for any such loss will be in excess of the limit of liability of the last bond or policy subject to all of the terms and conditions of this Coverage Section; or

B.   if the **Insured** or some predecessor in interest of such **Insured** carried a prior bond or policy which afforded coverage for a loss sustained during the period of such prior bond or policy and such prior bond or policy was issued by the Underwriter or any subsidiary or affiliate of the Underwriter then such prior bond or policy shall terminate as of the inception of this Policy and such prior bond or policy shall not cover any loss not discovered and noticed to the Underwriter prior to the inception of this Policy and then the Underwriter's Limit of Liability for such loss shall be the applicable Limit of Liability set forth in ITEM 1 of the Crime Declarations.

X.   **NON-ACCUMULATION OF LIABILITY**

A.   When there is more than one **Insured**, the maximum liability of the Underwriter for loss sustained by one or all **Insureds** shall not exceed the amount for which the Underwriter would be liable if all losses were sustained by any one **Insured**.

B.   Regardless of the number of years this coverage remains in effect and the total premium amounts due or paid, the limit of liability of the Underwriter with respect to any loss shall not be cumulative from **Policy Period** to **Policy Period**.

XI.   **LEGAL ACTION AGAINST UNDERWRITER**

No **Insured** shall institute legal proceedings against the Underwriter:

A.   unless the **Insured** has fully complied with all of the terms of this Coverage Section and this Policy;

B.   until ninety (90) days after the date on which the **Insured** filed its proof of loss with the Underwriter; and

C.   unless such legal action is commenced within two (2) years immediately following **Discovery**.

If any limitation of time set forth in this Section XI is prohibited by applicable law, such limitation shall be deemed amended so as to equal the minimum period of limitation required by applicable law.

**XII.  OTHER INSURANCE**

If an **Insured** or any other party in interest in any loss covered by this Coverage Section has any bond, indemnity or insurance which would cover such loss in whole or in part in the absence of this Coverage Section, then this Coverage Section shall be null and void to the extent of the amount recoverable or received under such other bond, indemnity, or insurance; but this Coverage Section shall cover such loss, subject to its exclusions, conditions and other terms, only to the extent of the amount of such loss in excess of the amount recoverable or received under such other bond, indemnity or insurance.

**XIII.  TERMINATION OF PRIOR BONDS OR POLICIES**

Any prior bonds or policies issued by the Underwriter or any subsidiary or affiliate of the Underwriter shall terminate, if not already terminated, as of the inception of this Policy.

**XIV.  VALUATION AND FOREIGN CURRENCY**

The Underwriter shall pay:

A.  the actual market value of lost, damaged or destroyed **Securities** at the closing price of such **Securities** on the business day immediately preceding the day on which a loss is **Discovered**; or the cost of replacing **Securities**, whichever is less, plus the cost to post a Lost Instrument Bond;

B.  the cost of blank books, pages or tapes or other blank materials to replace lost or damaged books of account or other records;

C.  the least of:

   1.  the actual cash value of the **Property**; or

   2.  the cost to repair or replace **Property**, other than precious metals, with that of similar quality and value,

   at the time the **Named Insured** complies with Section V (Notice and Proof of Loss) regarding the furnishing of proof of loss;

D.  the United States of America dollar value of foreign currency based on the rate of exchange published in *The Wall Street Journal* on the day loss involving foreign currency is **Discovered**; or

E.  the United States of America dollar value of any precious metals based on the amount published in *The Wall Street Journal* Cash Prices, Precious Metals, on the day loss involving such precious metals is **Discovered**.

**XV.  EXTENDED PERIOD TO DISCOVER LOSS**

The Underwriter will pay for loss **Insured** sustained prior to the effective date of cancellation or termination of this Coverage Section, which is **Discovered** by the **Insured** or an **Executive**:

A.  no later than sixty (60) days from the effective date of such cancellation or termination; and

B.    with respect to any **ERISA Plan** under Insuring Agreement A.3 (ERISA Coverage), of this Coverage Section, no later than one (1) year from the effective date of such cancellation or termination.

Notwithstanding the foregoing, this extended period to **Discover** loss terminates immediately upon the effective date of any other insurance obtained by the **Insured** replacing in whole or in part the insurance afforded by this Coverage Section.

## XVI.  RECOVERIES

Recoveries for any loss covered under this Coverage Section, whether effected by the Underwriter or the **Insured** or whether effected before or after the Underwriter has made payment under this Coverage Section, less the costs of recovery shall be distributed as follows:

A.    first, to an Insured in satisfaction of its covered loss in excess of the applicable Per Occurrence Limit of Liability;

B.    second, to the Underwriter in satisfaction of the amounts paid to an Insured for a covered loss;

C.    third, to an Insured in satisfaction of any Deductible applicable to such loss;

D.    fourth, to an Insured in satisfaction of any amount of such loss not covered by this Coverage Section.

Any amounts recovered from insurance, suretyship, reinsurance, security or indemnity taken for the Underwriter's benefit shall not be deemed a recovery hereunder. Recovery of original Securities after duplicates of them have been issued shall not be deemed a recovery hereunder.

**ENDORSEMENT NO.** MPE-00014-07-19

AMEND DEFINITION OF ORGANIZATION

This Endorsement, which is effective at 12:01 a.m. on 07/01/2021, forms part of:

| Policy No. | FQ350DMLA210 |
|---|---|
| Issued to | Lutheran Child & Family Services of IL |
| Issued by | Professional Solutions Insurance Company |
| Section(s) | GTC |

In consideration of the premium charged:

1. The term "**Organization**," as defined in Section II DEFINITIONS in the Coverage Section identified above, is amended to include the following position(s):

   **Organization(s)**:
   • Lutheran Child & Family Services of Illinois Foundation
   • Camp Wartburg Lutheran Retreat Center Incorporated
   • Lifelink International Adoption Services (Inactive as of 7/1/2017)

All other terms, conditions and limitations of this Policy shall remain unchanged.

**ENDORSEMENT NO.** MPE-01015-07-19

DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

This Endorsement, which is effective at 12:01 a.m. on 07/01/2021, forms part of:

| Policy No. | FQ350DMLA210 |
|---|---|
| Issued to | Lutheran Child & Family Services of IL |
| Issued by | Professional Solutions Insurance Company |
| Section(s) | D&O |

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THIS POLICY.**

1. In accordance with the Terrorism Risk Insurance Act, the Underwriter is required to provide the Insured with a notice disclosing the premium, if any, attributable to coverage for Certified Acts of Terrorism. The premium attributable to such coverage is $0.

2. If coverage is provided by the Coverage Section(s) identified above for losses resulting from **Certified Acts of Terrorism**, such losses may be partially reimbursed by the United States Government under a formula established by federal law. Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.

3. If aggregate insured losses attributable to **Certified Acts of Terrorism** exceed $100 billion in a calendar year and the Underwriter has met its insurer deductible under the Terrorism Risk Insurance Act ("the Act"), the Underwriter shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

4. For the purposes of this endorsement, the DEFINITIONS Section of the Coverage Section identified above is amended to include the following terms:

    **Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act ("the Act"), to be an act of terrorism pursuant to the Act. The criteria contained in the Act for a **Certified Act of Terrorism** include the following:

    a. the act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Act;

    b. the act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian

population of the United States or to influence the policy or affect the conduct of the
United States Government by coercion.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**ENDORSEMENT NO.** MPE-01017-07-19

CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on 07/01/2021, forms part of:

| Policy No. | FQ350DMLA210 |
|---|---|
| Issued to | Lutheran Child & Family Services of IL |
| Issued by | Professional Solutions Insurance Company |
| Section(s) | D&O |

In consideration of the premium charged:

1. If aggregate insured losses attributable to **Certified Acts of Terrorism** exceed $100 billion in a calendar year and the Underwriter has met its insurer deductible under the Terrorism Risk Insurance Act ("the Act"), the Underwriter shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

2. For the purposes of this endorsement, the DEFINITIONS Section of the Coverage Section identified above is amended to include the following terms:

   **Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act ("the Act"), to be an act of terrorism pursuant to the Act.  The criteria contained in the Act for a **Certified Act of Terrorism** include the following:

   a. the act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Act;

   b. the act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**ENDORSEMENT NO.** MPE-000IL-07-19

ILLINOIS AMENDATORY ENDORSEMENT

This Endorsement, which is effective at 12:01 a.m. on 07/01/2021, forms part of:

| Policy No. | FQ350DMLA210 |
|---|---|
| Issued to | Lutheran Child & Family Services of IL |
| Issued by | Professional Solutions Insurance Company |
| Section(s) | GTC |

The Policy is amended as follows:

**I.**  Throughout this Policy:

**A.**  The term "spouse" is deemed to include any natural person qualifying as a party to a civil union with an **Insured Person** under applicable Illinois law.

**B.**  The first paragraph in the definition of **Loss** in Section III. DEFINITIONS is replaced by the following:

**Loss** means the total amount the **Insured** becomes legally obligated to pay on account of a **Claim** made against them, including, but not limited to, monetary damages, judgments, settlements, and **Defense Expenses**. **Loss** does not include punitive, exemplary or multiple damages, or any award of pre-judgment or post-judgement interest; however, the Underwriter will provide a defense for **Claims** involving compensatory and punitive damages.

(This is Section II. DEFINITIONS in the PRIVATE COMPANY MANAGEMENT LIABILITY POLICY MISCELLANEOUS PROFESSIONAL LIABILITY COVERAGE SECTION and NOT-FOR-PROFIT MANAGEMENT LIABILITY POLICY MISCELLANEOUS PROFESSIONAL LIABILITY COVERAGE SECTION.)

**II.**  With respect to the PRIVATE COMPANY MANAGEMENT LIABILITY POLICY GENERAL TERMS AND CONDITIONS SECTION and NOT-FOR-PROFIT MANAGEMENT LIABILITY POLICY GENERAL TERMS AND CONDITIONS SECTION:

**A.**  The following is added to Section II. DEFINITIONS, paragraph F:

**Defense Expenses** shall not include remuneration, salaries, overhead, fees or benefit expenses of the Underwriter.

**B.**  Section II. DEFINITIONS, paragraph EE. Is replaced by the following:

EE.  **Pollutants** means any substance located anywhere in the world exhibiting any hazardous characteristics as defined by or identified on a list of hazardous substances issued by, the United States Environmental Protection Agency or a state, county, municipality or locality counterpart thereof. **Pollutants** also means any other air emission, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, silica, noise and fungus (including mold, mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but not any fungi intended by the **Insured** for consumption). Such matters shall include, without limitation, solids, liquids, gaseous, thermal, biological, nuclear or radiological irritants, contaminants or smoke, soot, fumes, acids, alkalis, chemicals or waste materials.

**C.**  The following is added to Section X. REPRESENTATIONS, SEVERABILITY AND NON-RESCINDABLE COVERAGES, paragraph A. REPRESENTATIONS:

No misrepresentation or false warranty made in the **Application** shall defeat or avoid the Policy unless it shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the Underwriter.

**D.** Section XI. OTHER INSURANCE is replaced by the following:

**XI.   OTHER INSURANCE**

If any **Loss** resulting from any **Claim** is insured by any other valid and collectible insurance issued to any **Insured**, then this Policy shall apply pro rata with such other insurance, unless such other policy is written specifically excess of this Policy.  Subject to the available Limits of Liability, the share of coverage under this Policy will equal the percentage that this Policy's applicable Limits of Liability bear to the total of the limits of all valid and collectible insurance policies available to the **Insured**.

**E.** The first paragraph of Section XII. EXTENDED REPORTING PERIOD is replaced by the following:

If the Underwriter or the **Named Insured** terminates or refuses to renew this Policy, the **Insureds** shall have the right, upon payment of the additional premium set forth in ITEM 4.A of the Declarations, to an extension of the coverage granted by the **Liability Coverage Sections** for the **Extended Reporting Period** set forth in ITEM 4.B of the Declarations following the effective date of termination or nonrenewal, but only with respect to any **Wrongful Act** taking place prior to the effective date of such termination or nonrenewal. This right of extension shall lapse unless written notice of such election, together with payment of the additional premium due, is given by the **Insureds** to the Underwriter within sixty (60) days following the effective date of termination or nonrenewal.

**F.** Item XIX. CANCELLATION AND NONRENEWAL is replaced by the following:

**XIX.   CANCELLATION AND NONRENEWAL**

The **Named Insured** may cancel this Policy or any Coverage Section by mailing or delivering to the Underwriter advance written notice of cancellation. The Underwriter may not cancel this Policy or any Coverage Section, except for the **Named Insured's** failure to pay a premium when due.  In such event, the Underwriter shall mail to the **Named Insured** and the broker or agent of record, at the last mailing addresses known to the Underwriter, written notice of cancellation at least twenty (20) days before the effective date of such cancellation, but such cancellation shall not become effective if the **Insureds** pay such premium in full during such twenty (20) day period. Any notice of cancellation will state the reason for cancellation. The **Policy Period** will end on the effective date of cancellation stated in the notice. Proof of mailing shall be maintained in a form authorized or accepted by the United States postal service or other commercial mail delivery service. If this Policy is cancelled, the Underwriter will send to the **Named Insured** the premium refund, computed pro rata. The cancellation will be effective even if the Underwriter has not made or offered a premium refund.

The Underwriter will not be required to renew this Policy upon expiration.  The Underwriter will mail written notice to the **Named Insured** and the broker or agent of record, at the last mailing addresses known to the Underwriter, at least sixty (60) days before the expiration date of this Policy. Proof of mailing shall be maintained in a form authorized or accepted by the United States postal service or other commercial mail delivery service.

**G.** Item XXI. AUTHORIZATION CLAUSE is replaced by the following:

**XXI.   AUTHORIZATION CLAUSE**

By acceptance of this Policy, the **Named Insured** agrees to act on behalf of the **Insureds** with respect to giving and receiving notices (other than notices of cancellation or nonrenewal, which will be sent in accordance with Section XIX. CANCELLATION AND NONRENEWAL above), paying premiums and receiving any return premiums that may become due under this Policy, and agreeing to endorsements, and the **Insureds** agree that the **Named Insured** may act on their behalf with respect to such matters.

**H.** The following is added:

**CONSUMER COMPLAINT INFORMATION**

If an **Insured** has a complaint arising out of this Policy, the **Insured** may contact the following:

Professional Solutions Insurance Company
14001 University Avenue
Clive, IA 50325
1-800-864-8026

The **Insured** may also contact the Department of Insurance at:

Illinois Department of Insurance

Consumer Division

122 S. Michigan Ave., 19th Floor

Chicago, Illinois 60603

or

Illinois Department of Insurance

320 West Washington Street

Springfield, Illinois 62767

**III.** With respect to the PRIVATE COMPANY MANAGEMENT LIABILITY POLICY DIRECTORS AND OFFICERS LIABILITY COVERAGE SECTION and NOT-FOR-PROFIT MANAGEMENT LIABILITY POLICY DIRECTORS AND OFFICERS LIABILITY COVERAGE SECTION, Section IV. EXCLUSIONS, paragraph E. POLLUTION shall not apply to **Loss** caused by heat, smoke or fumes from a hostile fire.

**IV.** With respect to the PRIVATE COMPANY MANAGEMENT LIABILITY POLICY EMPLOYED LAWYERS LIABILITY COVERAGE SECTION and NOT-FOR-PROFIT MANAGEMENT LIABILITY POLICY EMPLOYED LAWYERS LIABILITY COVERAGE SECTION, Section IV. EXCLUSIONS is amended as follows:

**A.** Paragraph E. POLLUTION shall not apply to **Loss** caused by heat, smoke or fumes from a hostile fire.

**B.** Paragraph L. OTHER INSURANCE is replaced by the following:

**L.   LOSS FROM ANY INTRA-ORGANIZATION DEFENSE CLAIM**

for any **Loss,** other than **Defense Expenses**, from any **Intra-Organization Defense Claim**.

**V.** With respect to the PRIVATE COMPANY MANAGEMENT LIABILITY POLICY MISCELLANEOUS PROFESSIONAL LIABILITY COVERAGE SECTION and NOT-FOR-PROFIT MANAGEMENT LIABILITY POLICY MISCELLANEOUS PROFESSIONAL LIABILITY COVERAGE SECTION, Section III. EXCLUSIONS, paragraph E. POLLUTION shall not apply to **Loss** caused by heat, smoke or fumes from a hostile fire.

**VI.** With respect to the PRIVATE COMPANY MANAGEMENT LIABILITY POLICY CRIME COVERAGE SECTION and NOT-FOR-PROFIT MANAGEMENT LIABILITY POLICY CRIME COVERAGE SECTION:

**A.** Section XI. LEGAL ACTION AGAINST UNDERWRITER, paragraph C. is replaced by the following:

**C.**   unless such legal action is commenced within two (2) years immediately following **Discovery**. The running of such two (2)-year period is tolled from the date proof of loss is filed until the date the **Claim** is denied in whole or in part.

**B.** Section XII. OTHER INSURANCE is replaced by the following:

### XII.   OTHER INSURANCE

If an **Insured** or any other party in interest in any loss covered by this Coverage Section has any bond, indemnity or insurance which would cover such loss in whole or in part in the absence of this Coverage Section, then this Coverage Section shall apply pro rata with such bond, indemnity or insurance. Subject to the available Limits of Liability, the share of coverage under this Coverage Section will equal the percentage that this Coverage Section's applicable Limits of Liability bear to the total of the limits of all bond, indemnity or insurance policies available to the **Insured**. This Coverage Section will not be subject to the terms of any bond, indemnity or other insurance.

**VII.** With respect to the PRIVATE COMPANY MANAGEMENT LIABILITY POLICY CYBER COVERAGE SECTION and NOT-FOR-PROFIT MANAGEMENT LIABILITY POLICY CYBER COVERAGE SECTION:

**A.** Section II. DAMAGES, Paragraph H. is replaced by the following:

**H.** **Damages** means: (a) a monetary judgment or award that the **Insured** is legally obligated to pay; or (b) a negotiated monetary settlement agreed to by the **Insured** with the Underwriter's consent.

**Damages** do not include:

1. future profits, restitution, or disgorgement of unjust enrichment or profits by an **Insured**;

2. the costs of complying with orders granting injunctive or equitable relief;

3. return or offset of fees, service credits, charges, or commissions for the provision of goods or services;

4. taxes or loss of tax benefits;

**5.** **Penalties** or any other fines, sanctions, or penalties;

6. discounts, coupons, prizes, awards, or other incentives;

7. liquidated or multiple damages;

**8.** **PCI Assessments**;

9. any amounts for which the **Insured** is not liable, or for which there is no legal recourse against the **Insured**; or

10. punitive or exemplary damages; however, the Underwriter will provide a defense for **Claims** involving compensatory and punitive damages.

**B.** Section III. EXCLUSIONS, paragraph N. Pollution is replaced by the following:

N.   **Pollution**

For, arising out of, or resulting from:

1. asbestos, or any materials containing asbestos in whatever form or quantity;

2. any fungi, molds, spores, or mycotoxins of any kind;

4. any pollutants, such as solids, liquids, gaseous or thermal irritants or contaminants including gas, acids, alkalis, chemicals, heat, smoke, vapor, soot, fumes, or waste (including waste to be recycled, reconditioned, or reclaimed); or

5. smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, act of God, or any other physical event, however caused.

This exclusion shall not apply to **Loss** caused by heat, smoke or fumes from a hostile fire.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**ENDORSEMENT NO**. MPE-02009-07-19

SEXUAL ABUSE EXCLUSION

This Endorsement, which is effective at 12:01 a.m. on 07/01/2021, forms part of:

| Policy No. | FQ350DMLA210 |
|---|---|
| Issued to | Lutheran Child & Family Services of IL |
| Issued by | Professional Solutions Insurance Company |
| Section(s) | D&O |

In consideration of the premium charged, no coverage will be available under the Coverage Section identified above for **Loss** arising from any **Claim** based upon, arising out of, directly or indirectly resulting from, or in any way involving any actual or alleged sexual abuse, sexual assault, or molestation, including any mental anguish or emotional distress resulting therefrom and the failure to supervise or report any person alleged to have engaged in such misconduct.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**ENDORSEMENT NO**. MPE-02013-07-19

NETWORK SECURITY AND PRIVACY EXCLUSION

This Endorsement, which is effective at 12:01 a.m. on 07/01/2021, forms part of:

| Policy No. | FQ350DMLA210 |
|---|---|
| Issued to | Lutheran Child & Family Services of IL |
| Issued by | Professional Solutions Insurance Company |
| Section(s) | D&O |

In consideration of the premium charged, Section III EXCLUSIONS of the Coverage Section identified above is amended to add the following:

   based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:

  **i.** unauthorized, unlawful, or unintentional taking, obtaining, accessing, using, disclosing, distributing, disseminating, transmitting, gathering, collecting, acquiring, corrupting, damaging, destroying, deleting, or impairing of any non-public personally identifiable information; or

  **ii.** failure or inability of any computer, computer component (including but not limited to any hardware, network, terminal device, data storage device, input and output device, or back up facility), application, program, software, code, or script of any kind (a "System") to perform or function as planned or intended, including but not limited to any failure or inability of any System to prevent any hack, virus, contaminant, worm, trojan horse, logic bomb, or unauthorized or unintended accessing or use involving any System;

   provided, that this exclusion shall not apply to any **Claim** brought directly or derivatively by one or more securityholders of the **Organization** in their capacity as such;

All other terms, conditions and limitations of this Policy shall remain unchanged.

**ENDORSEMENT NO.** MPE-12003-07-19

ABSOLUTE BI/PD EXCLUSION

This Endorsement, which is effective at 12:01 a.m. on 07/01/2021, forms part of:

| Policy No. | FQ350DMLA210 |
|---|---|
| Issued to | Lutheran Child & Family Services of IL |
| Issued by | Professional Solutions Insurance Company |
| Section(s) | D&O |

In consideration of the premium charged:

1.  Section IV EXCLUSIONS D of the Coverage Section identified above is deleted in its entirety and replaced with the following:

    **D.  BODILY INJURY/PROPERTY DAMAGE**

    based upon, arising out of, directly or indirectly resulting from, or in any way involving any actual or alleged bodily injury (other than mental anguish or emotional distress), sickness, disease or death, mental anguish, emotional distress or humiliation of any person or damage to or destruction of any tangible property including loss of use of such damaged or destroyed property; provided this exclusion shall not apply to: (i) **Defense Expenses** incurred by an **Executive** in connection with a **Claim** against such **Protected Executive** for a violation of the United Kingdom Corporate Manslaughter and Corporate Homicide Act of 2007 or any similar statute in any other jurisdiction or (ii) a **Claim** covered under Insuring Agreement A.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**ENDORSEMENT NO.** MPE-12015-05-20

PROFESSIONAL E&O EXCLUSION – D&O

This Endorsement, which is effective at 12:01 a.m. on 07/01/2021, forms part of:

| Policy No. | FQ350DMLA210 |
|------------|--------------|
| Issued to | Lutheran Child & Family Services of IL |
| Issued by | Professional Solutions Insurance Company |
| Section(s) | D&O |

In consideration of the premium charged:

1.  No coverage will be available under the Coverage Section identified above for **Loss** based upon, arising out of, or attributable to, directly or indirectly resulting from or in any way involving any **Insured's** failure to perform professional services for others for a fee.

All other terms, conditions and limitations of this Policy shall remain unchanged.

# EXHIBIT D

**ENDORSEMENT NO.** MPE-00005-07-19

AMEND ITEM 8 OF THE DECLARATIONS

This Endorsement, which is effective at 12:01 a.m. on 01/01/2022, forms part of:

| Policy No. | FQ350DMLA210 |
|---|---|
| Issued to | Lutheran Child & Family Services of IL |
| Issued by | Professional Solutions Insurance Company |
| Section(s) | GTC |

In consideration of the premium charged, ITEM 8 of the Declarations is amended to read in its entirety as follows:

| COVERAGE SECTION | AGGREGATE LIMIT OF LIABILITY | SUBLIMIT | RETENTION | PENDING OR PRIOR DATE | SHARED LIMIT |
|---|---|---|---|---|---|
| **DIRECTORS AND OFFICERS LIABILITY** | $4,000,000 | | $25,000 | 07/01/2009 | Separate |
| Stakeholder Investigative Costs | | $250,000 | $25,000 | | |
| Asset Protection Costs | | $100,000 | $25,000 | | |
| Public Relations Costs | | $100,000 | $25,000 | | |
| D&O Crisis Management Expenses | | $25,000 | $25,000 | | |
| Internal Revenue Code Violations | | $100,000 | $25,000 | | |
| Excess Benefit Transaction Excise Taxes | | $100,000 | $25,000 | | |
| | | | | | |
| **EMPLOYMENT PRACTICES LIABILITY** | $1,000,000 | | $75,000 | 01/01/2022 | Separate |
| Workplace Violence Expenses | | $250,000 | $75,000 | | |
| EPL Crisis Management Expenses | | $25,000 | $75,000 | | |
| Illegal Hiring or Harboring | | $25,000 | $75,000 | | |
| | | | | | |
| **FIDUCIARY LIABILITY** | $1,000,000 | | $0 | 07/01/2009 | Separate |
| Voluntary Settlement Program Costs | | $100,000 | $0 | | |
| HIPAA Penalties | | $150,000 | $0 | | |
| Section 502(c) Penalties | | $250,000 | $0 | | |
| Pension Protection Act of 2006 Penalties | | $250,000 | $0 | | |

|  | | | | | |
|---|---|---|---|---|---|
|  | Affordable Care Act Penalties | | $250,000 | $0 | | |
|  | Section 4975 Tax Penalties | | $250,000 | $0 | | |
|  | Pension Crisis Management Expenses | | $25,000 | $0 | | |
|  | | | | | | |
|  | **CRIME** | See Attached Crime Declarations Page | | | | |
|  | | | | | | |
|  | **CYBER** | See Attached Cyber Declarations Page | | | | |
|  | | | | | | |
|  | **EMPLOYED LAWYERS LIABILITY** | Not Purchased | | Not Purchased | N/A | N/A |
|  | Intra-Organization Claims Defense Expenses | | | | | |
|  | General Counsel Replacement Expenses | | | | | |
|  | | | | | | |
|  | **MISCELLANEOUS PROFESSIONAL LIABILITY** | Not Purchased | | Not Purchased | N/A | N/A |
|  | Disciplinary Proceeding Expenses | | | | | |

All other terms, conditions and limitations of this Policy shall remain unchanged.

**ENDORSEMENT NO.** MPE-01008-07-19

SPECIFIC EVENT/MATTER EXCLUSION

This Endorsement, which is effective at 12:01 a.m. on 01/01/2022, forms part of:

| Policy No. | FQ350DMLA210 |
|---|---|
| Issued to | Lutheran Child & Family Services of IL |
| Issued by | Professional Solutions Insurance Company |
| Section(s) | EPL |

In consideration of the premium charged, no coverage will be available under the Coverage Section(s) identified above for **Loss** in connection with:

1. any of the notices, events, investigations or actions listed under **EVENTS** below or any acts, facts, circumstances or situations references therein (hereinafter "**Event**s");

2. the investigation, prosecution, adjudication, resolution, settlement, disposition, or defense of any **Event(s)** or any **Claim** or investigations arising from any **Event(s)**; or

3. any **Wrongful Act(s)**, fact, circumstance, act or omission relating, in whole or in part to any **Event(s)**;

**<u>EVENTS</u>**
Matthew Growder matter

All other terms, conditions and limitations of this Policy shall remain unchanged.

**ENDORSEMENT NO**. MPE-03006-07-19

SEXUAL ABUSE EXCLUSION

This Endorsement, which is effective at 12:01 a.m. on 01/01/2022, forms part of:

| Policy No. | FQ350DMLA210 |
|---|---|
| Issued to | Lutheran Child & Family Services of IL |
| Issued by | Professional Solutions Insurance Company |
| Section(s) | EPL |

In consideration of the premium charged, no coverage will be available under the Coverage Section identified above for **Loss** arising from any **Claim** based upon, arising out of, directly or indirectly resulting from, or in any way involving any actual or alleged sexual abuse, sexual assault, or molestation, including any mental anguish or emotional distress resulting therefrom and the failure to supervise or report any person alleged to have engaged in such misconduct.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**ENDORSEMENT NO.** MPE-03009-07-19

WAGE AND HOUR CLAIMS SUBLIMIT AND RETENTION

This Endorsement, which is effective at 12:01 a.m. on 01/01/2022, forms part of:

| Policy No. | FQ350DMLA210 |
|------------|--------------|
| Issued to | Lutheran Child & Family Services of IL |
| Issued by | Professional Solutions Insurance Company |
| Section(s) | EPL |

In consideration of the premium charged:

1. Section IV EXCLUSIONS D.3. of the Coverage Section identified is amended to add the following:

   provided that this exclusion shall not apply to **Defense Expenses** incurred solely in connection with any **Claim**, subject to an aggregate limit of liability in the amount of $100,000, which amount shall be part of and not in addition to the applicable Aggregate Limit of Liability for the Coverage Section.

2. Solely with respect to **Claims** for any actual or alleged violation of any **Wage & Hour Law**, the Retention amount shall be $75,000.

All other terms, conditions and limitations of this Policy shall remain unchanged.

**ENDORSEMENT NO.** MPE-03013-07-20

BIOMETRIC INFORMATION PRIVACY CLAIM SUBLIMIT AND RETENTION

This Endorsement, which is effective at 12:01 a.m. on 01/01/2022, forms part of:

| Policy No. | FQ350DMLA210 |
|---|---|
| Issued to | Lutheran Child & Family Services of IL |
| Issued by | Professional Solutions Insurance Company |
| Section(s) | EPL |

In consideration of the premium charged:

1. The Underwriter shall pay on behalf of the **Organization** under the Coverage Section identified above, all **Loss** arising from any **Biometric Information Privacy Claim** first made against the **Insured** during the **Policy Period**, subject to a Sublimit of Liability in the amount of $250,000, for all such **Loss**, which shall be part of and not in addition to the Aggregate Limit of Liability for the Coverage Section identified above.

2. The applicable Retention for any **Biometric Information Privacy Claim** shall be $250,000.

3. For purposes of this endorsement, the Coverage Section identified above, is amended to include the following definitions:

    a. "**Biometric Information**" means any Biometric identifier including a retina or iris scan, fingerprint, voiceprint or scan of hand or face geometry; or Biometric information including any information, regardless of how it is captured, converted, stored or shared, based on an individual's biometric identifier used to identify an individual.

    b. "**Biometric Information Privacy Claim**" means any **Claim** in whole or in part, based upon, arising from, or in consequence of any actual or alleged:

        i. disclosure, collection, possession, usage, retention, storage, transmission, protection, dissemination, or destruction of **Biometric Information**;

        ii. consent to or release of the disclosure of **Biometric Information**;

        iii. sale, lease, capture, purchase or trade or any other types of profit from **Biometric Information**;

        iv. violation of any policies or practices involving **Biometric Information**; or

        v. violation of any federal, state or local statutory law or common law anywhere in the world involving **Biometric Information**, or any amendments thereto or rules or regulations promulgated thereunder.

All other terms, conditions and limitations of this Policy shall remain unchanged.

nexus

## NOT-FOR-PROFIT MANAGEMENT LIABILITY POLICY
## EMPLOYMENT PRACTICES LIABILITY COVERAGE SECTION

In consideration of payment of the premium and subject to the Declarations, the General Terms and Conditions, and the terms, conditions and limitations of this Coverage Section, the Underwriter and the **Insureds** agree as follows:

I.    **INSURING AGREEMENTS**

    A.    **EMPLOYMENT PRACTICES LIABILITY COVERAGE**

        The Underwriter shall pay on behalf of the **Insureds** all **Loss** for which the **Insureds** become legally obligated to pay on account of any **Employment Practices Claim** first made against the **Insureds** during the **Policy Period** or during the **Extended Reporting Period**, if exercised, for **Employment Practices Wrongful Act**.

    B.    **THIRD PARTY LIABILITY COVERAGE**

        The Underwriter shall pay on behalf of the **Insureds** all **Loss** for which the **Insureds** become legally obligated to pay on account of any **Third Party Claim** first made against the **Insureds** during the **Policy Period** or during the **Extended Reporting Period**, if exercised, for a **Third Party Wrongful Act**.

II.    **COVERAGE ENHANCEMENTS**

    A.    **WORKPLACE VIOLENCE COVERAGE**

        1.    The Underwriter shall pay on behalf of the **Organization** all **Workplace Violence Expenses** incurred by the **Organization** as a result of all **Workplace Violence Incidents** first occurring during the **Policy Period**, subject to the Sublimit of Liability for all **Workplace Violence Expenses**, combined as set forth in the Coverage Schedule in ITEM 8 of the Declarations, which shall be part of and not in addition to the Aggregate Limit of Liability for this Coverage Section, provided that the Underwriter shall not be liable to make any payment pursuant to this Section II.A for:

            a.    any **Workplace Violence Expenses** incurred in connection with any **Workplace Violence Incident** based upon, arising out of, or attributable to (i) declared or undeclared war, civil war, insurrection, riot, rebellion, revolution, governmental intervention, expropriation or nationalization, or (ii) use or threat of force or violence occurring on the **Premises** for the purpose of demanding money, securities or property;

            b.    any **Workplace Violence Expenses** incurred in connection with any **Workplace Violence Incident** which occurs at any location other than the **Premises**; or

            c.    any **Workplace Violence Expenses** incurred as a result of any demand, suit or proceeding against any **Organization** based upon, arising out of, or attributable to a **Workplace Violence Incident**.

        2.    The **Insureds** shall, as a condition precedent to coverage provided by this Section II.A, give the Underwriter notice in writing of any **Workplace Violence Incident** as soon as practicable after the general counsel or risk manager of the **Organization** first learns of

such **Workplace Violence Incident,** but in no event later than thirty (30) days after the **Workplace Violence Incident** occurs.

B. **EPL CRISIS MANAGEMENT REIMBURSEMENT COVERAGE**

Upon satisfactory proof of payment by the **Organization**, the Underwriter will reimburse the **Organization**, up to the EPL Crisis Management Expense Sublimit stated in ITEM 8 of the Declarations, for all **EPL Crisis Management Expenses** actually paid by the **Organization** in connection with a **EPL Crisis Management Event** that first occurs during the **Policy Period**, subject to the Sublimit of Liability as set forth in ITEM 8 of the Declarations, for all **EPL Crisis Management Expenses**, which shall be part of and not in addition to the Aggregate Limit of Liability for this Coverage Section.

C. **OUTSIDE CAPACITY COVERAGE**

Subject to the other terms and conditions applicable to this Coverage Section, Insuring Agreement A and Insuring Agreement B include coverage for **Executives** while serving in an **Outside Capacity**. Such coverage shall be specifically excess of any indemnification and insurance available from or provided by the **Outside Entity** in which the **Executives** serves in an **Outside Capacity**.

D. **ILLEGAL HIRING OR HABORING COVERAGE**

The Underwriter shall pay on behalf of the **Organization** all **Loss** on account of all **Employment Practices Claims** for **Illegal Hiring** or **Harboring Wrongful Acts** first received by the **Organization** during the **Policy Period** or the **Extended Reporting Period**, if exercised, subject to the Illegal Hiring or Harboring Sublimit of Liability set forth in ITEM 8 of the Declarations, for all **Loss**, which shall be part of and not in addition to the Aggregate Limit of Liability for this Coverage Section.

E. **ADDITIONAL DEFENSE EXPENSES LIMIT FOR EMPLOYMENT PRACTICES LIABILITY**

Additional Defense Expenses Limit for Employment Practices Liability if selected on ITEM 8 of the Declarations, then the **Organization** shall provide an additional Limit of Liability for **Defense Expenses** covered under this Coverage Section, in the amount set forth in the Declarations. This Additional Defense Expenses Limit shall be in addition to and not part of the Aggregate Limit of Liability for this Coverage Section, and in addition to and not part of the **Policy Aggregate** Limit of Liability set forth in ITEM 2 of the Declarations, provided that such Additional Limit shall attach only after the exhaustion of such Aggregate Limit of Liability and any amounts payable under any other insurance policies that are specifically written excess of this Coverage Section.

## III.   DEFINITIONS

When used in the Employment Practices Liability Coverage Section, the following terms, whether in the singular or plural, are defined as follows:

A.   **Benefits** means perquisites, fringe benefits, deferred compensation, stock options or payments (including insurance premiums) in connection with an employee benefit plan, and any other payment to or for the benefit of an **Employee** arising out of the employment relationship, including without limitation to retirement benefits, vacation or sick days, medical or insurance benefits other than wages, salary, commissions or similar non-deferred cash compensation.

B. **Claim** means an **Employment Practices Claim** or a **Third Party Claim.**

C. **EEOC Charge** means any written charge filed against one or more **Insureds** with the Equal Employment Opportunity Commission or any state or local fair employment practices agency but does not include any proceeding or investigation initiated by the Equal Employment Opportunity Commission or any state or local fair employment practices agency.

D. **Employment Practices Claim** means:

1. a written demand against any **Insured** for monetary damages or non-monetary (including injunctive) relief, including a written demand for reinstatement, reemployment or reengagement of an **Employee,** a written demand that the **Insured** toll or waive a statute of limitations, or a written demand or request for arbitration, mediation or other alternative dispute resolution, which shall be deemed first made upon the **Insured's** receipt of the demand;

2. a civil proceeding against any **Insured** commenced by and which shall be deemed first made upon service upon the **Insured** of a complaint or similar pleading;

3. a criminal proceeding against any **Insured** commenced by and which shall be deemed first made upon the **Insured's** arrest, the return of an indictment or information, or receipt of a notice of charges or similar document;

4. an administrative or regulatory proceeding against any **Insured**, including a proceeding before the Equal Employment Opportunity Commission or a similar state or local governmental body, or by the Office of Federal Contract Compliance Programs, commenced by and which shall be deemed first made upon the **Insured's** receipt of a notice of charges or similar document;

5. an **EEOC Charge** against any **Insured** commenced by and which shall be deemed first made upon the service on or other receipt by the **Insured** of such **EEOC Charge**;

6. in the content of an audit conducted by the Office of Federal Contract Compliance Programs, a Notice of Violation or Order to Show Cause commenced by the receipt by an Insured of such Notice or Order; or

For the purpose of III. Definition D, *commenced by* is defined as: by or on behalf of any past, present or prospective **Employee**, in their capacity as such, or by or on behalf of any past, present or prospective **Outside Entity Employees** against an **Executive** in his or her **Outside Capacity**, or an **Employment Practices Wrongful Act**.

E. **Employment Practices Wrongful Act** means any actual or alleged:

1. breach of any express or implied employment contract;

2. violation of any law or public policy concerning discrimination in employment whether based upon race, national origin, religion, sex, sexual orientation or preference, gender identity or expression, age, military or veteran status, marital or family status, disability, pregnancy, HIV status, mental status, medical leave or genetic predisposition;

3. employment-related misrepresentation(s);

4. harassment, sexual harassment, or hostile work environment;

5. retaliation;

6. employment-related libel, slander, defamation, humiliation, invasion of privacy, wrongful entry, false imprisonment, malicious prosecution, workplace bullying or the giving of negative or defamatory statements in connection with an employment reference;

7. wrongful deprivation or a career opportunity within the **Organization**, or the wrongful discipline, demotion or failure to employee, promote or grant tenure;

8. wrongful termination of employment, including constructive termination, dismissal or discharge;

9. wrongful failure or refusal to adopt or enforce workplace or employment practices, policies or procedures, solely as respects to employment-related discrimination or harassment;

10. failure to provide or enforce adequate or consistent corporate policies and procedures;

11. employment-related negligent hiring, retention, training or supervision leading to the infliction of emotional distress or mental anguish;

12. violation of an individual's civil rights, but only when alleged as part of an **Employment Practices Claim** for paragraphs 1-12 above;

Without limitation, the conduct described in paragraphs 1-12 above shall include matters carried out by any means in any location, including, without limitation to the Internet (i.e. e-mail, instant messaging, social networking services, blogs, etc.), regardless of whether access to the Internet is effected (i) on or off the **Premises**; or (ii) through any computer or device owned or leased by an **Organization**, **Insured Person**, or others.

F. **EPL Crisis Management Event** means any of the following events which, in the good faith opinion of the **Organization**, did cause or is reasonably likely to cause material public harm to the **Organization**:

1. a past or present **Employee** alleging an **Employment Practices Wrongful Act**;

2. a **Third Party** alleging a **Third Party Wrongful Act** by an **Insured**;

3. congressional inquiry regarding the **Insured's** violations of employment laws; or

4. the **Insured's** receipt of notice by a civil rights **Organization** or public interest group that it is investigating the **Insured** for violations of employment laws.

G. **EPL Crisis Management Expenses** means reasonable fees, costs and other expenses of a public relations or crisis management firm engaged by the **Organization** and approved by the Underwriter, such approval not to be unreasonably withheld, to mitigate reputational harm to such **Organization** as a result of an **EPL Crisis Management Event**.

H. **Independent Contractor** means any natural person who is not an **Employee** and who is working for an **Organization** in the capacity as an independent contractor pursuant to an

express contract or agreement with the **Organization** which governs the nature of such person's engagement.

I. **Illegal Hiring or Harboring Wrongful Act** means any actual or alleged (1) hiring of any illegal alien as an **Employee**; or (2) harboring of any illegal alien who is an **Employee**, in violation of any state or federal law of the United States of America by the **Organization** or any **Insured Person** acting within the scope of his or her duties for the **Organization**.

J. **Insured Persons** means:

    1.    any one or more natural persons who were, now are or shall become a duly elected or appointed director (including a de facto director and shadow director), trustee (other than a bankruptcy or litigation trustee), governor, **Manager**, officer, **Employee** (including employed lawyers solely in their capacity as an **Employee**), general counsel, risk manager, controller, advisory director, or member of a duly constituted committee or board of the **Organization** or their functional equivalent; or

    2.    any **Independent Contractor**, but only if the **Organization** agrees in writing to provide indemnification to such **Independent Contractor** to the same extent as provided to the **Organization's** employees; provided any coverage under this Coverage Section for any such **Independent Contractor** shall be specifically in excess of any indemnification or insurance otherwise available to such **Independent Contractor** from any other source.

K. **Insured** means the **Insured Persons** and the **Organization**.

L. **Labor Relations Law** means any federal, state, local, foreign, statutory or common law (including the National Labor Relations Act) or any amendments to or regulations promulgated under any such law that governs:

    1.    the rights of employees to engage in, or to refrain from engaging in, union or other collective bargaining activities, including union organizing, union elections and any other union activities;

    2.    the duty or obligation of an employer to meet, discuss, notify or bargain with an employee or employee representative, collectively or otherwise;

    3.    the enforcement of any collective bargaining agreement, including any grievance or arbitration proceedings;

    4.    strikes, work stoppages, boycotts, picketing and lockouts; or

    5.    any similar rights or duties.

M. **Loss** means the total amount the **Insureds** become legally obligated to pay on account of a **Claim** made against them, including, but not limited to, damages (including punitive, exemplary, liquidated damages awarded pursuant to the Age Discrimination in Employment Act or the Equal Pay Act, or the multiple portion of any multiplied damages awards, to the extent such damages are insurable under the law of any jurisdiction which has a substantial relationship to the **Insureds**, this Policy or the **Claim** giving rise to such damages and which is most favorable to the insurability of such damages), back pay, front pay, claimant's attorney's fees awarded by a court against an **Insured** or agreed to in writing by the Underwriter in

connection with a settlement, any award of pre-judgment and post-judgment interest with respect to covered damages, settlements and **Defense Expenses**.

**Loss**, except with respect to **Defense Expenses**, does not include:

1. any amount incurred by the **Insured** to comply with any injunctive or other non-monetary relief or any agreement to provide such relief, including without limitation any costs associated with providing any reasonable accommodations required by, made as a result of, or to conform with the requirements of, the Americans with Disabilities Act and any amendments thereto or any similar foreign, federal, state or local statute, regulation, rule or law;

2. future salary, wages, commissions, **Benefits**, **Stock Benefits**, or any other employment related benefits or compensation of a claimant who has been or shall be rehired, promoted or reinstated;

3. salary, wages, commissions, **Benefits**, **Stock Benefits**, or other monetary payments which constitute severance payments or payments pursuant to a notice period, other than any payments negotiated with and consented to by the **Organization** as part of a settlement

4. taxes, fines or penalties imposed by law, except as provided above; or

5. matters uninsurable under the law pursuant to which this Policy is construed.

N. **Outside Capacity** means services by an **Executive** in the position of a director, officer, trustee, trustee emeritus or governor of an **Outside Entity**, but only during the time that such service is at the request or direction of the **Organization**;

O. **Outside Entity** means any of the following Organizations, provided such Organization is not included in the definition of **Organization**:

1. any Organization chartered and operated as a not-for-profit Organization;

2. any other Organization specifically included as an **Outside Entity** by endorsement to this Policy.

P. **Premises** means all properties and buildings which the **Organization** regularly occupies in conducting its business.

Q. **Related Claims** means all **Claims** for **Wrongful Acts** or **Interrelated Wrongful Acts**, which allege, arise out of, are based upon, or are in consequence of, the same or related facts, circumstances, situations, transactions or events, or series of related facts, circumstances, situations, transactions or events.

R. **Stock Benefits** means stock, stock warrants, stock appreciation rights, phantom stock plans or arrangements, stock options or other similar rights.

S. **Third Party** means any natural person who is not an Insured Person or an applicant for employment with the **Organization** or an **Outside Entity**, including but not limited to customers, vendors and suppliers provided.

T. **Third Party Claim** means:

    1.   a written demand against any **Insured** for monetary damages or non-monetary relief, including a written demand that the **Insured** toll or waive a statute of limitations or a written demand or request for arbitration, mediation or other alternative dispute resolution, which shall be deemed first made upon the **Insured's** receipt of the demand;

    2.   a civil proceeding against any **Insured** commenced by and which shall be deemed first made upon the service upon the **Insured** of a complaint or similar pleading;

    3.   a criminal proceeding against any **Insured** commenced by and which shall be deemed first made upon, the **Insured's** arrest, the return of an indictment or information or receipt of a notice of charges or similar document;

by or on behalf of a **Third Party** in their capacity as such, including any appeal therefrom.

U. **Third Party Wrongful Act** means any actual or alleged:

    1.   discrimination against a **Third Party** based on race, national origin, religion, sex, sexual orientation or preference, gender identity or expression, age, military or veteran status, marital or family status, disability, pregnancy, HIV status, mental status, medical leave or genetic predisposition;

    2.   sexual harassment, including unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature, against a Third Party; or

    3.   unlawful harassment of a non-sexual nature against a **Third Party.**

Without limitation, the conduct described in paragraphs 1, 2 and 3 above, shall include matters carried out by any means in any location, including, without limitation, the Internet (i.e. e-mail, instant messaging, social networking services, blogs, etc.), regardless of whether access to the Internet is effected (i) on or off the **Premises**; or (ii) through any computer or device owned or leased by an **Organization**, **Insured Person**, or others.

V. **Workplace Violence Expenses** means reasonable fees and expenses incurred by the **Organization** with the **Organization's** prior written consent, such consent not to be unreasonably withheld, to hire:

    1.   an independent public relations or security consultant or forensic analyst for ninety (90) days;

    2.   an independent consultant to provide counseling for **Employees**; or

    3.   an independent security guard to provide security services for fifteen (15) days;

immediately following the **Workplace Violence Incident**.

W. **Workplace Violence Incident** means any unlawful and intentional actual or threatened use of deadly force involving the display of a lethal weapon which occurs in or on the **Premises** and which did or could reasonably result in the death or bodily injury of any **Insured Person**.

X.  **Wrongful Act** means:

1.  an **Employment Practices Wrongful Act** by any of the **Insured Persons** in their capacity as such, or by the **Organization**;

2.  an **Employment Practices Wrongful Act** by any **Executive** in their **Outside Capacity**;

3.  a **Third Party Wrongful Act** by any of the **Insured Persons** in their capacity as such, or by the **Organization**; or

4.  an **Illegal Hiring or Harboring Wrongful Act** by any of the **Insured Persons** in their capacity as such, or by the **Organization.**

## IV.  EXCLUSIONS

The Underwriter shall not be liable under this Coverage Section to pay any **Loss** from any **Claim** made against any **Insured**:

A.  **PRIOR NOTICE**

based upon, arising out of, or attributable to any fact, circumstance, situation, transaction, event or **Wrongful Act** which have been the subject of any written notice given prior to inception of this Policy and accepted under any prior employment practices liability or comparable insurance policy or coverage section.

B.  **PENDING OR PRIOR LITIGATION**

based upon, arising out of, or attributable to any **Claim** against any **Insured** which was pending on or existed prior to the respective Pending or Prior Date for this Coverage Section set forth in the Coverage Schedule in ITEM 8 of the Declarations, or the same or substantially the same fact, circumstance or **Wrongful Act** alleged in or underlying such prior **Claim**.

C.  **BODILY INJURY/PROPERTY DAMAGE**

for bodily injury, sickness, emotional distress, mental anguish, humiliation, disease or death of any person or damage to or destruction of any tangible property including loss of use of such damaged or destroyed property, provided this exclusion shall not apply to any **Loss** for employment-related emotional distress, mental anguish or humiliation.

D.  **VIOLATIONS OF LAW**

for an actual or alleged violation of the responsibilities, obligations or duties imposed by:

1.  any law governing workers' compensation, unemployment insurance, social security, disability benefits or similar law;

2.  **ERISA** (except Section 510 thereof);

3.  **Wage and Hour Law**, provided that notwithstanding anything in this Policy to the contrary it shall be the duty of the **Insureds** and not the duty of the **Organization** to defend any **Claim** which is in part excluded from coverage pursuant to this Exclusion D.3;

4.  any **Labor Relations Law**, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act;

or any rules or regulations promulgated under any of such statutes or laws, amendments thereto or similar provisions of any federal, state, local or foreign statutory or common law; but this exclusion shall not apply to **Loss** on account of that portion of any **Claim** for any actual or alleged retaliatory treatment of the claimant by the **Insured** on account of the claimant's exercise of rights pursuant to any such law, rule or regulation or for any other actual or alleged violation of any whistleblower statue or law.

E.  **CONTRACT**

based upon, arising out of, or attributable to any liability under any written contract or agreement, provided this exclusion shall not apply to: (1) the extent that liability would have been incurred in the absence of such contract or agreement; or (2) **Defense Expenses**.

## V.   SEVERABILITY OF EXCLUSIONS

For the purpose of determining the applicability of any Exclusion set forth in Section IV, the **Wrongful Act** or knowledge of any **Insured Person** shall not be imputed to any other **Insured Person**, and only the **Wrongful Act** or knowledge of the chief executive officer or chief financial officer of the **Organization** shall be imputed to such **Organization**.

## VI.   NOTICE OF CLAIM AND CIRCUMSTANCES

A.  *Notice of Claim***:** The **Insureds** shall give to the Underwriter written notice of any **Claim** made against an **Insured** as soon as practicable after a risk manager or general counsel of an **Organization** (or the functional equivalent), first learns of such **Claim**, but in no event later than ninety (90) days after the expiration of the **Policy Period** or the end of the **Extended Reporting Period**, if exercised.  The failure of the **Insureds** to provide notice of a **Claim** as soon as practicable as required by this Section VI.A shall not constitute a coverage defense with respect to such **Claim** unless the Underwriter establishes it was materially prejudiced by such failure.

B.  *Notice of an EPL Crisis Management Event:*  If an **Insured** elects to seek coverage for a **EPL Crisis Management Event**, the **Insured** shall give notice of such of any **EPL Crisis Management Event** to the Underwriter no later than thirty (30) days after the **Organization's** risk manager or general counsel (or functional equivalent) first learns of such **EPL Crisis Management Event**.  Within sixty (60) days of making any payment of **EPL Crisis Management Event Expenses**, the **Insureds** must provide the Underwriter with a detailed breakdown of all **EPL Crisis Management Event Expenses** for which the **Organization** seeks reimbursement, together with satisfactory proof of payment and any additional information as the Underwriter may reasonably request.

C.  *Notice of Circumstances*: If during the **Policy Period** or the **Extended Reporting Period**, if exercised, the **Insured** first becomes aware of circumstances that could give rise to a **Claim** against the **Insureds** and give written notice of such circumstances to the Underwriter during the **Policy Period** or the **Extended Reporting Period**, if exercised, then any **Claims** subsequently arising from such circumstances shall be considered to have been made during the **Policy Period**. No coverage is afforded under this Coverage Section for fees, expenses or

other loss incurred in connection with such circumstances prior to the time a **Claim** is actually made and reported to the Underwriter.

The **Insureds** shall include with any such notice of circumstance a description of the circumstances, the nature of any potential **Wrongful Act(s)**, the nature of the alleged or potential damage, the names of actual or potential claimants, and the manner in which the **Insureds** first became aware of the **Wrongful Act(s)**.

## VII.   CLAIM SETTLEMENT

The **Insureds** agree not to admit any liability for any **Claim**, offer to settle or settle any **Claim**, incur any **Defense Expenses** or otherwise assume any contractual obligation, without the Underwriter's prior written consent, such consent shall not be unreasonably withheld. The Underwriter shall not be liable for or as a result of any offer to settle, settlement, **Defense Expenses**, assumed obligation, admission or stipulated judgment to which it has not given its prior consent, provided however, if the **Insured** is able to fully and finally settle all **Claims** in their entirety, which are subject to a single retention, for an aggregate amount including **Defense Expenses** not exceeding fifty percent (50%) of such retention, the Underwriter's consent will not be required for the settlement of such **Claims**.

The Underwriter shall have the right to make investigations and conduct negotiations and, with the consent of the **Insureds**, enter into such settlement of any **Claim** as the Underwriter deems appropriate.  If the **Insureds** refuse to consent to a settlement acceptable to the claimant in accordance with the Underwriters' recommendation, then, subject to the Underwriter's applicable Limits of Liability stated in ITEM 8 of the Declarations, the Underwriter's liability for such **Claim** will not exceed:

A.   the amount for which the **Claim** could have been settled plus **Defense Expenses** incurred up to the date of the Insureds refused to settle such **Claim** (the "settlement amount"); plus

B.   ninety percent (90%) of any **Loss** in excess of the settlement amount incurred in connection with such **Claim**.  The remaining ten percent (10%) of **Loss** in excess of the settlement amount will be carried by the **Insureds** at their own risk and will be uninsured.

## VIII.   CLAIM DEFENSE

The Underwriter shall have the right and duty to defend any **Claim** covered this Coverage Section, even if any of the allegations are groundless, false or fraudulent. The Underwriter's duty to defend any **Claim** shall cease upon exhaustion of the applicable Limit of Liability applicable to such **Claim**.

The Underwriter shall have the right to select and appoint counsel to defend against any **Claim**. The Underwriter may appoint different defense counsel to represent different **Insureds**, but only if required due to an actual conflict of interest.